UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| WAI OLA ALLIANCE, A PUBLIC INTEREST ASSOCIATION, ET AL.<br><br>　　　　　　Plaintiffs,<br><br>　　vs.<br><br>UNITED STATES DEPARTMENT OF THE NAVY,  UNITED STATES DEPARTMENT OF DEFENSE,  JOINT TASK FORCE RED HILL,  UNITED STATES NAVY REGION HAWAII,  UNITED STATES NAVY FACILITIES ENGINEERING COMMAND - HAWAII,<br><br>　　　　　　Defendants. | CIV. NO. 22-00272 LEK-RT |

**ORDER: GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, STAY PROCEEDINGS; GRANTING DEFENDANTS' AMENDED UNOPPOSED REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, STAY PROCEEDINGS (ECF NO. 90); AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, STAY PROCEEDINGS (ECF NO. 90)**

On October 27, 2023, Defendants United States Department of the Navy ("the Navy"), United States Department of Defense ("DOD"), Joint Task Force Red Hill ("JTF-RH"), United States Navy Region Hawaii ("Navy Region Hawai`i"), and United States Navy Facilities Engineering Command – Hawaii ("Navy Engineering – Hawai`i" and collectively "Defendants") filed their Moton to Dismiss or, in the Alternative, Stay Proceedings ("Motion"). [Dkt. no. 90.] On December 7, 2023, Defendants filed

their Amended Unopposed Request for Judicial Notice in Support
of Motion to Dismiss or, in the Alternative, Stay Proceedings
(ECF No. 90) ("Defendants' RJN"). [Dkt. no. 102.] On
December 22, 2023, Plaintiffs filed their memorandum in
opposition to the Motion ("Opposition"),[1] and their request for
judicial notice in support of their Opposition ("Plaintiffs'
RJN"). [Dkt. nos. 107, 108.] On January 5, 2024, Defendants
filed their partial opposition to Plaintiffs' RJN ("Opposition
to Plaintiffs' RJN") and their reply in support of the Motion
("Reply"). [Dkt. nos. 110, 111.] On January 19, 2024, Plaintiffs
filed their reply in support of Plaintiffs' RJN ("Plaintiffs'
RJN Reply"). [Dkt. no. 116.]

These matters came on for hearing on February 2, 2024.
Defendants filed a supplemental brief on February 9, 2024, and
Plaintiffs filed a supplemental brief on February 14, 2024.

---

[1] The plaintiffs are: Wai Ola Alliance ("the Alliance"); and
individual members of the Alliance, Mary Maxine Kahaulelio,
Clarence Ku Ching, Melodie Aduja, Kim Coco Iwamoto, Peter
Doktor, Steven Hanaloa Helelā, Kalamaokaaina Niheu, Dr. Lynette
Hiilani Cruz, James J. Rodrigues, and Jade Mahina Frank
(collectively "Plaintiffs"). [Second Amended Complaint for
Declaratory Relief and Injunctive Relief, filed 10/13/23 (dkt.
no. 89) ("Second Amended Complaint"), at pgs. 9-11.] "The
Alliance is a community-based organization composed of
environmentally- and culturally-focused individuals and
organizations dedicated to protecting the waters of Hawai`i from
the effects of past and ongoing releases, discharges, and
disposal of petroleum pollutants from [the] Red Hill [Bulk Fuel
Storage Facility] . . . ." [Id. at ¶ 39.]

[Dkt. nos. 122, 123.] On February 16, 2024, an entering order was issued informing the parties of this Court's rulings on the Motion. [Dkt. no. 124.] The instant Order supersedes that entering order. Defendants' Motion is hereby granted in part and denied in part for the reasons set forth below. In addition, Defendants' RJN is granted, and Plaintiffs' RJN is granted in part and denied in part.

### BACKGROUND

Plaintiffs filed their original complaint on June 14, 2022. [Dkt. no. 1.] The operative pleading is Plaintiffs' Second Amended Complaint for Declaratory Relief and Injunctive Relief ("Second Amended Complaint"). In sum, Plaintiffs argue the Navy's operation of the Red Hill Bulk Fuel Storage Facility ("Red Hill" or "the Facility")[2] "has and will continue to present imminent and substantial endangerment to health and the environment through historic, existing, and impending contamination of the irreplaceable Southern O`ahu Basal Aquifer (the 'Aquifer')." [Second Amended Complaint at ¶ 4.] Plaintiffs allege the Navy is engaging in conduct that constitutes: "a. significant ongoing violations of the Resource Conservation

---

[2] Defendants state that Red Hill is on Joint Base Pearl Harbor-Hickam ("JBPHH"). [Motion, Mem. in Supp. at 1.] Plaintiffs allege "[t]he Navy is a military department and instrumentality of the [DOD]." [Second Amended Complaint at ¶ 52.]

and Recovery Act ('RCRA'), 42 U.S.C. § 6901, *et seq.;* and

b. significant ongoing violations of the Federal Water Pollution
Control Act ('Clean Water Act' [or 'CWA']) 33 U.S.C. § 1251, *et
seq.*" [Second Amended Complaint at ¶ 2.] Specifically,
Plaintiffs allege the Navy is violating:

> a.   the RCRA section 7002(a) prohibition on
> conduct that may present an imminent and
> substantial endangerment to human health and
> the environment, 42 U.S.C. § 6972(a); and
>
> b.   the Clean Water Act section 301 prohibition
> on the unpermitted discharges of pollutants
> to waters of the United States, 33 U.S.C.
> § 1311(a).

