**Exhibit A**

*November 2, 2021*

**SENT VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Lloyd J. Austin III                                 Honorable Carlos Del Toro
U.S. Secretary of Defense                           Secretary of the Navy
1000 Defense Pentagon                               1000 Navy Pentagon
Washington, DC 20301-1000                           Washington, DC 20350-1000

Lieutenant General Darrell K. Williams              Admiral Samuel J. Paparo
Director of Defense Logistics Agency                Commander, U.S. Pacific Fleet
8725 John J. Kingman Road                           250 Makapala Drive
Fort Belvoir, Virginia 22060-6221                   Pearl Harbor, Hawaii 96860-3131

**RE:    NOTICE OF ENDANGERMENT AND INTENT TO FILE SUIT PURSUANT TO
RESOURCE CONSERVATION AND RECOVERY ACT, 42 U.S.C. § 6972(a)(1)(B)**

To Whom It May Concern:

Sycamore Law, Inc. and Margaret Wille & Associates LLLC, on behalf of Melodie Aduja,
Clarence Ku Ching, Pete Shimazaki Doktor, Kim Coco Iwamoto, and Mary Maxine Kahaulelio,
as individuals and members of the Wai Ola Alliance, and on behalf of the Wai Ola Alliance
(collectively "Wai Ola Alliance") provide this letter ("Notice Letter") regarding violations of the
Resource Conservation and Recovery Act ("RCRA" or "Act"), 42 U.S.C. §§ 6901 *et seq*., at the
Red Hill Bulk Fuel Storage Facility ("Facility") owned and operated by the U.S. Navy[1] (the
"Navy") on the western edge of the Koʻolau Range near Pearl Harbor. On the ninetieth day from
the date you receive this Notice Letter, the Wai Ola Alliance intends to file a citizen suit in
Federal District Court against the Navy addressing the unlawful operation of the Facility. *See* 42
U.S.C. § 6972(a)(1)(B). The civil action will specifically allege that the Navy has violated, and
remains in violation of, RCRA by causing or contributing to the past and present handling,
storage, treatment, transportation, and/or disposal of solid waste in such a manner that presents
an imminent and substantial endangerment to human health and the environment. *See id*.

The lawsuit will seek declaratory relief establishing that the Navy has violated RCRA, as well as
injunctive relief requiring the Navy to eliminate existing endangerment to human health and the
environment. Specifically, the Wai Ola Alliance is informed that the Facility's ongoing
endangerment to the island's irreplaceable sole-source groundwater aquifer stems from: (1)
historical releases; (2) chronic, episodic releases, i.e., "leaks"; and (3) the imminent potential for
catastrophic release. The Wai Ola Alliance seeks the immediate abatement of existing and
imminent releases through installation of tank liners, the replacement of pipelines, and a leak

---

[1] According to an August 16, 2010 Navy memorandum titled DEPARTMENT OF THE NAVY RED HILL AND
UPPER TANK FARM FUEL STORAGE FACILITIES (AUDIT REPORT N2010-0049), the property on which the
Facility is located is owned by Commander, Navy Installations Command (CNIC) and operated by Fleet and
Industrial Supply Center (FISC), while the fuel inventory is owned by the Defense Logistics Agency.

Notice of Intent to File RCRA Action
November 2, 2021
Page 2 of 20

detection system capable of preventing fuel releases while a longer term solution via administrative processes overseen by the U.S. Environmental Protection Agency ("U.S. EPA") and the Hawaiʻi Department of Health ("HDOH") (collectively, "Regulating Agencies") is negotiated. As authorized by RCRA, the Wai Ola Alliance will also seek an order from the Court requiring the Navy to pay fees and costs associated with bringing this enforcement action, including reasonable attorneys' fees and costs including expert witness costs. *See* 42 U.S.C. § 6972(e).

Through this action, the Wai Ola Alliance aims to preserve the rights of present and future generations in the waters of Hawaiʻi consistent with constitutional and statutory provisions embodying the State's Public Trust Doctrine. During the ninety-day notice period, the Wai Ola Alliance will seek discussions with the Navy to resolve this matter without litigation. The Wai Ola Alliance's primary focus is the preservation and protection of Oʻahu's groundwater resources, and cooperative negotiations leading to engineering solutions is likely the swiftest path to eliminate the imminent endangerment. Whether through settlement agreement or via court order, the Navy must eliminate the endangerment on an enforceable timeline to resolve this action.

## I.    Background

### A.    Individual Plaintiffs

Individual Plaintiffs include Melodie Aduja, Clarence Ku Ching, Pete Shimazaki Doktor, Kim Coco Iwamoto, and Mary Maxine Kahaulelio, each of whom suffers direct injury as a result of the Navy's past and ongoing endangerment of the aquifer contaminated by releases of petroleum fuels from the Facility.

### B.    Wai Ola Alliance

The Wai Ola Alliance is an alliance of environmentally and culturally focused individuals and organizations dedicated to securing immediate action to protect the Southern Oahu Basal Aquifer from threats posed by the Facility. Specifically, the Wai Ola Alliance seeks the immediate abatement of existing and imminent releases from the Facility through the immediate installation of tank liners, the replacement of pipelines, and a leak detection system capable of detecting even minor fuel level changes in real time.

### C.    Owners and Operators of the Facility

The Navy is the maritime service branch of the United States Armed Forces, and one of the eight uniformed services of the United States. The Navy is part of the Department of the Navy, alongside the U.S. Marine Corps. The Department of the Navy is headed by the civilian Secretary of the Navy. The Department of the Navy is itself a military department of the Department of Defense, which is headed by the Secretary of Defense. The Navy is a "person" as defined in RCRC. *See* 42 U.S.C. § 6903(15). The Navy is the owner and an operator of the Facility.

2

The Defense Logistics Agency is a combat support agency in the U.S. Department of Defense. The Defense Logistics Agency provides supplies to the military services and supports their acquisition of weapons, fuel, repair parts, and other materials. The Defense Logistics Agency supplies the U.S. military with nearly 100% of its fuel. The Defense Logistics Agency is a "person" as defined in RCRA. *See* 42 U.S.C. § 6903(15). The Defense Logistics Agency owns the fuel stored at the Facility.