[Second Amended Complaint at ¶ 3.] Plaintiffs assert each of
them is a "person" under the RCRA, Title 42 United States Code
Section 6903(15), and that they are all "citizens" under the
CWA, Title 33 United States Code Sections 1362(5) and 1365(a),
(g). [Second Amended Complaint at ¶¶ 45-46.] Further, the Navy
and the DOD are persons under the RCRA and the CWA. [Id. at
¶ 54.]

I.   **Factual Allegations**

Plaintiffs allege the Navy owns and operates Red Hill.
[Id. at ¶ 55.] Red Hill was constructed between 1940 and 1943,
and it has twenty "'field constructed' underground storage tanks
('USTs')." [Id. at ¶¶ 87, 89.] "Each UST has the capacity to
hold 12.5 million gallons of petroleum-based fuel," [id. at
¶ 105,] and is located approximately 100-200 feet underground,

4

[id. at ¶ 122]. Red Hill has approximately twenty-nine miles of pipeline that connect the USTs to fueling stations. [Id. at ¶¶ 91, 96.] Red Hill became operational in 1943. [Id. at ¶ 175.] According to Plaintiffs, Red Hill does not have an operating permit from either the State of Hawai`i ("the State") or the United States Environmental Protection Agency ("EPA"). [Id. at ¶ 124.]

As of April 2022, two of the USTs were not in service and eighteen were in service, with at least fourteen holding petroleum-based fuel. [Id. at ¶ 106.] As of the filing of the Second Amended Complaint, the fourteen USTs "contain[ed] diesel marine fuel ('F-76') and multiple types of jet propellent fuel ('JP-5,' 'JP-8,' and 'F-24')." [Id. at ¶ 108.]

The USTs are connected to fueling stations at various piers along Pearl Harbor,[3] including the Hotel Pier, which "is located immediately south to the mouth of Hālawa Stream," [id. at ¶¶ 96-97 (citations omitted),] and the Kilo Pier, which "is located parallel to and immediately south of Hotel Pier," [id. at ¶ 103 (citation omitted)]. The "Hotel Pier is used for both receipt and issue of fuel." [Id. at ¶ 99 (citation and internal quotation marks omitted).] A 2015 report assessing pipeline integrity recommended '[i]solating and temporarily deactivating

_____

[3] Plaintiffs refer to Pearl Harbor as "Pu`uloa." See Second Amended Complaint at ¶ 5.

or permanently closing the defuel line on the Hotel Pier.'" [Id. at ¶ 102 (quoting Enter. Eng'g, Inc., Integrity Management Plan – POL Pipelines NAVSUP FLC Pearl Harbor, HI (PRL) 6 (Interim Final Submission, 2015)).]

The USTs are approximately 100 feet above the Aquifer, [id. at ¶¶ 125, 127,] which the Navy has recognized "supplies potable water to Naval Station (NAVSTA) Pearl Harbor and public water systems on the island of Oahu, HI," [id. at ¶ 126 (citing Naval Audit Service, Audit Report N2010-0049 11 (Aug. 15, 2010))]. Plaintiffs assert "[t]he Aquifer is an irreplaceable source of fresh water" that is relied upon by approximately seventy-seven percent of O`ahu residents. [Id. at ¶¶ 130, 132.] There are multiple potable water wells in the vicinity of Red Hill that supply water from the Aquifer, including, *inter alia*, the Navy's Red Hill Shaft well 2254-01, the Honolulu Board of Water Supply's ("BWS") Hālawa Shaft well 2354-01, and BWS's Moanalua wells 2153-10, 2153-11, and 2153-12. [Id. at ¶¶ 133-134.c.] "The Red Hill Shaft well is the closest of approximately five (5) wells in the vicinity of the Red Hill USTs," and the Red Hill Shaft well "suppl[ies] water to as many as 93,000 individuals, mostly residents of military housing on and near JBPHH." [Id. at ¶¶ 306-07.]

The groundwater level at the Hālawa Shaft is approximately three feet lower than the level of Red Hill's

6

USTs, which Plaintiffs argue "demonstrat[es] that the hydraulic gradient could drive contaminant migration to Hālawa Shaft." [Id. at ¶ 135 (citation omitted).] "Since at least 2008, the Navy acknowledged that cleaning up and/or remediating the impact of a large spill would be infeasible." [Id. at ¶ 136 (citing Naval Facilities Eng'g Command, Red Hill Bulk Fuel Storage Facility Final Groundwater Protection Plan ES-3 (2008) ("2008 Groundwater Protection Plan")).]

Pu`uloa is a historically, "spiritually and politically important place to Hawai`i's native people." See id. at ¶¶ 149-56. It is also navigable waters of the United States. [Id. at ¶ 157.] Hālawa Stream is considered United States waters, and it "empties into Pu`uloa south of the Pearl Harbor National Memorial, and immediately north of Hotel Pier." [Id. at ¶¶ 167-68.] Hālawa Stream flows through Hālawa Valley, which is an ahupua`a that is considered sacred by the Kānaka Maoli. [Id. at ¶¶ 161-66.]