### C.    The Red Hill Facility

The 144-acre Facility is believed to be the world's largest underground fuel storage facility. The Facility was activated in 1943 to support World War II efforts in the Pacific. The Facility currently provides fuel to support the Navy, the U.S. Air Force, the U.S. Marine Corps, the U.S. Army, the Hawaiian National Guard, and the U.S. Coast Guard. The Facility is located on the southern side of the island of Oʻahu, approximately two and a half miles northeast of Pearl Harbor. The Facility lies on a ridge known as Kapukaki, or "Red Hill."

The Facility consists of twenty[2] vintage underground storage tanks ("USTs"), each with the capacity to hold 12.5 million gallons of petroleum-based fuel. The USTs currently contain diesel marine fuel ("F-76") and multiple types of jet fuel ("JP-5," "JP-8," and "F-24").[3] Historically, the USTs were used to store a variety of other fuels, including diesel oil, Navy Special Fuel Oil, Navy distillate, aviation gas, and motor gas. In addition to the USTs, the Facility includes seven miles of tunnels, twenty-nine miles of exposed and buried pipelines, ventilation systems with air intakes and exhaust portals, a pumphouse, control room, surge tanks, slop oil and oil recovery facilities, and a pier that can fuel ships.

---

[2] Two of the tanks have been removed from service (Tanks 1 and 19), but not officially closed. Another two to three tanks are generally empty as part of the Navy's ongoing "clean, inspect, and repair" program. The Navy generally stores fuel in fourteen or fifteen tanks at Red Hill, with a total capacity of over 187 million gallons of fuel. On information and belief, only fifteen tanks are operational at the time this Notice Letter was being prepared.

[3] JP-5 and JP-8 are used as military aircraft fuels but can also be used for fueling land vehicles and as a fuel source for heaters and lights. They are colorless liquids that are flammable and smell like kerosene. Diesel marine fuel and JP-5 and JP-8 are composed of broad, dynamic heterogeneous mixtures of chemical constituents, including hundreds of hydrocarbon compounds. These hydrocarbons can be grouped into several classes of chemicals which have similar chemical properties. The different chemical classes can behave differently when they enter the environment. Some may also evaporate when jet fuels are spilled accidentally onto soils or surface waters. Other chemical classes are more likely to dissolve in water following spills to surface waters or leaks from underground storage tanks. Some chemical classes found in jet fuels may slowly move down through the soil to the groundwater, while others may readily attach to particles in the soil or water. Once attached in water, these particles may sink down into the sediment. The rates at which these constituents naturally degrade in the environment are highly variable. The chemicals that dissolve in water may be broken down into other substances by microorganisms found in water and sediment. However, this may take many years to occur, depending on environmental conditions. Some chemicals that attach to soil or other matter (for example, marsh sediment) may remain in the environment for decades. Some of the chemicals in jet fuels may be detected in fish and aquatic organisms after an accidental release into a lake, river, or stream.

Notice of Intent to File RCRA Action
November 2, 2021
Page 4 of 20

**IMAGE 1**
(Source: Hawaii Business Magazine)



The Facility's USTs are "field-constructed," which means they were built directly into the basalt rock formation. Each tank is constructed from quarter-inch steel, which is reinforced with three to four feet of concrete. The concrete serves to reinforce the steel liners and does not provide fluid containment. The tops and bottoms of each tank are domed half-inch steel, so that each tank resembles a massive pharmaceutical capsule standing on end. See IMAGE 1. Each UST has approximately two acres of surface area. Bechtel Corp., *Engineering Survey of U.S. Navy Petroleum Facilities at Pearl Harbor* ("*Bechtel Red Hill Survey*") (1949).

Notice of Intent to File RCRA Action
November 2, 2021
Page 5 of 20

The tank storage system is comprised of two parallel rows of vertical tanks sloping southeast towards Pearl Harbor. Each tank measures 245 feet in height and 100 feet in diameter. See IMAGE 2. Two tunnels connect the tanks and allow partial access—an upper tunnel provides access to the top of each tank, and a lower tunnel houses pipelines and other equipment that carry fuel the two and a half miles between the Facility and distribution points at Pearl Harbor.

The majority of the surface topography of the Facility lies at an elevation of approximately 200 to 500 feet above mean sea level. The tanks, however, are located approximately 100 to 200 feet below the ground surface, which positions them approximately 100 feet above the underlying groundwater aquifer. See IMAGE 2. The geology of the fractured basalt rock means there are networks of cracks and fissures through which fuel releases from the USTs can reach the aquifer, the principal source of drinking water for the island.

**IMAGE 2**
(Source: Hawaii Business Magazine)



The tanks are not equipped with secondary containment or leak detection systems, which, as the Navy acknowledges, makes the potential for a large release extremely high. The release of a single tank's contents would contaminate over 125 billion gallons of water, and render the source aquifer for 70 percent of the island's water supply unusable for the foreseeable future.

    D.    <u>Affected Water Supply</u>

The Facility is located above the boundary of the Waimalu and Moanalua Aquifers, each of which is a semi-independent reservoir forming part of the Southern Oahu Basal Aquifer. "No

5

Notice of Intent to File RCRA Action
November 2, 2021
Page 6 of 20

known groundwater divide exists along this geomorphic boundary and groundwater is believed to flow freely between these two aquifer designations[].” TEC Inc., *Red Hill Bulk Fuel Storage Facility Final Groundwater Protection Plan* (2008) (“*Groundwater Protection Plan* (2008)”) at 1-5. According to the Navy, the Waimalu and Moanalua Aquifers are “currently used, fresh [] drinking water sources” that are “irreplaceable” and have a “high vulnerability to contamination.” *Groundwater Protection Plan* (2008) at 1–2. Navy studies show the groundwater underneath and within close proximity to the Red Hills USTs is already contaminated with petroleum chemicals: for example, data collected at monitoring wells 1, 2 and 3 between 2005 and 2009 confirm elevated concentrations of Total Petroleum Hydrocarbons (“TPH”)[4] below the Facility. Naval Audit Service, *Audit Report: Department of the Navy Red Hill and Upper Tank Farm Fuel Storage Facilities* (“*Navy Audit Report* (2010)”), Rep. No. N201 0-0049 (August 16, 2010) at 12; *see also* TEC Inc., *Red Hill Bulk Fuel Storage Facility Final Groundwater Protection Plan Interim Update* (revised 2014) (“*Groundwater Protection Plan* (2014)”) at ES-1 (“[P]ast inadvertent releases have contaminated the. . . basal groundwater. . . beneath the Facility with petroleum hydrocarbons.”).