A.  **Fuel Releases**

"Petroleum-based fuels have been released to the environment from Red Hill, including to Red Hill Shaft." [Id. at ¶ 139.] The released fuels "are composed of a heterogeneous mixture of chemical constituents," including "middle distillates, which include lead, Total Petroleum Hydrocarbons ('TPH'), benzene, toluene, ethylbenzene, xylenes, naphthalene,

1-methylnaphthalenes, and 2-methylnaphthalenes," and exposure to these chemical constituents is harmful to human health. [Id. at ¶¶ 140-42.] Although the Navy does not have complete records for the period from 1943 to 2017 of spills, leaks, releases, or discharges of petroleum contaminants ("Release Incidents"), the Navy's records show that there were at least seventy Release Incidents during that period, but the total amount of fuel released in those incidents is unknown. [Id. at ¶¶ 178-80.] The State of Hawai`i Department of Health ("DOH") has found that "it is 'more likely than not' that the Navy has 'understated the true number of releases [and] total volume of fuel actually released' from the Facility." [Id. at ¶ 181 (citing Haw. Dep't of Health, Hearings Officer's Proposed Decision and Order, Findings of Fact, and Conclusions of Law (Dec. 27, 2021) 6 (¶ 25) affirmed by DOH, Final Decision, Order, Findings of Fact, and Conclusions of Law (Jan. 3, 2022) ("DOH Decision and Order")).] In 2014, the Navy recognized that prior releases "contaminated the fractured basalt, basal groundwater, and soil vapor beneath the Facility with petroleum hydrocarbons." [Id. at ¶ 183 (quotation marks and citation omitted).]

        "In addition to Release Incidents at the Facility's USTs, leaks and spills from the Facility's pipeline infrastructure have resulted in contamination of Pu`uloa, Hālawa Stream, and other surface waters." [Id. at ¶ 197.] Plaintiffs

argue that, "[n]early twenty (20) years after identifying [a] massive underground plume of petroleum contamination near Hotel Pier, significant pollution remained on site." [Id. at ¶ 210.]

In particular, Plaintiffs focus upon: a discharge of oil to Puʻuloa and Hālawa Stream at Hotel Pier that the Navy informed DOH about on March 17, 2020 ("2020 Hotel Pier Discharge"); [id. at ¶¶ 212-53;] a July 16, 2021 petroleum discharge from a Kilo Pier pipeline into Puʻuloa ("2021 Kilo Pier Discharge"); [id. at ¶¶ 254-65;] a May 6, 2021 incident when fuel was released from Red Hill during a tank refueling ("May 2021 Release Incident"); and a November 20, 2021 incident when fuel was released from Red Hill ("November 2021 Release Incident"), [id. at ¶¶ 284-326]. Plaintiffs also argue Red Hill has insufficient infrastructure and protocols for monitoring and reporting. See id. at ¶¶ 266-83.

Plaintiffs allege the May 2021 Release Incident and the November 2021 Release Incident occurred in spite of the fact that the Navy was purportedly taking actions to comply with the EPA's September 28, 2015 Administrative Order on Consent ("2015 AOC").[4] [Id. at ¶¶ 286, 298.] On November 27, 2021, the Navy suspended the operation of Red Hill, but it did not publicly

---

[4] The 2015 AOC was issued in In the Matter of Red Hill Bulk Fuel Storage Facility, EPA DKT NO. RCRA 7003-R9-2015-01, DOH DKT NO. 15-UST-EA-01. The 2015 AOC is Exhibit A to Defendants' RJN. [Dkt. no. 102-1.]

disclose that fact until December 6, 2021. [Id. at ¶¶ 304–05, 315.] "By November 28, 2021, the Navy had received multiple complaints from residents receiving water from the Navy's water distribution system," such as "petroleum smell, chemical taste, and oily sheen in tap water." [Id. at ¶¶ 308, 310.]

> 309. On November 29, 2021, DOH issued a public health advisory telling families served by the Navy's water distribution system to avoid any use of water in their home which might expose them to the contamination . . . .
>
> . . . .
>
> 313. On December 1, 2021, testing showed petroleum contamination in water being distributed to school children at Red Hill Elementary, which is served by the Navy's water system.
>
> 314. On December 2, 2021, the Navy confirmed that multiple tests had established the presence of volatile hydrocarbons associated with JP-5 or diesel fuel in Red Hill Shaft well.
>
> . . . .
>
> 319. On December 2, 2021, [BWS] shut down Hālawa Shaft as a precautionary measure because, in the words of [BWS] manager and chief engineer Ernie Lau, water distributed to consumers draws water "from the same glass" as the Navy's contaminated Red Hill Shaft well.
>
> 320. By December 10, 2021, [BWS] had shuttered two additional wells due to fears that continued pumping could cause migration of the contaminant plume further into the Aquifer.

[Id. at pgs. 44–45.]