In 1987, the U.S. EPA designated the Southern Oahu Basal Aquifer as a “sole source” aquifer. 52 Fed. Reg. 45496. U.S. EPA defines sole source aquifers as having the following two characteristics: (1) the aquifer supplies at least fifty percent of the drinking water for its service area; and (2) there are no reasonably available alternative drinking water sources should the aquifer become contaminated.[5] According to U.S. EPA, the Southern Oahu Basal Aquifer is the “principal source of drinking water” for the island and that “[i]f contaminated, would create a significant hazard to public health.” *Id*. at 45497. The groundwater underlying the Facility is effectively an irreplaceable source of water from which 70 percent of the island’s water supply comes.

There are multiple potable water supply wells in the vicinity of the Facility. The U.S. Navy Red Hill Shaft well 2254-01 is located approximately 3,000 feet west and hydraulically downgradient from the Facility. The Honolulu Board of Water Supply (“HBWS”) Hālawa Shaft well 2354-01 is located approximately 5,000 feet northwest of the Facility. The HBWS Moanalua wells 2153-10, 2153-11, and 2153-12 lie approximately 6,500 feet south of the Facility.

Together with the HDOH, U.S. EPA, HBWS, the U.S. Geological Survey, University of Hawaii, and private contractors, the Navy developed an interim groundwater monitoring model, which indicates that groundwater generally flows from the Facility toward Red Hill Shaft. Expert Rep. of Dr. William Rogers (“Rogers Expert Rep.”) at 11. Further, data collected by the U.S. Geological Survey in 2015 show that the groundwater level at Hālawa Shaft is about 3 feet lower than that beneath the Facility’s tanks, demonstrating that the hydraulic gradient could drive

---

[4] Petroleum is a complex mixture of hundreds of different compounds composed of hydrogen and carbon or “hydrocarbon” compounds. The bulk of these compounds are evaluated collectively under the all-inclusive category of TPH. The amount of fuel contamination in the aquifer and how quickly it spreads depends on the volume of fuel released into the groundwater. A larger volume of fuel released into the groundwater due to a major pipe or tank failure will contaminate the groundwater much faster, in greater amounts and over a larger area than fuel that is slowly leaking from the pipes or tanks.

[5] U.S. EPA’s sole source aquifer program is authorized by Section 1424(e) of the Safe Drinking Water Act of 1974.

6

contaminant migration to Hālawa Shaft. Letter from Honolulu Bd. of Water Supply to City & Cnty. of Honolulu ("HBWS Letter (2017)") (May 4, 2017) at 1-2.

The Navy acknowledges that cleaning up and/or remediating the impact of a large spill would be exceedingly difficult. *Groundwater Protection Plan* (2008) at ES-3. "Under site conditions, remediation of a large fuel release would be extremely costly and technically difficult, due to the underground nature of the Facility, the steep ridgeline upon which the Facility in located, the distance from ground surface to the aquifer (between 400 and 500 feet on the Red Hill ridgeline), and finally because of the complex hydrogeology associated with the fractured basalt aquifers. Pump and treat methods could be implemented but would be costly and inefficient in this environment. Multi-phased extraction may be more efficient, but very complex at the depths required." *Groundwater Protection Plan* (2014) at ES-4; see also Letter from Steven Linder, Red Hill Project Coordinator, U.S. EPA Region 9, and Roxanne Quan, Interim Red Hill Project Coordinator, State of Hawaii Department of Health to Gordie Meyer, Commander, Navy Region Hawaii, *Notice of Deficiency for the Tank Upgrade Alternatives Decision Document and New Release Detection Alternatives Decision Document, for Red Hill Administrative Order on Consent Statement of Work Sections 3.5 and 4.8* (Oct. 26, 2020) ("Notice of Deficiency") attach. B at 8. Remediating contamination of the aquifer, therefore, would be extremely costly at best, and impossible to accomplish at worst.

### E.    Human Health Impacts

Petroleum-based fuels stored at the Facility are composed of a broad, dynamic, and heterogeneous mixture of chemical constituents. The primary contaminants of concern are middle distillates, which include lead, TPH, benzene, toluene, ethylbenzene, xylenes, naphthalene, 1-methylnaphthalenes, and 2-methylnaphthalenes. Chronic exposure to these constituents is harmful to human health. The rates at which these constituents naturally degrade in the environment are highly variable. In the Matter of Red Hill Bulk Fuel Storage Facility, U.S. EPA Dkt. No. RCRA 7003-R9-2015-01, Hawaii DOH Dkt. No. 15-UST-EA-01 (2015) ("2015 AOC") at 6.

## II.    Facility History of Regulation

The Red Hill Facility was a classified state secret from the time it was being constructed (approx. 1940-1943) until 1995 and remained effectively unregulated by the U.S. EPA or HDOH until 2015.

### A.    2015 Administrative Order on Consent

On September 28, 2015, following the 2014 spill of nearly thirty thousand gallons of fuel from Tank 5 (discussed in detail *infra* Section IV.B), the Navy and the Defense Logistic Agency entered into an Administrative Order on Consent ("2015 AOC") with HDOH and U.S. EPA.[6]

---

[6] The 2015 AOC consists of eight sections including: Section 1: Overall Program Responsibility; Section 2: Tank Inspection, Repair, Maintenance (TIRM); Section 3: Tank Upgrade Alternatives; Section 4: Release Detection/Tank

Notice of Intent to File RCRA Action
November 2, 2021
Page 8 of 20

The 2015 AOC is structured to establish a process for collecting the necessary data and evaluating technical solutions to address past fuel releases, and to reduce the potential for future releases. To date, the Navy has completed some data collection and evaluation work required by the 2015 AOC. The actual implementation of technical solutions, however, remains decades away. Naval Facilities Engineering Command Hawaii, *Red Hill Bulk Fuel Storage Facility Administrative Order on Consent Tank Upgrade Alternatives and Release Detection Decision Document* ("TUA Decision Document") (September 2019) at 6, 31, 41. For example, the earliest the Navy would complete minimum upgrades to the tank's integrity is 2037. Sierra Club of Hawaii, *Maintaining Status Quo with Thinning Tanks*, https://sierraclubhawaii.org/redhill (last visited Sept. 3, 2021).