"Since at least November 28, 2021, residents, schools,
businesses, churches, and others served by the Navy's water
distribution system have been exposed to toxic pollutants." [Id.
at ¶ 143.] According to Plaintiffs, "[a]pproximately 6,000
people sought medical attention for ailments related to their
exposure between November 20, 2021 and August 9, 2022." [Id. at
¶ 145.] These ailments included "nausea, stomach cramps,
vomiting, skin rashes, sore throats, burning eyes, difficulty
breathing, and headaches," and some of these required emergency
medical attention. Id. at ¶ 144; see also id. at ¶¶ 311-12.

In addition to the adverse effects on human health,
"[p]etroleum can be rapidly lethal to fish, birds, mammals, and
shoreline organisms due to the readily dissolved components of
oil and the physical effects of smothering and destruction of
the thermal insulation and buoyancy provided by fur and
feathers." [Id. at ¶ 169.] Petroleum's less soluble components
can also cause "[c]hronic and sublethal effects." [Id. at
¶ 170.]

B.    **State and Federal Response**

"On December 6, 2021, DOH issued an Emergency Order
premised on its position that the Facility 'poses an imminent
and ongoing peril to human health and safety and the
environment.'" [Id. at ¶ 327 (some citations omitted) (citing
Haw. Dep't of Health, Emergency Order (Dec. 6, 2021) ("12/6/21

Emergency Order")).[5] DOH adopted the 12/6/21 Emergency Order in its January 3, 2022 Final Decision, Order, Findings of Fact, and Conclusions of Law in Department of Health, State of Hawai`i v. United States Department of the Navy, Docket No. 21-UST-EA-02 ("1/3/22 Final Order"). See Second Amended Complaint at ¶ 328.[6]

> The [12/6/21] Emergency Order requires the Navy take, among others, the following three (3) actions:
>
> a.  complete an investigation that is similar to what was required under the 2015 AOC to "assess the Facility operations and system integrity;"
>
> b.  submit a detailed work plan and schedule for making repairs to the Facility and revisions to operating procedures; and
>
> c.  remove fuel from the Facility. Haw. Dep't of Health, [12/6/21] Emergency Order at 4.

[Second Amended Complaint at ¶¶ 329-329.c.] The 12/6/21 Emergency Order does not require that the Navy permanently close Red Hill. [Id. at ¶ 330.] "On March 7, 2021, the Secretary of Defense announced that the Red Hill Facility would be defueled

---

[5] The 12/6/21 Emergency Order is Exhibit D to Defendants' RJN. [Dkt. no. 102-5.]

[6] The 1/3/22 Final Order is Exhibit E to Defendants' RJN. [Dkt. no. 102-6.] The final order was issued in the contested case that the Navy brough to challenge the 12/6/21 Emergency Order. Sierra Club and BWS intervened in the contested case. See id. at 1.

and then closed[,]"[7] but Plaintiffs argue the Secretary of Defense could unilaterally withdraw the decision to close the facility. [Id. at ¶¶ 333-34.]

JTF-RH – which reports to the United States Indo-Pacific Command, a DOD instrumentality - has been assigned the responsibility for the defueling of Red Hill. [Id. at ¶¶ 58-59.] Navy Region Hawai`i – an instrumentality of the Navy - has been assigned the responsibility for the closure of Red Hill. [Id. at ¶¶ 60-61.] Navy Engineering – Hawai`i – an instrumentality of the Navy – has been assigned the responsibility for environmental remediation at Red Hill. [Id. at ¶¶ 62-63.]

"On May 6, 2022, DOH issued a new/revised Emergency Order" ("5/6/22 Emergency Order"). Id. at ¶ 335; see also Defendants' RJN, Exh. C (5/6/22 Emergency Order). There was no administrative challenge to the 5/6/22 Emergency Order. See Motion, Mem. in Supp. at 7 n.4.

The Navy released its defueling plan on June 30, 2022 ("June Defueling Plan"). Second Amended Complaint at ¶ 373; see also Defendants' RJN, Exh. H (June Defueling Plan). According to Plaintiffs, defueling should be completed, at best, by

---

[7] Exhibit F to Defendants' RJN is the March 7, 2022 memorandum from the Secretary of Defense to Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency and DOD Field Activity Directors directing the Navy to defuel and permanently close Red Hill. [Dkt. no. 102-7.]

December 1, 2024. [Second Amended Complaint at ¶ 376.] "On July 19, 2022, DOH rejected the June Defueling Plan, citing the Navy's failure to include substance, details, and timelines. DOH further criticized the plan for failing to fully address any of the Emergency Order's minimum requirements."[8] [Id. at ¶ 377.] According to Plaintiffs, under the June Defueling Plan, the defueling process would not be completed until the end of 2028. [Id. at ¶ 382.]

"On June 2, 2023, U.S. EPA released an administrative consent order (EPA Dkt. No. RCRA 7003-R9-2023-001, EPA Dkt. No. PWS-AO-2023-001) ('2023 Consent Order') regarding the Red Hill Bulk Fuel Storage Facility." [Id. at ¶ 383.[9]] It "requires the Navy to submit to U.S. EPA monitoring, defueling, and closure plans, according to specifications included in an attached 'Statement of Work[,]'" but it "does not contain any requirements specific to remediation of the Aquifer." [Id. at ¶¶ 388-89.]