Many of the deliverables required by the 2015 AOC still have not been approved by state or federal regulators, with key Navy reports disapproved, and the Navy's tank upgrade proposal rejected. A few of the major problems in implementing the 2015 AOC are summarized here:

- The 2015 AOC's Section 2 required the Navy to develop a set of tank inspection, repair, and maintenance ("TRIM") procedures. While the Regulating Agencies approved the Navy's 2017 TRIM procedures, subsequent implementation revealed that the procedures are fundamentally unreliable. *HBWS Post-Hr'g Mem.* (June 24, 2019) at 10 (citing Hr'g Test. of Navy witness Robert Jamond), ¶ 95. For example, the Navy's non-destructive testing was only accurate in detecting significant corrosion ("metal loss") 50 percent of the time. *Id.* ¶ 95.

- Under Section 3 of the 2015 AOC, the Navy is required to evaluate and identify Tank Upgrade Alternatives, i.e., secondary containment options, that will be protective of human health and the environment. 2015 AOC, attach. A at 5. On September 9, 2019, the Navy submitted a Tank Upgrade Alternatives proposal to the U.S. EPA and HDOH. TUA Decision Document. The Regulating Agencies rejected the proposal, finding that it lacked adequate "detail, clarity, rationale and justification" and failed to identify a "clear nexus between the proposal and protection of groundwater resources." Notice of Deficiency at 1, attach. A at 1; *see also HBWS Post-Hr'g Mem.* ¶¶ 96–97. In August of 2021, the Navy issued a supplement to its initial Tank Upgrade Alternatives proposal. Naval Facilities Engineering Command Hawaii, *Supplement to Red Hill Bulk Fuel Storage Facility Administrative Order on Consent Tank Upgrade Alternatives and Release Detection Decision Document* ("TUA Supplement Document") (August 2021). The supplement does not alter the Navy's proposed solution, e.g., status quo tank maintenance, and confirms the Navy's plan to avoid implementing any form of secondary containment until 2045. TUA Supplement Document at 17.

- Section 4 of the 2015 AOC requires the Navy to evaluate the release detection and tank tightness testing procedures implemented at the Facility, and to modify them to be more protective of the environment. *HBWS Post-Hr'g Mem.* ¶ 98. However, the Navy is proposing to use "tightness" criteria that is significantly less stringent than required for repaired USTs by Hawai'i law. State law requires that such USTs meet a 0.1 gallon per hour ("gph")

---

Tightness Testing; Section 5: Corrosion and Metal Fatigue Practices; Section 6: Investigation and Remediation of Releases; Section 7: Groundwater Protection and Evaluation; and Section 8: Risk/Vulnerability Assessment.

8

standard. The Navy, however, insists on using a 0.5 gph standard, which was used prior to returning Tank 5 to service immediately before it failed in 2014. Furthermore, the Navy has refused to verify the accuracy of its tank tightness testing, and to provide the Regulating Agencies with data necessary for independent verification. *Id.* ¶ 109–110.

- Section 5 of the 2015 AOC requires that the Navy develop a scope of work to evaluate the possibility and extent of corrosion and metal fatigue at the USTs. 2015 AOC, attach. A at 10; *HBWS Post-Hr'g Mem.* ¶ 99. In order to validate its "non-destructive" testing methods, i.e., computer-derived data, the Navy completed an inventory of actual physical "destructive testing" results. This "destructive testing" demonstrated that the computer-derived data was only accurate 50 percent of the time. Accordingly, the Regulating Agencies found that additional studies and analyses are necessary to demonstrate the reliability of the Navy's approach. *HBWS Post-Hr'g Mem.* ¶ 99 (citing Norfleet Expert Rep.).

- Between 2016 and 2018, U.S. EPA and HDOH made specific findings and demands of the Navy with respect to its failure to comply with Sections 6 and 7, relating to the spill response and groundwater flow modeling. The primary concerns with the Navy's effort included that the conceptual site model was not sufficiently supported by the data collected to date, that the Navy and its consultants were drawing conclusions prematurely "about key aspects of the model that strongly influence groundwater flow and contaminant fate and transport," that the Navy had not "presented a strategy and framework for evaluating the uncertainty associated with the results obtained from the model," and that the "initial analysis of Non-Aqueous Phase Liquid transport, fate and transformation in the unsaturated zone is not likely to be conservative and appears inconsistent with data collected at the site." *HBWS Post-Hr'g Mem.* ¶ 100.

- Section 8 of the AOC requires the Navy to develop a Risk/Vulnerability Assessment for, e.g., the impact of an earthquake. 2015 AOC, attach. A at 15. The Phase 1 Risk Assessment, which was approved by the Regulating Agencies, confirmed high level of risks for both chronic and acute releases. *HBWS Post-Hr'g Mem.* ¶ 101. Thereafter, the Phase 2 document was disapproved by U.S. EPA and HDOH, meaning that the Navy is not prepared for known risks to the Facility.

The Navy's response to the 2015 AOC has been fundamentally inadequate. The risks posed by the Facility's operation are clearly identified, and all parties agree there is a serious threat to the Southern Oahu Basal Aquifer. In spite of this, the Navy proposes a 2045 deadline for the installation of secondary containment.

The Honolulu Board of Water Supply ("HBWS"), the agency charged with managing Oʻahu's municipal water resources and providing residents with safe and dependable water service, actively participated in the 2015 AOC process by providing extensive comments. The HBWS expressed its concern that a catastrophic event could cause fuel to infiltrate the Waimalu and Moanalua Aquifers and contaminate the Hālawa Shaft and Moanalua Well, which supply the public water system.  HBWS also cautioned about the possibility of fuel contamination of nearby Hālawa Stream and Pearl Harbor.

Notice of Intent to File RCRA Action
November 2, 2021
Page 10 of 20

      B.       <u>Contested State Operating Permit</u>

Since the 1990s, Hawai'i law has required USTs to be upgraded or replaced. However, so-called "field-constructed" USTs, like those at the Red Hill Facility, were largely exempt from federal[7] and HDOH regulation until 2018. Effective July 15, 2018, HDOH adopted Hawai'i Administrative Rule ("HAR") Chapter 11.280.1, which for the first time required large field-constructed USTs to be subject to permitting requirements by July 15, 2019. HAR §§ 11-280.1–10(a)(1)(A), 11-280.1–323(a).