---

[8] Exhibit I to Defendants' RJN is the July 22, 2022 letter to Rear Admiral Stephen Barnett, from Kathleen S. Ho, DOH Deputy Director for Environmental Health ("Deputy Director Ho"), rejecting the June Defueling Plan. [Dkt. no. 102-10.]

[9] The Navy filed the 2023 Consent Order in this case. [Notice of U.S. Environmental Protection Agency Final 2023 Consent Order, filed 6/5/23 (dkt. no. 65), Exh. A (2023 Consent Order).]

C.   __Claims in the Instant Case__

Plaintiffs argue petroleum fuels and oils that leak or are spilled from Red Hill constitute "solid waste" for purposes of the RCRA. [Id. at ¶ 109 (citing 42 U.S.C. § 6903(27); 2015 AOC).] Petroleum fuels and oils that are discharged to surface waters constitute "pollutants" for purposes of the CWA. [Id. at ¶ 110 (citing 33 U.S.C. § 1362(6)).]

Based on the incidents described *supra*, Plaintiffs assert the following claims: a claim under the RCRA alleging that the Navy created an ongoing, imminent, substantial danger to health and the environment, in violation of Title 42 United States Code Section 6972(a) ("Count I"); and a claim under the CWA alleging that the Navy is committing ongoing, unpermitted discharges of pollutants, in violation of Title 33 United States Code Sections 1311(a), 1342, and 1365(a), (f) ("Count II").

Plaintiffs seek declaratory and injunctive relief regarding the Navy's ongoing violations of the RCRA and the CWA that result from the Navy's operations at Red Hill. [Id. at ¶ 6 (citing 33 U.S.C. § 1365(a)(1); 42 U.S.C. § 6972(a)(1)(A), (B)).] Plaintiffs seek an injunction requiring the Navy "to remedy, reduce, redress, mitigate, and/or offset all adverse human health, wildlife, and environmental consequences resulting from contamination of the Aquifer and the surface waters caused by violations of RCRA and the Clean Water Act." [Id. at ¶ 13.]

15

Plaintiffs also seek the imposition of civil penalties for the violations of the CWA, [id. at ¶ 7 (citing 33 U.S.C. § 1319(d)),] as well as an award of reasonable attorney's fees and costs, [id. at ¶ 14 (citing 42 U.S.C. § 6972(e); 33 U.S.C. § 1365(d))].

## II.  Motion

In the instant Motion, Defendants argue this case should be dismissed pursuant to either the primary jurisdiction doctrine or the Burford v. Sun Oil, 319 U.S. 315 (1943), abstention doctrine because of DOH's and the EPA's ongoing regulatory enforcement process regarding Red Hill. In the alternative, Defendants argue this case should be stayed until the regulatory enforcement processes have concluded. [Motion at 1-2.] Defendants bring the instant Motion pursuant to Federal Rule of Civil Procedure 12(b)(6). [Motion, Mem. in Supp. at 1.]

## DISCUSSION

## I.   Requests for Judicial Notice

As a general rule, when this Court considers a Rule 12(b)(6) motion to dismiss, it may only consider the allegations in the pleadings; consideration of materials beyond the pleadings converts the motion to dismiss into a motion for summary judgment. See Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018). Judicial notice under Federal Rule of Evidence 201 is one exception to this general rule. Id.

16

       Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2).

       Accordingly, "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." Lee [v. City of Los Angeles], 250 F.3d [668,] 689 [(9th Cir. 2001)] (quotation marks and citation omitted).[10] But a court cannot take judicial notice of disputed facts contained in such public records. Id.

Id. at 999 (some alterations in Khoja).

      Defendants' RJN asks this Court to "take judicial notice of facts identified in their Motion . . . that are contained in the attached Exhibits." [Defendants' RJN at 2.] Plaintiffs do not oppose Defendants' RJN. [Id.] Each of Exhibits A to V of Defendants' RJN is a publicly available order, report, statement, press release, plan, or letter, prepared by or for a state or federal department or agency. See dkt. nos. 102-1 to 102-23. Plaintiffs have not disputed the factual statements in the Motion that are taken from Defendants' Exhibits A to V. This Court concludes that the documents themselves and the factual statements in the Motion taken from

---

     [10] Lee was overruled on other grounds by Galbraith v. County of Santa Clara, 307 F.3d 1119, 1125-26 (9th Cir. 2002). See, e.g., Leszczynski v. Kitchen Cube LLC, Case No. 8-23-cv-01698-MEMF-ADS, 2024 WL 1829620, at *3 (C.D. Cal. Apr. 17, 2024).

those documents are matters of public record that are not subject to reasonable dispute. This Court therefore grants Defendants' RJN.