On June 12, 2019, the Navy completed its application for a state permit to operate USTs at Red Hill. In order to issue a permit to the Navy for the Red Hill USTs, HDOH must find that the "installation and operation of the UST [] tank system will be done in a manner that is protective of human health and the environment." HAR §§ 11-280.1–323(b). On June 24, 2019, the HBWS submitted written comments on the Navy's permit application, making clear that "it is not appropriate for the [H]DOH to issue an operating permit" for the USTs at Red Hill. *HBWS Post-Hr'g Mem.* at 3. In October, HBWS and the Sierra Club of Hawai'i filed complaints with HDOH challenging the Navy's permit application. These challenges triggered a contested case, i.e., the requirement to have a mini-trial complete with expert witness testimony and cross-examination.

Between February 1 and 5, 2021,[8] HDOH held a contested case hearing on whether or not the Navy can operate its USTs in compliance with state law. Following a September 12, 2021 decision in favor of granting a permit to the Facility by an HDOH hearing officer, a final decision and order from the Director of HDOH is pending. The deadline was originally set for October 19, 2021 but was extended to November 19, 2021.  Final submissions from the Navy, the HBWS and the Sierra Club of Hawaii are due to the HDOH in November.

## III.    The Resource Conservation and Recovery Act

RCRA was passed in 1976 as an amendment to the Solid Waste Disposal Act of 1965. The Act is the principal federal law governing the management and disposal of solid and hazardous waste. With RCRA, Congress sought to address increasing problems the nation faced from growing volumes of municipal and industrial waste. In passing the statute, Congress intended to "promote the protection of health and the environment" by "requiring that hazardous waste be properly managed in the first instance thereby reducing the need for corrective action at a future date." 42 U.S.C. § 6902(a)(5). RCRA set national goals, including to protect human health and the environment from the potential hazards of waste disposal, and to ensure that regulated wastes are managed in an environmentally sound manner "from cradle to grave"—i.e., including generation, transportation, treatment, storage, and disposal.[9]

---

[7] "Field constructed" tanks are exempt from federal UST regulations. 40 C.F.R. 280.

[8] Closing arguments were completed on February 8, 2021.

[9] *See* Summary of the Resource Conservation and Recovery Act, U.S. EPA LAWS AND REGULATIONS, https://www.epa.gov/laws-regulations/summary-resource-conservation-and-recovery-act (last visited Aug. 9, 2021).

In addition to the enforcement power given to the U.S. EPA, RCRA also confers on private citizens the right to: (a) bring lawsuits to enforce RCRA's performance standards; and (b) initiate lawsuits demanding the abatement of imminent and substantial endangerments to public health and the environment. 42 U.S.C. § 9672(a)(1)(A)–(B). Section 7002(a)(1)(B) provides that any person may commence a civil action in federal district court on their own behalf:

> against any person, including the United States or any other government instrumentality or agency . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).

RCRA defines "person" to include "an individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body and shall include each department, agency, and instrumentality of the United States." 42 U.S.C. § 6903(15). "Contributing" is not defined in the statute. Courts have broadly interpreted "contributing to" to mean "to have a share in any act or effect." *United States v. Aceto Agricultural Chemicals Corp.,* 872 F.2d 1373, 1384 (8th Cir. 1989) (citing Webster's Third New International Dictionary 496 (1961)). RCRA defines "solid waste" as "any garbage, refuse, . . . and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations[.]" *Id.* § 6903(27). The Act defines "disposal" broadly to include "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid or hazardous waste . . . may enter the environment or be . . . discharged into any waters[.]" *Id.* § 6903(3).

Liability under the Act exists where a person's disposal of solid waste may present an imminent and substantial endangerment to human health or the environment. Courts emphasize the preeminence of the word "may" in defining the degree of risk needed to support liability under RCRA. *See e.g. Me. People's Alliance v. Mallinckrodt, Inc*., 471 F.3d 277, 288 (1st Cir. 2006). Where there is a risk of threatened harm, an endangerment is "imminent," i.e., no requirement to show actual harm will occur immediately. *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994). And an endangerment is "substantial" where it is serious. *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1021 (10th Cir. 2007).

The Navy's operations at the Facility have created, and currently pose, imminent and substantial endangerment to human health and the environment. The Navy is a "person" as defined under RCRA.[10] And as the owner/operator of the Facility since at least 1943, the Navy has contributed to the past and present handling, storage, treatment, transportation, and/or disposal of solid

---

[10] According to the 2015 AOC, "Navy and [the Defense Logistics Agency] are "persons" as defined in Section 1004(15) of RCRA, 42 U.S.C. § 6903(15)."

Case 1:22-cv-00272-LEK-RT     Document 130-1     Filed 06/13/24     Page 13 of 21
                                        PageID.3061
Notice of Intent to File RCRA Action
November 2, 2021
Page 12 of 20

waste.[11] The Navy's handling, storage, treatment, transportation, and/or disposal of solid waste at the Facility—including specifically fuel releases constituting the "disposal" of RCRA-regulated wastes[12]—poses an imminent and substantial endangerment to health or the environment.[13] As such, the Navy is in ongoing violation of the Act's section 7003(a)(1)(B) at the Facility. *See* 42 U.S.C. § 6972(a)(1)(B).

According to 42 U.S.C. § 6972(a), the United States District Court of Hawai'i shall have jurisdiction to order any person who "has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" that presents an imminent and substantial endangerment to health or the environment to take such action as may be necessary to cease and remedy the pollution. The Wai Ola Alliance intends to seek legal and equitable relief in their planned lawsuit, including but not limited to an assessment of past, present, and future response, remediation, removal, and/or clean-up costs against the Navy, mandatory and prohibitory injunctive relief, as well as attorneys' and expert consultant fees and costs.

## IV.     Imminent and Substantial Endangerment at Red Hill

The Navy acknowledges that "site investigations have shown evidence of fuel releases which have resulted in contamination of the bed rock, soil, and groundwater surrounding the [Red Hill] tanks." *Navy Audit Report* (2010) at 2; *see also Groundwater Protection Plan* (2014) at ES-1. ("Previous environmental Site Investigations (SIs) at the Facility showed that past [] releases have contaminated the fractured basalt, basal groundwater, and soil vapor beneath the Facility with hydrocarbons.") Each of the following lines of evidence—including historic and ongoing leaks, evidence of hydrocarbons in the environment, deficiencies in the Facility's operation and maintenance, and predicted future releases—demonstrate that the Facility has and will continue to present an imminent and substantial endangerment to human health and the environment.