Plaintiffs' RJN has three exhibits – the EPA's 2023 Consent Order, previously filed by Defendants; and two documents that are related to exhibits submitted with Defendants' RJN. Defendants do not oppose Plaintiffs' RJN as to the existence and authenticity of those documents. [Opp. to Plaintiffs' RJN at 2.] This Court concludes that the documents are matters of public record that are not subject to reasonable dispute. Plaintiffs' RJN is therefore granted as to the existence and authenticity of Plaintiffs' exhibits. Defendants' Opposition to Plaintiffs' RJN identifies ten facts or statements in Plaintiffs' Opposition that are based upon the exhibits to Plaintiffs' RJN. See Opp. to Plaintiffs' RJN at 4-9. This Court finds that facts/statements one through nine, as modified or clarified in Plaintiffs' RJN Reply, are not subject to reasonable dispute. This Court therefore grants Plaintiffs' RJN as to those facts/statements. This Court denies Plaintiffs' RJN as to fact/statement ten for the reasons stated in Defendants' Opposition to Plaintiff's RJN.

In considering Defendants' Motion, this Court will consider the documents and the facts/statements that this Court has taken judicial notice of.

18

## II.   **Primary Jurisdiction Doctrine**

Defendants argue that, under the primary jurisdiction doctrine, this Court should "refer" to the EPA's and DOH's regulatory actions regarding the defueling and closure of Red Hill, *i.e.* this Court should dismiss or stay the action pending the completion of the administrative process. [Opp. at 13 & n.8 (citing Astiana v. Hain Celestial Grp., Inc., 783 F.3d 753, 761 (9th Cir. 2015)).]

> The primary jurisdiction doctrine "is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts." Syntek Semiconductor Co., Ltd., v. Microchip Tech. Inc., 307 F.3d 775, 780 (9th Cir. 2002). "Primary jurisdiction is properly invoked when a claim . . . requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1172 (9th Cir. 2002). "The doctrine does not require that all claims within an agency's purview to be decided by the agency. Nor is it intended to 'secure expert advice' for the courts from regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit." Id. (quoting United States v. Gen. Dynamics Corp., 828 F.2d 1356, 1365 (9th Cir. 1987)).

Cohen v. ConAgra Brands, Inc., 16 F.4th 1283, 1291 (9th Cir. 2021) (alteration in Cohen).

> In evaluating primary jurisdiction, we consider "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory

19

> authority (3) pursuant to a statute that subjects
> an industry or activity to a comprehensive
> regulatory authority that (4) requires expertise
> or uniformity in administration." Syntek, 307
> F.3d at 781.

Astiana, 783 F.3d at 760.[11]

Congress has placed the general enforcement of the RCRA in the jurisdiction of the EPA and any applicable state agency. See, e.g., 42 U.S.C. § 6928(a)(1) ("Except as provided in paragraph (2), whenever on the basis of any information the Administrator determines that any person has violated or is in violation of any requirement of this subchapter, the Administrator may issue an order assessing a civil penalty for any past or current violation, requiring compliance immediately or within a specified time period, or both . . . ."); § 6928(a)(2) ("In the case of a violation of any requirement of this subchapter where such violation occurs in a State which is authorized to carry out a hazardous waste program under section 6926 of this title, the Administrator shall give notice to the State in which such violation has occurred prior to issuing an order or commencing a civil action under this section."); 42 U.S.C. § 6903(1) ("The term "Administrator" means the Administrator of the Environmental Protection Agency."). The

---

[11] Astiana has been abrogated in part on other grounds. See, e.g., Genasys Inc. v. Vector Acoustics, LLC, 638 F. Supp. 3d 1135, 1153 & n.10 (S.D. Cal. 2022).

State of Hawai`i has an EPA-approved UST program, operated by DOH. See generally Haw. Rev. Stat. Chap. 342L; Title 11 Haw. Admin. R. Chap. 280.1.

Similarly, general civil enforcement of the CWA is within the jurisdiction of the EPA and any applicable state agency. See, e.g., 33 U.S.C. § 1319(b) ("The Administrator is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order under subsection (a) of this section."); § 1319(a) (stating that, when the Administrator finds there is a violation of a state-issued permit, "[i]f beyond the thirtieth day after the Administrator's notification the State has not commenced appropriate enforcement action, the Administrator shall issue an order requiring such person to comply with such condition or limitation or shall bring a civil action in accordance with subsection (b) of this section"); Water Quality Act of 1987 & 33 USC 1251 note, Pub. L. No. 100-4, 101 Stat 7, § 1(d) ("the term 'Administrator' means the Administrator of the Environmental Protection Agency"). The State of Hawai`i has assumed the authority to administer the CWA permit program. See generally Haw. Rev. Stat. §§ 342D-50 to 342D-62; Title 11 Haw. Admin. R. Chap. 55.

However, this Court finds significant the fact that Plaintiffs bring this action as a citizen suit, and Congress

21

specifically authorized citizen suits through the RCRA and the CWA. See 42 U.S.C. § 6972(a); 33 U.S.C. § 1365(a). This Court also notes that the Ninth Circuit has described the citizen suit provision of the RCRA as "expansive." Cal. River Watch v. City of Vacaville, 39 F.4th 624, 629 (9th Cir. 2022) (citation and quotation marks omitted).

While the defueling and closure of Red Hill and the associated remediation efforts are unquestionably important to, and may have a far-reaching impact upon, the people and the environment of Hawai`i, the **legal** issues presented by the instant case are not issues of first impression, nor are the legal issues so complex that this Court should defer to the expertise and experience of the regulatory agencies. Thus, if this Court considered Plaintiffs' claims, standing alone, this Court would be inclined to conclude that the primary jurisdiction doctrine does not apply. However, as a practical matter, this Court must also consider the extent of the work that Defendants have already completed through the state and federal administrative processes, *i.e.* pursuant to DOH's 5/6/22 Emergency Order and the EPA's 2023 Consent Order.