### A.     Historical Tank Releases Constitute Disposal of Solid Waste

Between its construction and 1995, "public access and independent investigations were not conducted" at the Red Hill Facility. *Groundwater Protection Plan* (2008) at 1-2. The Navy acknowledges, however, that records from that era indicate that "one or more" tanks leaked. *Groundwater Protection Plan* (2014) at 1-3. The Navy's own records and reports detail numerous leaks, including the following examples:

- In 1948, Tank 16 released an estimated 461,000 gallons of fuel following an "earth disturbance."

---

[11] According to the 2015 AOC, "EPA has determined that Navy and DLA have contributed to or are contributing to the handling, storage, treatment, transportation or disposal of solid waste at the Facility."

[12] According to the 2015 AOC, "EPA has determined that any fuel released from the Facility would be a "solid waste" within the meaning of Section 1004(27) of RCRA, 42 U.S.C. § 6903(27)."

[13] According to the 2015 AOC, "EPA has determined that Navy and DLA's handling, storage, treatment, transportation, or disposal of solid waste may present an imminent and substantial endangerment to health or the environment."

Notice of Intent to File RCRA Action
November 2, 2021
Page 13 of 20

- Between August 1970 and April 1972, Tank 1 had "[u]nexplained fuel drops amounting to 31,294 gallons."
- In 1981, Tank 15 "leaked badly upon refilling after tank repair and lining."

*HBWS Letter* (2017) at 4 *citing to* Department of the Navy Letter to Hawaii State Department of Health, *Red Hill Tank Complex, Enclosure 1. Excerpts of Engineering Report on the Results of Survey of Navy Petroleum Facilities at Pearl Harbor by the Bechtel Corporation dated May 12, 1949* (July, 2004) at 17; *Groundwater Protection Plan* (2008) at 3-2, 3-4. In total, there are at least 73 documented fuel release incidents in the Facility's history—that's an average of nearly one documented spill per year. And that figure does not include the 1,000 gallons released on May 21, 2021. *HBWS Post-Hr'g Mem.* at 2, ¶¶ 35, 43 (citing Norfleet Expert Rep.). In addition to data from rock core and soil vapor samples (described *infra* Sections VI.D-E), "[t]ests performed by the Navy of the groundwater underneath the Red Hill tanks since 2005 show the presence of petroleum contamination" and thus confirm that historic releases have been "disposed of" to the Southern Oahu Basal Aquifer. *HBWS Letter* (2017) at 4.

      B.     Five-Day Release in 2014

On December 9, 2013, the Navy placed Tank 5 back into service after it had undergone routine scheduled maintenance. The maintenance work consisted of cleaning, inspection, and repairing multiple sites within the tank. Upon placing it back into service, the Navy commenced filling Tank 5 with JP-8 fuel. 2015 AOC at 5.

Less than one month later, the Navy discovered a "loss of fuel" from Tank 5 and notified the State of Hawaiʻi and U.S. EPA. On January 13, 2014, the Navy began transferring fuel from Tank 5 to other tanks at the Facility. It took the Navy five days to complete the fuel transfer. The total amount of fuel released to the environment between January 13 and 18, 2014 is unknown, but the Navy estimates that at least 27,000 gallons were released. *Id.*

The Navy does not know where the fuel released from Tank 5 went or how it traversed through the environment. Following multiple investigations, the Navy was not able to locate any of the fuel or identify the pathways for its release to the environment. *HBWS Post-Hr'g Mem.* at 10, ¶ 40. The monitoring well nearest to Tank 5, however, showed a "signature spike of petroleum products" following the release, which confirms that fuel released was not contained within the Facility but rather was released to the environment. *HBWS Post-Hr'g Mem.* at 9, ¶ 37.

      C.     1,000 Gallon Spill in 2021

On May 6, 2021, approximately 1,000 gallons leaked from the Facility. Despite the Navy's claims that that the spill was contained, soil vapor monitoring readings in the area below the spill indicate otherwise. Two weeks before the leak, soil vapor monitor readings in the area ranged between 173 and 223 parts per billion by volume (ppbv). On May 13, however, volatile organic compounds spiked more than one thousand times to 232,667 ppbv. The total amount attributable to the 2021 release is unknown to the Wai Ola Alliance.

Notice of Intent to File RCRA Action
November 2, 2021
Page 14 of 20

      D.      <u>Rock-Core Sample Data Establish Fuel Disposal from 19 of 20 Tanks</u>

In order to confirm the existence and evaluate the magnitude of the Facility's fuel releases to the environment, the Navy has collected and analyzed rock-core samples beneath the USTs. The first report to HDOH of a release from the Facility occurred when the Navy discovered petroleum-stained basalt in rock-core samples from beneath the tanks on November 10, 1998. 2015 AOC at 5.

In the early 2000s, the Navy performed transverse rock-core analyses beneath each tank. 2015 AOC at 5. The study revealed evidence of petroleum staining beneath nineteen of the Facility's twenty tanks. 2015 AOC at 5; *see also* Red Hill Bulk Fuel Storage Facility Community Informational Briefing, PURE WATER HAWAII, http://purewaterhawaii.org/red-hill-bulk-fuel-storage-facility-community-informational-briefing (last visited Sept. 3, 2021). "The most likely source of the petroleum contamination was from the USTs, although it is possible that the leaks could have originated from buried piping or spills in the tunnels that seeped into the rock." *Groundwater Protection Plan* (2014) at 1-6. In other words, there is no dispute that releases from the Facility caused the hydrocarbon contamination found in the rocks beneath the tanks. Inadequate leak detection and monitoring systems, however, prevent the Navy from definitively establishing which of the Facility's various sources were responsible for the releases.

      E.      <u>Soil Vapor Data Confirms Fuel Disposal</u>

In addition to collecting rock-core samples/data, the Navy relies on another secondary source of evidence to detect leaks—soil vapor sampling from below the Facility's tanks. *Groundwater Protection Plan* (2014) at ES-2 (describing how soil vapor monitoring can "potentially limit the size of a hypothetical release, by shorting the confirmation and response time.") Soil vapor, or soil gas, is the air found in the pore spaces between soil and rock particles. Soil vapor can become contaminated when chemicals , e.g., petroleum hydrocarbons evaporate from subsurface sources and enter the soil vapor. Soil vapor analysis can establish the presence of volatile organic compounds associated with stored fuels in the ground and provide evidence of (or confirm) releases to the environment.[14] Past analyses establish that "soil vapor beneath the USTs contains petroleum-related compounds." *Id*.