The Ninth Circuit has emphasized that "efficiency is the deciding factor in whether to invoke primary jurisdiction." Astiana, 783 F.3d at 760 (citation and internal quotation marks omitted). For example, "[c]ommon sense tells us that even when

22

agency expertise would be helpful, a court should not invoke primary jurisdiction when the agency is aware of but has expressed no interest in the subject matter of the litigation." Id. at 761. In the instant case, although this Court is competent to decide issues regarding the defueling and closure of Red Hill, it would be inefficient for this Court to undertake either review of the defueling process, which Defendants represented at the hearing was almost complete, or review of the closure process, which is underway with significant oversight by DOH and the EPA.

Plaintiffs state they do not intend to interfere with the efforts that DOH and the EPA are taking to ensure the timely and safe defueling and closure of Red Hill, but Plaintiffs argue they must be allowed to proceed with this case because there are significant issues that are not addressed in either the 5/6/22 Emergency Order or the 2023 Consent Order. For example, Plaintiffs argue the 5/6/22 Emergency Order and the 2023 Consent Order do not address CWA violations, nor do they address the identification of the source of the violations. This Court agrees with Plaintiffs that the primary jurisdiction doctrine must not be invoked to preclude the portions of Plaintiffs' citizen suit which concern matters that are not being addressed under either the DOH's 5/6/22 Emergency Order or the EPA's 2023 Consent Order. However, this Court agrees with Defendants that

23

the primary jurisdiction doctrine applies to the portions of
Plaintiffs' citizen suit which concern matters that have been,
or are being, addressed under the administrative orders – such
as issues related to the defueling and closure of the Facility.

As to the portions of Plaintiffs' citizen suit which
concern matters that have been, or are being, addressed under
either the DOH 5/6/22 Emergency Order or the EPA 2023 Consent
Order, this Court concludes that a stay is warranted. This
Court, however, concludes that dismissal is not warranted.
Plaintiffs may move to lift the stay if, for example, the
administrative processes come to completion but leave
unaddressed some of the Facility closure issues that Plaintiffs
have identified in this case.

## III. *Burford* Abstention Doctrine

As to the portions of this case to which the primary
jurisdiction doctrine does not apply, Defendants argue this
Court should abstain under <u>Burford</u>. The United States Supreme
Court has described the Burford doctrine as follows:

> Where timely and adequate state-court review is
> available, a federal court sitting in equity must
> decline to interfere with the proceedings or
> orders of state administrative agencies: (1) when
> there are "difficult questions of state law
> bearing on policy problems of substantial public
> import whose importance transcends the result in
> the case then at bar"; or (2) where the "exercise
> of federal review of the question in a case and
> in similar cases would be disruptive of state
> efforts to establish a coherent policy with

respect to a matter of substantial public concern." Colorado River Water Conservation Dist. v. United States, [424 U.S. 800,] 814 [(1976)].

New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 361 (1989) ("NOPSI"). The Supreme Court subsequently clarified that NOPSI and other cases that interpreted NOPSI

do not provide a formulaic test for determining when dismissal under Burford is appropriate, but they do demonstrate that the power to dismiss under the Burford doctrine, as with other abstention doctrines, derives from the discretion historically enjoyed by courts of equity. They further demonstrate that exercise of this discretion must reflect "principles of federalism and comity." Growe v. Emison, 507 U.S. 25, 32 (1993). Ultimately, what is at stake is a federal court's decision, based on a careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the "independence of state action," Burford, 319 U.S., at 334, that the State's interests are paramount and that a dispute would best be adjudicated in a state forum. See NOPSI, [491 U.S.] at 363 (question under Burford is whether adjudication in federal court would "unduly intrude into the processes of state government or undermine the State's ability to maintain desired uniformity"). This equitable decision balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining "uniformity in the treatment of an 'essentially local problem,'" 491 U.S., at 362 (quoting Alabama Pub. Serv. Comm'n [v. S. Ry. Co.], [341 U.S. 341,] 347 [(1951)]), and retaining local control over "difficult questions of state law bearing on policy problems of substantial public import," Colorado River, 424 U.S., at 814. This balance only rarely favors abstention, and the power to dismiss recognized in Burford represents

> an "'extraordinary and narrow exception to the
> duty of the District Court to adjudicate a
> controversy properly before it.'" <u>Colorado River</u>,
> [424 U.S.] at 813 (quoting <u>County of Allegheny</u>
> [v. Frank Mashuda Co.]</u>, 360 U.S.[ 185,] 188
> [(1959)]).

<u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 727–28 (1996)
(some citations omitted).