The Navy has conducted soil vapor monitoring under at least eighteen of the USTs. "[T]he highest soil vapor readings are beneath Tanks 6, 16, 14, 11, and 12." *Groundwater Protection Plan* (2008) at 1-7. Recent testimony given by the Navy described "elevated or pronounced spikes of soil vapor readings at Tanks 20, 17, 18, 16, and 15 in particular." *HBWS Post-Hr'g Mem*. at 7. The Navy's data, therefore, establish that hydrocarbons released from the Facility have reached the rock/soil beneath the Facility.

---

[14] The Navy, however, acknowledges that historical releases may cofound the process because it is difficult to determine if vapors present in the subsurface are the result of past spills, or due to new releases.

Following the Facility's most recent fuel leak during the refilling of Tank 20 on May 6, 2021, soil vapor data collected by the Navy indicates a spike in petroleum vapors, and thereby confirmed a release to the environment. *HBWS Post-Hr'g Mem*. at 7.

### F.     Monitoring Well Data Demonstrates Fuel Has Reached the Aquifer

The Navy maintains monitoring wells beneath (and near) the Facility to assess groundwater contamination levels from past and ongoing fuel releases. Testing conducted by the Navy establishes beyond dispute that fuel released from the Facility reach the Southern Oahu Basal Aquifer. Samples collected between 2005 and 2009 demonstrate ongoing contamination of the groundwater above HDOH Environmental Action Levels, which are pollutant concentrations below which HDOH asserts there is no threat to human health or the environment. *Navy Audit Report* (2010) at 11-12. The data show that Red Hill Monitoring Well No. 2 ("RHMW02"), which is located near the middle of the Facility, consistently exhibited the highest levels of contamination, particularly TPH. *Id*. at 12-13.

At one point in the fourth quarter of 2008, contamination at RHMW02 exceeded the Navy's own "Site Specific Risk-Based Level" ("SSRBL"). The SSRBL represents the contaminant concentration level in the monitoring wells that could potentially impact the Navy Well,[15] i.e., contaminants could migrate from the Facility to nearby potable water supply wells. *Id*. Then in the first quarter of 2009, TPH contaminants were also detected at the Navy Well itself, the first time contaminants were recorded since the Navy began testing in 2006.

In 2010, the Navy concluded that "testing results at all four monitoring wells indicate[d] that the groundwater ha[d] been contaminated by various chemical constituents, such as total petroleum hydrocarbons (TPH) and naphthalene, which are found in petroleum-based fuels." *Id.* at 11.

In 2014 the Navy increased the total number of monitoring wells to 15; and plans to install eight additional wells by the end of 2021. Rogers Expert Rep. at 10-11. The most recent data show increases in one or more chemicals of concern in 11 of the existing monitoring wells. *See e.g.* IMAGE 4. For example, data from monitoring well RHMW02 show TPH-d at 1500 and 1700 ug/L for the first and second quarters of 2020. *Id*. at 4. Similarly, concentrations of TPH-d doubled in monitoring well Red Hill Monitoring Well No. 4 from 120 ug/L during the first quarter of 2020 to 240 ug/L in the second quarter sample. *Id*.

---

[15] Navy Well 2254-01 is located west and hydraulically downgradient from the Facility. This well feeds into the Joint Base Pearl Harbor-Hickam Water System.

**IMAGE 4**
Groundwater Contamination in Monitoring Well RHMW02 (2005-2019)

[Source: Honolulu Board of Water Supply]

G.     Absence of Leak Detection and Ongoing Disposal

A 2010 audit of the Red Hill Facility recommended that the Navy "research, develop[], and install[] a permanent precision leak detection system in the [] tanks." *Navy Audit Report* (2010) at 20. Following a major leak in 2014 (discussed in detail *infra* Section VI.B), HDOH concluded that in order to operate the facility in an environmentally sound manner, the Navy must install "state-of-the-art leak detection." *HBWS Post-Hr'g Mem.* at 17, ¶ 58. The Navy, however, has responded that "precision leak detection technology is not currently available for [Red Hill] tanks." *Navy Audit Report* (2010) at 20. The Facility continues to operate in 2021 without precision leak detection systems. The absence of leak detection technology means "the Navy cannot provide assurance that slow, chronic fuel releases can be detected and mitigated in a timely manner." *Id.* at 9.

In place of an actual leak detection system, the Facility relies heavily on an Automated Fuel Handling System ("AFHS") and tank tightness tests to address leaks. Both systems, however, suffer fatal flaws that fail to protect human health and the environment. For example, if the AFHS indicates that a tank is leaking, the Navy cannot address the release until the tank is drained. During the "drain down time," which can take as many as 36 hours, fuel will continue to leak. Additionally, tank tightness tests currently being performed on the USTs do not comply with the 0.1 gallons per hour ("gph") detection threshold established in Hawaii law for repaired USTs. In fact, Tank 5 underwent *and passed* the Navy's less stringent tank tightness test (0.5

gph) only months before the 2014 leak (discussed below) occurred. *HBWS Post-Hr'g Mem,* at 10, ¶ 38.

### H.    Corrosion to Tank Integrity

The most pervasive and chronic threat to the integrity of the Red Hill USTs is corrosion-induced failures, which the Navy itself has identified as a primary risk factor for decades. *See Bechtel Red Hill Survey* at 9-11; *HBWS Letter* (2017) at 2-3, 11. The problem is that moisture, e.g., rainwater, groundwater, has and continues to seep between the tank's steel liner and reinforcing concrete—causing rust and corrosion on the backside of each tank. Due to the vintage construction, however, this corrosion cannot be effectively prevented or monitored because the Navy cannot physically access, inspect, maintain, or protect the backside of its USTs.

In 2018 the Navy completed a corrosion assessment on Tank 14, which involved cutting out small pieces of the tank (called "coupons") to evaluate corrosion on the tank's backside. Each coupon was analyzed for the degree of corrosion. Rogers Expert Rep. at 8. The study revealed that corrosion had caused the loss of 48% of the steel in one coupon, i.e., only 1/8-inches of 78-year-old steel stands between 12.5-million-gallons of fuel and the environment. *Id*. at 8.