Because the remaining portions of Plaintiffs' citizen
suit raise issues that are not being addressed under either
DOH's 5/6/22 Emergency Order or the EPA's 2023 Consent Order,
this Court's review of those issues would not disrupt the
State's efforts to establish coherent policy in its programs
under RCRA and the CWA, and this Court's decision on the
remaining portions of the citizen suit will not intrude upon the
State's interests. Further, because Congress has expressly
authorized citizen suits under the RCRA and the CWA, and because
the ability to brining citizen suits under the RCRA is
expansive, there is a strong federal interest in having the
remaining portions of Plaintiffs' citizen suit decided in
federal court. This Court therefore concludes that the <u>Burford</u>
abstention doctrine does not apply to the remaining portions of
Plaintiffs' citizen suit.

**IV.  <u>Ruling</u>**

Neither the primary jurisdiction doctrine nor the
<u>Burford</u> abstention doctrine applies to the portions of

Plaintiffs' citizen suit which concern matters that are not being addressed through the administrative processes under either the DOH's 5/6/22 Emergency Order or the EPA's 2023 Consent Order. Defendants' Motion is therefore denied as to their request to dismiss or stay those portions of the Second Amended Complaint.

Defendants' Motion is granted insofar as the portions of Plaintiffs' citizen suit which concern matters that have been, or are being, addressed under through the administrative processes under either the DOH 5/6/22 Emergency Order or the EPA 2023 Consent Order are stayed under the primary jurisdiction doctrine. Defendants' request to dismiss those portions of Plaintiffs' citizen suit is denied.

However, having considered the Second Amended Complaint and the parties' arguments in connection with the instant Motion, this Court concludes that the Second Amended Complaint does not clearly identify the issues that are not being addressed through the administrative processes under either DOH's 5/6/22 Emergency Order or the EPA's 2023 Consent Order. For example, although Plaintiffs state they do not intend to interfere with the ongoing defueling and closure of Red Hill, the Second Amended Complaint expressly seeks

> injunctive relief related to RCRA violations,
> pursuant to 42 U.S.C. § 6972(a)(1)(A) and (B),
> directing the Navy to:

27

. . . .

> b.    develop a critical path analysis and
> comprehensive management plan with deadlines
> for timely and safe **defueling of the
> Facility**; and
>
> c.    develop a critical path analysis and
> comprehensive management plan with deadlines
> for timely and safe **decommissioning and
> closure of the Facility**.

[Second Amended Complaint at ¶¶ 11.b-c (emphases added).]

This Court therefore DISMISSES Plaintiffs' Second Amended Complaint and ORDERS Plaintiffs to file a third amended complaint that clearly identifies the issues that are not being addressed through the administrative processes under either the DOH's 5/6/22 Emergency Order or the EPA's 2023 Consent Order. After the filing of Plaintiffs' third amended complaint, this case will proceed as to the issues that are not being addressed under either DOH's 5/6/22 Emergency Order or the EPA's 2023 Consent Order. The remainder of the case will be stayed for a period of one year from the filing of the third amended complaint. Defendants will be required to file periodic status reports regarding their compliance with the 5/6/22 Emergency Order and the 2023 Consent Order. If warranted under the circumstances, the stay may be extended beyond the one-year period or it may be lifted before the end of the one-year period.

## **CONCLUSION**

For the foregoing reasons, this Court rules as follows:

-Defendants' Amended Unopposed Request for Judicial Notice in Support of Motion to Dismiss or, in the Alternative, Stay Proceedings (ECF No. 90), filed December 7, 2023, is GRANTED;

-Plaintiffs' Request for Judicial Notice in Support of Motion to Dismiss or, in the Alternative, Stay Proceedings (ECF No. 90), filed December 22, 2023, is GRANTED IN PART AND DENIED IN PART; and

-Defendants' Moton to Dismiss or, in the Alternative, Stay Proceedings, filed October 27, 2023, is HEREBY GRANTED IN PART AND DENIED IN PART.

Plaintiffs' Second Amended Complaint for Declaratory Relief and Injunctive Relief, filed October 13, 2023, is HEREBY DISMISSED WITHOUT PREJUDICE. Plaintiffs are directed to file their third amended complaint by **June 13, 2024**. After the filing of the third amended complaint, the portions of Plaintiffs' claims concerning matters that are being addressed through the administrative processes under either the DOH's 5/6/22 Emergency Order or the EPA's 2023 Consent Order will be STAYED for one year from the filing of the third amended complaint. This case will proceed only as to the portions of Plaintiffs' claims

concerning matters that are **not** being addressed under either the 5/6/22 Emergency Order or the 2023 Consent Order.

   Defendants are ORDERED to file their first status report regarding their compliance with the 5/6/22 Emergency Order and the 2023 Consent Order by **July 15, 2024**. After Plaintiffs file their third amended complaint, deadlines will be issued for Defendants' subsequent status reports.

   IT IS SO ORDERED.

   DATED AT HONOLULU, HAWAII, May 14, 2024.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**WAI OLA ALLIANCE, A PUBLIC INTEREST ASSOCIATION, ET AL. VS. UNITED STATES DEPARTMENT OF THE NAVY, ET AL; CV 22-00272 LEK-RT; ORDER:  GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, STAY PROCEEDINGS; GRANTING DEFENDANTS' AMENDED UNOPPOSED REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS OR, IN THR ALTERNATIVE, STAY PROCEEDINGS (ECF NO. 90); AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, STAY PROCEEDS (ECF NO. 90)**