Other analyses indicate that there is an ongoing risk of fuel leaks from corroding tanks, including by corrosion that, over time, leads to through-wall holes in the steel tanks. *Navy Audit* (2010) at 14; *see also HBWS Post-Hr'g Mem.* at 6–8 (describing twenty-two through-wall holes identified during inspections of Tanks 2, 5, 6, 15, 16, and 20); *see also* Rogers Expert Rep. at 7 (identifying through-wall corrosion and other potential leaks in Tanks 5, 10, 17, 19 and 20). Based on the numerous Navy reports observing tank corrosion and the age of the tanks, it is reasonable to expect that the frequency and size of leaks/spills will increase as the Red Hill tanks continue to age and corrode.

### I.    Inspection and Maintenance Problems

According to the Navy, "inspection and maintenance of the storage tanks is essential to preserving the structural integrity of the [USTs] and to preventing leaks and further contamination of the environment and groundwater sources in the [Facility] area." *Navy Audit Report* (2010) at 13-14. The Navy's own modified American Petroleum Institute 653[16] inspection process requires that every Red Hill UST should be inspected once every ten years. During the decade between 1998 and 2008, however, only six tanks (6, 7, 8, 10, 15 and 16) underwent inspection and repair. *Groundwater Protection Plan* (2008) at 3-5 – 3.6. Six of the 18 active tanks in 2010 had no recorded inspection or maintenance efforts for between twenty-seven and forty-six years. *Navy Audit Report* (2010) at 9. The Navy acknowledges that Tanks 3, 4, 7, 8, 9, 10, 11, and 12 have either no inspection history or are overdue for an inspection. *HBWS Post-Hr'g Mem.* at 9 (citing Hearing Testimony of Navy witness John Floyd). According to the

---

[16] The Navy modified an inspection program referred to as America Petroleum Institute 653 method, which establishes minimum requirements for maintaining the integrity of above-ground welded steel fuel storage tanks.

Regulating Agencies, the Navy's current inspection cycle is averaging thirty years, with the longest duration being fifty-nine years for Tank 18. *HBWS Post-Hr'g Mem.* at 9.

In addition to the Navy's failure to maintain a reasonable schedule for tank inspection and maintenance, the Wai Ola Alliance is concerned with the quality and reliability of the tests being implemented. For example, a Navy-contracted laboratory performed "destructive testing" (i.e., removing "coupons") on Tank 14 in order to, in part, assess the reliability of its standard "non-destructive" inspection measurements. Four of the ten coupons removed from Tank 14 were thinned to the point where they required patching. However, the Navy's standard inspection technique had identified only two areas as warranting repair, yielding only a 50% success rate for identifying tank wall areas in need of corrosion repair. Therefore, not only is the Navy failing to inspect tanks on a regular basis, but the inspections it does conduct potentially miss half of the areas actually requiring repair.

## J.       Future Releases Present Imminent Threats

Prior to the 2014 spill from Tank 5, a Navy study concluded that "the age of the [F]acility presents a future risk of a moderate to large release of fuel to the underlying groundwater." *Navy Audit Report* (2010) at 55. In 2018, the Navy contracted a study—called the *Quantitative Risk and Vulnerability Assessment (Phase I)* ("QRVA")—specifically to assess the Facility's potential for future releases. As a result of these assessments, the Navy has identified the Facility as "high-risk," i.e., there is a high probability of a future releases from the Facility to the Southern Oahu Basal Aquifer.

The 2018 study identified probabilities for fuel releases from the Facility in the near and foreseeable future. The "top line" predictions are as follows:

> (1) 5,806 gallons of fuel will be released each year (Facility-wide) from chronic, undetected leaks[17];
> (2) there is a greater than 27% probability of a sudden release of up to 30,000 gallons of fuel from the Facility each year;
> (3) there is greater than 34% probability of a sudden release of more than 120,000 gallons of fuel from the Facility in the next 100 years;
> (4) there is a greater than a 5% probability of a sudden release of more than 1,000,000 gallons of fuel from the Facility in the next 100 years.

Therefore, according to the Navy's own analyses, the Facility presents imminent and substantial endangerments to Oahu's sole source aquifer in both the near and long term.

## IV.    Identification of Counsel

The Wai Ola Alliance is represented by:

---

[17] The Navy's *QRVA* admits that it cannot detect slow, chronic fuel releases from the Facility's tanks because current methods are not effective for that purpose. Sierra Club, *Post-Hr'g Brief* at PDF 11.

18

Sycamore Law, Inc.
Daniel Cooper
Jesse Swanhuyser
1004 O'Reilly Ave.
San Francisco, CA 94129
daniel@sycamore.law
jesse@sycamore.law
(415) 360-2962

Margaret Wille & Associates, LLLC
Margaret Wille
Timothy Vandeveer
P.O. Box 6398
Kamuela HI 96743
tim@mwlawhawaii.com
(808) 388-0660

## V.    Conclusion

Red Hill has released fuel into the environment in the past, did so just months ago, and will continue to do so in the future. The Navy has been aware of and on notice for decades that the Facility's tanks (and associated infrastructure, e.g., pipelines) are antiquated, corroding, leaking, improperly operated and maintained, and at risk of catastrophic failure. Immediate action is required. The Wai Ola Alliance is willing to discuss effective remedies for the violations described in this Notice Letter. Upon expiration of the 90-day notice period, however, the Wai Ola Alliance intends to file a citizen suit against the Navy for past and ongoing RCRA violations at the Facility. If you wish to pursue settlement discussions, please contact counsel.

Sincerely,

Jesse C. Swanhuyser
Sycamore Law, Inc.

Tim Vandeveer
Margaret Wille & Associates LLLC

19

**SERVICE LIST**

<u>VIA CERTIFIED U.S. MAIL</u>

Merrick Garland, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Michael Regan, Administrator
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

John Busterud, Regional Administrator
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, CA 94105

Hon. David Yutaka Ige, Governor of Hawai'i
Executive Chambers, State Capitol
Honolulu, HI 96813

Dr. Elizabeth A. Char, MD, Director
State of Hawai'i, Department of Health
1250 Punchbowl Street
Honolulu, HI 96813