UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| WAI OLA ALLIANCE, A PUBLIC INTEREST ASSOCIATION, ET AL.<br><br>         Plaintiffs,<br><br>   vs.<br><br>UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES DEPARTMENT OF DEFENSE, JOINT TASK FORCE RED HILL, UNITED STATES NAVY REGION HAWAII, UNITED STATES NAVY FACILITIES ENGINEERING COMMAND - HAWAII,<br><br>         Defendants. | CIV. NO. 22-00272 LEK-RT |

**ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

      The instant matter involves Clean Water Act claims for

the release of fuel into bodies of freshwater on Oʻahu. Here,

Plaintiffs[1] seek partial summary judgment on liability for

---

[1] The plaintiffs are: Wai Ola Alliance ("the Alliance"); and individual members of the Alliance, Mary Maxine Kahaulelio, Clarence Ku Ching, Melodie Aduja, Kim Coco Iwamoto, Peter Doktor, Steven Hanaloa Helelā, Kalamaokaaina Niheu, Dr. Lynette Hiilani Cruz, James J. Rodrigues, and Jade Mahina Frank (collectively "the Individual Plaintiffs" and all collectively "Plaintiffs"). [Third Amended Complaint for Declaratory Relief and Injunctive Relief, filed 6/13/24 (dkt. no. 130) ("Third Amended Complaint"), at pgs. 10-16.] "The Alliance is a community-based organization composed of environmentally and culturally focused individuals and organizations dedicated to protecting the waters of Hawaiʻi from the effects of past and ongoing releases, discharges, and disposal of petroleum

                (. . . continued)

unpermitted waste discharges from two locations controlled by

Defendant United States Department of the Navy ("the Navy").

[Pltfs.' Motion for Partial Summary Judgment ("Plaintiffs'

Motion"), filed 4/25/25 (dkt. no. 177).] Defendants[2] contend that

Plaintiffs lack standing and that their claims fail because they

have not proven either ongoing discharge or likelihood of

recurrence, and Defendants assert therefore that Plaintiffs'

Motion must be denied. [Defs.' Opposition to Plaintiffs' Motion

for Partial Summary Judgment ("Defendants' Opposition"), filed

5/30/25 (dkt. no. 193).] As follows, Plaintiffs' Motion is

granted insofar as this Court concludes that the Alliance and

the Individual Plaintiffs who submitted declarations in support

of Plaintiffs' Motion have standing to pursue the Clean Water

Act claim in this case. Plaintiffs' Motion is denied in all

other respects.

## BACKGROUND

The crux of the instant case is Plaintiffs' allegation

that the Navy's operation of the Facility "has and will continue

to present imminent and substantial endangerment to health and

---

pollutants from [the] Red Hill [Bulk Fuel Storage Facility ('the
Facility')] . . . ." [Id. at ¶ 39.]

    [2] The defendants are the Navy and Defendants Joint Task
Force Red Hill, United States Navy Region Hawaii, and United
States Navy Facilities Engineering Command – Hawaii
(collectively "Defendants"). [Third Amended Complaint at ¶¶ 50-
63.]

the environment through historic, existing, and impending
contamination of the irreplaceable Southern O`ahu Basal Aquifer
(the 'Aquifer')." [Third Amended Complaint at ¶ 6.] Plaintiffs
allege the Navy is engaging in conduct that constitutes:
"a. significant ongoing violations of the Federal Water
Pollution Control Act ('Clean Water Act' [or 'CWA']) 33 U.S.C.
§ 1251, *et seq.*; and b. significant ongoing violations of the
Resource Conservation and Recovery Act ('RCRA'), 42 U.S.C.
§ 6901, *et seq.*" [Third Amended Complaint at ¶ 2.] Plaintiffs'
RCRA claim is currently stayed. <u>See</u> order, filed 5/14/24 (dkt.
no. 127) ("5/14/24 Order"), at 29.[3]

Plaintiffs' Motion seeks a summary judgment ruling
that the Navy is liable "for 543 violations and 543 days of
violations of Section 1311 of the Clean Water Act" ("the Self-
Reported Violations"). [Pltfs.' Motion at 4.] If Plaintiffs'
Motion is granted, it would leave for trial the issues of

---

[3] The 5/14/24 Order is also available at 734 F. Supp. 3d
1034. The 5/14/24 Order addressed the Second Amended Complaint
for Declaratory Relief and Injunctive Relief, [filed 10/13/23
(dkt. no. 89),] and the stay was ordered for one year after
Plaintiffs filed the third amended complaint. 734 F. Supp. 3d at
1038, 1049. Based on the June 13, 2024 filing of the Third
Amended Complaint, the stay was to expire on June 13, 2025. On
May 16, 2025, an entering order was issued extending the stay to
December 12, 2025. [Dkt. no. 181.] A further hearing on
Defendants' request to extend the stay to June 13, 2026 is
scheduled for September 23, 2025. <u>See</u> Minutes, filed 7/11/25
(dkt. no. 213).

whether there were other CWA violations and the appropriate

remedies. [Id., Mem. in Supp. at 10-11.]

I.    **Undisputed Facts**

The following facts are undisputed. The Facility is a

petroleum storage and conveyance system that is owned by the

Navy. The Facility includes Hotel Pier, Kilo Pier, Sierra Pier,

Mike Pier and Bravo Pier (collectively "the Piers"). The Navy

Supply Systems Command Fleet Logistics Center operates the

Facility. [Plaintiffs' Concise Statement of Material Facts in

Support of Motion for Partial Summary Judgment, filed 4/25/25

(dkt. no. 178) ("Pltfs.' Motion CSOF"), at ¶¶ 2-3; Defendants'

Concise Statement of Material Facts, filed 5/30/25 (dkt.

no. 194) ("Defs.' Opp. CSOF"), at ¶¶ 2-3 (admitting Pltfs.' ¶¶ 2

and 3).] Pipes from the upper tank farm and an underground

pumphouse extend to the Piers.[4] [Pltfs.' Motion CSOF at ¶ 6;

Defs.' Opp. CSOF at ¶ 6.]

A.    **Hotel Pier**

Hotel Pier is bordered by Pearl Harbor (which is also

known as Puʻuloa) and Hālawa Stream, both of which are navigable

---

[4] Plaintiffs refer to the Facility's twenty bulk fuel
underground storage tanks ("USTs") and the associated piping as
"Upper Red Hill," and they refer to the Piers and the above-
ground tanks, valves, pipes, venting, and other equipment that
are used to convey petroleum to vessels as "Lower Red Hill." See
Pltfs.' Motion, Mem. in Supp. at 11-12. Lower Red Hill is the
focus of Plaintiffs' CWA claim and Plaintiffs' Motion. [Id. at
13.]

waters that are considered Waters of the United States for
purposes of the CWA. See Pltfs.' Motion CSOF at ¶¶ 4-5, 7;
Defs.' Opp. CSOF at ¶¶ 4-5, 7. Hotel Pier was built after World
War II and, since then, Hotel Pier has been used for fueling and
defueling. Hotel Pier is currently used to send and receive
various types of fuel to vessels. [Pltfs.' Motion CSOF at ¶¶ 8-
9; Defs.' Opp. CSOF at ¶¶ 8-9.]

On March 17, 2020 and June 2, 2020, the Navy reported
to the State of Hawai`i Department of Health ("DOH") releases of
oil from Hotel Pier area into Pu`uloa and Hālawa Stream. See
Pltfs.' Motion CSOF at ¶¶ 15-16; Defs.' Opp. CSOF at ¶¶ 15-16
(disputing Plaintiffs' statements of fact only as to Plaintiffs'
characterization of the Navy's report as concerning "discharges
of petroleum").[5] Based on a failed leak test in January 2021, the
Navy reported that the likely cause of the Hotel Pier discharge
was a multi-product defuel line. [Pltfs.' Motion CSOF at ¶ 17;
Defs.' Opp. CSOF at ¶ 17.] In a February 4, 2021 email, Naval
Captain James G. Meyer ("Captain Meyer") confirmed that the fuel
was still being released into the water at Pu`uloa.[6] See Pltfs.'
Motion CSOF at ¶ 18; Defs.' Opp. CSOF at ¶ 18.

---

[5] For purposes of Plaintiffs' Motion, where Defendants only
dispute one of Plaintiffs' statements of fact as to the manner
in which Plaintiffs characterize or describe an event, that
statement of fact is considered to be admitted.

(. . . continued)

The Navy's efforts to address the release included the installation of booming at and around Hotel Pier to collect oil on the surface of the water and the deployment of divers to repair the Hotel Pier seawall.[7] See Pltfs.' Motion CSOF at ¶ 19; Defs.' Opp. CSOF at ¶ 19 (disputing other portions of Plaintiffs' ¶ 19). The Navy also installed observation wells to assist in the identification of the source of the release and to remove any free product before it reached Puʻuloa. [Pltfs.' Motion CSOF at ¶ 20; Defs.' Opp. CSOF at ¶ 20.] By August 2, 2021, the Navy had dug interception trenches that were intended to prevent free product from reaching Puʻuloa. [Pltfs.' Motion CSOF at ¶ 22; Defs.' Opp. CSOF at ¶ 22.]

---

[6] Captain Meyer's February 4, 2021 email stated:

> We have a relatively significant amount of fuel being released into the water at Pearl Harbor daily. Some of the fuel is from historic old releases already in the ground; however, tests of the leaking fuel **indicate it could be from an active fuel line.** FLC has done some pressure tests, most have passed, but the fidelity of the tests can rule out a slow ongoing release. **This release into the harbor is not only an environmental concern but also a concern as it relates to the Red Hill fuel system.**

[Pltfs.' CSOF, Exh. L (emails dated 2/4/21 and 2/5/21 between various Navy personnel) at RH004086 (emphases added).]

[7] The seawall is a sheet-pile seawall that was deteriorating and allowing free product to migrate into the harbor. See Pltfs.' Motion CSOF, Exh. K (Quarterly Release Response Report – Hotel Pier, dated Jan. 2022 ("Jan. 2022 Quarterly Report")) at NAVY_0041570.

From September 25 to December 9, 2021, the Navy
collected approximately one gallon of petroleum products per
week from the surface of the water within the boom system, but
no fuel was recovered from that area after the week of
September 3, 2021. [Pltfs.' Motion CSOF at ¶ 24; Defs.' Opp.
CSOF at ¶ 24.]

As of November 2021, the Navy had not delineated the
subsurface petroleum plume at Pu`uloa. [Pltfs.' Motion CSOF at
¶ 23; Defs.' Opp. CSOF at ¶ 23 (admitting that portion of
Plaintiffs' ¶ 23).]

According to the Navy, as of January 2022, observation
wells near Hotel Pier were collecting approximately one gallon
of oil product per week. The active collection was ongoing when
this action was filed on June 14, 2022. As of May 23, 2023, the
Navy was still collecting petroleum free product from the
observation wells. [Pltfs.' Motion CSOF at ¶¶ 26-28; Defs.' Opp.
CSOF at ¶¶ 26-28.]

A quarterly report regarding the response to the fuel
release at Hotel Pier stated that fuel product was measured at
one observation well (OW3), which is adjacent to Hālawa Stream,
during the January 2024 and February 2024 monitoring events.
[Pltfs.' Motion CSOF at ¶ 29; Defs.' Opp. CSOF at ¶ 29.]

Hotel Pier is currently in use. [Pltfs.' Motion CSOF
at ¶ 38; Defs.' Opp. CSOF at ¶ 38.]

B.    **Kilo Pier**

Kilo Pier is located in Pu`uloa. [Pltfs.' Motion CSOF at ¶ 10; Defs.' Opp. CSOF at ¶ 10.] On July 16, 2021, the Navy reported to DOH a release of petroleum from a pipeline into Pu`uloa at Kilo Pier. From July 16, 2021 to July 23, 2021, 150 gallons of fuel were released from Kilo Pier. The source of the release was a corroded fuel pipe at Kilo Pier. [Pltfs.' Motion CSOF at ¶¶ 30-32; Defs.' Opp. CSOF at ¶¶ 30-32.]

Kilo Pier's pipelines have been isolated, drained, and out of service since July 2021. [Pltfs.' Motion CSOF at ¶ 36; Defs.' Opp. CSOF at ¶ 36 (disputing other portions of Plaintiffs' ¶ 36).] However, the Navy plans to re-open Kilo Pier for fueling and defueling vessels after the system has been repaired. [Pltfs.' Motion CSOF at ¶ 37; Defs.' Opp. CSOF at ¶ 37.]

C.    **Mike, Bravo, and Sierra Piers**

A portion of Sierra Pier is currently in use. [Pltfs.' Motion CSOF at ¶ 38; Defs.' Opp. CSOF at ¶ 38).] Mike Pier and Bravo Pier are not currently in use, but the Navy plans to re-open them for fueling and defueling vessels after the system has been repaired. [Pltfs.' Motion CSOF at ¶ 37; Defs.' Opp. CSOF at ¶ 37.]

## II.  <u>**Evidence Presented by the Parties**</u>

Shortly after the June 2, 2020 report of the release

from Hotel Pier, the Navy stated the likely source was a

pipeline that runs perpendicular to the Hotel Pier seawall, but

in September 2020 it was shown that the pipeline was not the

source because the release continued after the pipeline was

closed. That month, the release rate was estimated to be

approximately twenty gallons per day. <u>See</u> Pltfs.' CSOF, Exh. C

(Final Hotel Pier Plume Delineation Pearl Harbor Naval Supply

Center report, dated November 2021, by AECOM Technical Services

Inc. ("AECOM Report")) at NAVY_0042017. After the defuel line

was identified as the source,[8] the booming installed at Hotel

Pier to contain surface water contamination was not properly

secured, and oil sheen escaped. [<u>Id.</u>, Exh. K (Jan. 2022

Quarterly Report) at NAVY_0041570; <u>id.</u>, Declaration of Daniel

Cooper in Support of Pltfs.' Motion for Partial Summary Judgment

("Cooper Decl."), Exh. 2 (emails from James Saul, CNRH NOSC

Representative, NAVFAC HI, to Sherri Eng and others, dated

2/1/21 and 2/2/21) at 1 (noting boom issues and sheen

escaping)).]

_____

[8] The defuel line that has been identified as the source of
the release to Pu`uloa that gave rise to this case is a
subsurface petroleum pipeline from Valve Station 3 ("VS-3") to
VS-1C ("the Defuel Line"). <u>See</u> Pltfs.' Motion CSOF, Exh. C
(AECOM Report) at NAVY_0042018; <u>id.</u>, Exh. J (email dated 1/27/21
from Trent Kalp to Captain Meyer and others ("1/27/21 Email")).

Even after the Defuel Line was identified as the likely source of the 2020 releases from Hotel Pier into Pu`uloa, the source of the non-aqueous-phase liquid ("NAPL") release to Pu`uloa and Hālawa Stream remained unknown. [Id., Exh. C (AECOM Report) at NAVY_0042012, NAVY_0042018).]

Plaintiffs argue that, in spite of a history of spills at the Facility, the maintenance at Upper Red Hill and Lower Red Hill has been poor, and there are pervasive problems, including corrosion, that threaten the integrity of the Facility's storage and conveyance systems. See Pltfs.' Motion, Mem. in Supp. at 18-19; see also Pltfs.' Motion CSOF, Exh. B (excerpts of Final Assessment Report by Simpson Gumpertz Heger Inc., dated 4/29/22 ("SGH Report")) at 57-59, 120-26, 134-64); Cooper Decl., Exh. 3 (Final Pigging Completion Report, dated Sept. 2016 by CB&I Federal Services LLC ("CBI&I Report")) at 2, 8).[9] Plaintiffs argue the SGH audit, which was performed in April 2022 before defueling, confirmed earlier findings by the DOH. Plaintiffs also argue the SGH audit shows that the discharges at Hotel Pier and Kilo Pier reflect system-wide operational and maintenance problems at Lower Red Hill. See Pltfs.' Motion, Mem. in Supp. at 19; Pltfs.' CSOF, Exh. B (SGH Report) at iv & App'x A.1 (Site

_____

[9] "PIG" refers to the "pipeline inspection gauge" method. See Pltfs.' CSOF, Exh. J (1/27/21 Email) at PageID.3899.

Visit Observations and Recommendations (Sorted by Location)) at
1-34)).

Defendants present evidence that the Defuel Line has
been inactive since January 2021, and the Navy plans to
permanently decommission it. [Defs.' CSOF, Declaration of Paul
Cirino ("Cirino Decl."), Exh. 8 (excerpts of trans. of Oral
Deposition of Dr. William James Rogers, taken 4/24/25 ("Rogers
Depo.")) at 71-72.]

The Navy also took Kilo Pier out of service in 2021,
and thus it is not currently a backup for Hotel Pier. See Cirino
Decl., Exh. 1 (excerpts of trans. of Deposition of Guy Pasco
30(b)(6), taken 12/10/24 ("Pasco Depo.")) at 16-18.

Defendants present the expert report of Paul B.
Summers, P.E., S.E., F.ASCE, of SGH ("Summers"). [Id., Exh. 10
(Expert Report Fuel System Integrity Joint Base Pearl Harbor-
Hickam Hawaii, dated 1/24/25 ("Summers Report")).] Based on his
review, which included approximately twenty site visits to the
Facility over three years, Summers opines that there are no fuel
discharges currently occurring, and future discharges are not
reasonably likely to occur.[10] [Id. at 17.]

---

[10] Summers assessed the structural integrity of the
Facility; he did not consider its operations, procedures, nor
the training of Facility personnel. [Cirino Decl., Exh. 10
(Summers Report) at 18.]

Defendants also obtained the Expert Report of Ted
Caudill, PE, dated January 24, 2025 ("Caudill Report"). See
Pltfs.' CSOF, Exh. AA (Caudill Report). Ted Caudill, PE
("Caudill") has been working as a contractor with Joint Base
Pearl Harbor-Hickam ("JBPHH") as the Chief Engineer of the Fuels
Department since 2022. [Id. at 2.] Caudill opines that there is
no ongoing release of fuel products into Pu`uloa and Hālawa
Stream, and future occurrences are not reasonably likely to
occur.[11] [Id. at 7.] According to Claudill, there is a residual
risk of future fuel releases, but the risk is "negligible, and
the safety measures in place effectively reduce the likelihood
and impact of any such event to the greatest extent
practicable." [Id.]

**DISCUSSION**

I.   **Standing**

This Court turns first to Defendants' argument that
Plaintiffs' Motion must be denied because Plaintiffs have not
established that the Alliance's members have standing to pursue
a claim based on the Self-Reported Violations. Defendants
emphasize that Plaintiffs only present declarations from four of
the ten Individual Plaintiffs, and those declarations do not

---

[11] Caudill's opinion addresses the reliability of JBPHH's
fuel system operations; it does not address the mechanical
integrity of the system. [Pltfs.' CSOF, Exh. AA (Claudill
Report) at 7.]

12

identify any injuries attributable to the Self-Reported

Violations. See Defs.' Opp. at 19.

> "The fundamentals of standing are well-known
> and firmly rooted in American constitutional
> law." FDA v. All. for Hippocratic Med., 602 U.S.
> 367, 380, 144 S. Ct. 1540, 219 L. Ed. 2d 121
> (2024). Most basic among those principles is that
> a case or controversy must include an injury-in-
> fact, caused by the defendant's acts, that likely
> would be redressed by the requested judicial
> relief. Id. Further, these conditions "must
> remain extant at all stages of review, not merely
> at the time the complaint is filed." Decker v.
> Nw. Env't Def. Ctr., 568 U.S. 597, 609, 133 S.
> Ct. 1326, 185 L. Ed. 2d 447 (2013) (simplified).
> Take redressability. "[W]hen it is impossible for
> a court to grant any effectual relief whatever to
> the prevailing party[,]" there is nothing left
> for the court to do and the "case becomes moot."
> Id. at 609, 133 S. Ct. 1326 (simplified). . . .

Coastal Env't Rts. Found. v. Naples Rest. Grp., LLC, 115 F.4th

1217, 1221 (9th Cir. 2024) (brackets in Coastal Env't Rts.).

> An association has standing to bring suit on
> behalf of its members when its members would
> otherwise have standing to sue in their own
> right, the interests at stake are germane to the
> organization's purpose, and neither the claim
> asserted nor the relief requested requires the
> participation of individual members in the
> lawsuit. Hunt v. Washington State Apple
> Advertising Comm'n, 432 U.S. 333, 343 (1977).

Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.

("Laidlaw"), 528 U.S. 167, 181 (2000). The focus of the standing

inquiry is on the injury to the plaintiff, not the injury to the

environment. Id. "[E]nvironmental plaintiffs adequately allege

injury in fact when they aver that they use the affected area

13

and are persons 'for whom the aesthetic and recreational values
of the area will be lessened' by the challenged activity." Id.
at 183 (some citations omitted) (quoting Sierra Club v. Morton,
405 U.S. 727, 735 (1972)). In Laidlaw, the United States Supreme
Court held that

> the affidavits and testimony presented by [the
> organizational plaintiffs] in this case assert
> that [Defendant-Respondent] Laidlaw
> [Environmental Services (TOC), Inc.'s
> ("Laidlaw")] discharges, and the affiant members'
> reasonable concerns about the effects of those
> discharges, directly affected those affiants'
> recreational, aesthetic, and economic interests.
> These submissions present dispositively more than
> the mere "general averments" and "conclusory
> allegations" found inadequate in [Lujan v.]
> National Wildlife Federation. [497 U.S. 871,] 888
> [(1990)]. Nor can the affiants' conditional
> statements — that they would use the nearby North
> Tyger River for recreation if Laidlaw were not
> discharging pollutants into it — be equated with
> the speculative "'some day' intentions" to visit
> endangered species halfway around the world that
> we held insufficient to show injury in fact in
> [Lujan v.] Defenders of Wildlife. 504 U.S. [555,]
> 564 [(1992)].

Id. at 183–84. In National Wildlife Federation, the record was
insufficient to establish standing because the plaintiff
presented the testimony of only one of its members, and that
testimony did not identify a specific portion of the millions of
acres at issue in the case, nor did it establish that the area
the member used was the location of either prior mining activity
or probable future mining activity. See id. at 183 (quoting
Nat'l Wildlife Fed'n, 497 U.S. at 889).

14

In contrast, in <u>Laidlaw</u>, the record at the time of the defendant's motion for summary judgment included more than ten exhibits with testimony by members of the three organizational plaintiffs, and the Supreme Court noted that other affidavits had been submitted in support of an earlier motion seeking a preliminary injunction. <u>See id.</u> at 176-77. The Supreme Court specifically noted that

> [Plaintiff-Petitioner Friends of the Earth, Inc. ("FOE")] member Kenneth Lee Curtis averred in affidavits that he lived a half-mile from Laidlaw's facility; that he occasionally drove over the North Tyger River, and that it looked and smelled polluted; and that he would like to fish, camp, swim, and picnic in and near the river between 3 and 15 miles downstream from the facility, as he did when he was a teenager, but would not do so because he was concerned that the water was polluted by Laidlaw's discharges. Curtis reaffirmed these statements in extensive deposition testimony. For example, he testified that he would like to fish in the river at a specific spot he used as a boy, but that he would not do so now because of his concerns about Laidlaw's discharges.

<u>Id.</u> at 181-82 (citations omitted). The Supreme Court stated, "[o]ther members presented evidence to similar effect," and it briefly discussed the testimony of three members of Plaintiff-Petitioner Citizens Local Environmental Action Network, Inc., another FOE member, and a member of Plaintiff-Petitioner Sierra Club. <u>Id.</u> at 182-83. The Supreme Court held that this testimony established an injury in fact because it was "entirely reasonable" that "a company's continuous and pervasive illegal

15

discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms." See id. at 184-85.

In the instant case, the declarations contain testimony similar to the testimony that the Supreme Court held was sufficient to establish standing in Laidlaw. For example, Plaintiff Pete Doktor ("Doktor") lives approximately one mile away from the Facility. [Pltfs.' CSOF, Exh. D (Standing Declaration of Peter Doktor in Support of Plaintiffs' Motion for Partial Summary Judgment) ("Doktor Decl.") at ¶ 4.] The water used in his home comes from the Aquifer, which is being impacted by the petroleum spills at Pu`uloa. See id. at ¶ 7. Doktor describes experiencing trauma and fear for his family and community because of the fuel releases at the Facility and the contamination of the Aquifer. See id. ¶¶ 14-19. Between 2020 and 2022, Doktor experienced the onset of depression, the causes of which included the Red Hill crisis and the unsatisfactory military response. [Id. at ¶ 22.] Doktor also states that he observes Pu`uloa regularly, such as when he goes hiking. When he sees Pu`uloa, he is saddened and disgusted by the contamination caused by the Navy. Doktor enjoys Pu`uloa less because of the sight and smell of pollution. He would use and enjoy Pu`uloa more, such as by kayaking, swimming, and fishing with his child,

16

were it not for its contamination by the Navy. [Id. at ¶¶ 25-27.]

Plaintiff Steven Hanaloa Helelā ("Helelā") has personal and ancestral ties to the Hālawa ahupua`a, which is the primary site of the contamination caused by the Facility. See Pltfs.' CSOF, Exh. E (Standing Declaration of Steven Hanaloa Helelā in Support of Plaintiffs' Motion for Partial Summary Judgment) ("Helelā Decl.") at ¶¶ 8-10. For more than thirty years, Helelā has worked to restore the native ecosystem and various cultural and ceremonial practices in the Hālawa ahupua`a. [Id. at ¶ 13.] Helelā states the Navy's discharges of pollutants from the Facility have caused him "to suffer noneconomic injuries including but not limited to cultural, religious, aesthetic and recreational harms." [Id. at ¶ 14.] Helelā is unable to engage in traditional and customary cultural practices at in the Hālawa ahupua`a, and the desecration of the affected lands and sacred waters have imposed burdens upon him and caused him to suffer sadness, grief, and depression. See id. at ¶¶ 16, 19. Helelā also fears developing cancer or other chronic illnesses because of exposure to contamination in the Aquifer from the recent spills and/or prior spills. [Id. at ¶ 30.]

Plaintiff Jade Frank and Plaintiff Kalamaoka`aina Niheu provide similar testimony to the testimony of Doktor and

17

Helelā. See Pltfs.' CSOF, Exh. F (Declaration of Jade Frank in
Support of Motion for Partial Summary Judgment) ("Frank Decl.")
at ¶¶ 3-5, 9-16; id., Exh. G (Declaration of Kalamaoka`aina
Niheu in Support of Motion for Partial Summary Judgment) ("Niheu
Decl.") at ¶¶ 4-6, 10, 17-21, 24-28, 32-33.

      Defendants appear to argue that the Motion should be
denied because there is no evidence that any plaintiff has
standing to pursue a CWA claim based on the Self-Reported
Violations. See Defs.' Opp. at 19. Defendants' argument is
misplaced.

> "[S]tanding is not dispensed in gross," Lewis v.
> Casey, 518 U.S. 343, 358 n.6, 116 S. Ct. 2174,
> 135 L. Ed. 2d 606 (1996), so "a plaintiff must
> demonstrate standing for each claim he seeks to
> press and for each form of relief that is
> sought," Davis v. Fed. Election Comm'n, 554 U.S.
> 724, 734, 128 S. Ct. 2759, 171 L. Ed. 2d 737
> (2008) (cleaned up). We therefore analyze
> separately whether [the plaintiffs] established
> Article III organizational standing to pursue the
> discharge and procedural allegations.

Inland Empire Waterkeeper v. Corona Clay Co., 17 F.4th 825, 831-
32 (9th Cir. 2021) (alteration in Inland Empire). Inland Empire
was a CWA citizen suit, and the plaintiff nonprofit
organizations alleged both the illegal discharge of pollutants
into navigable waters of the United States and violations of the
monitoring and reporting requirements in the defendant's permit.
Id. at 829-30. Nothing in Inland Empire suggests that the
plaintiffs were required to establish standing for **each**

18

**discharge** within the discharge allegations of their CWA claim. Defendants have not cited any binding authority that imposes such a standing requirement, nor is this Court aware of any. This Court therefore rejects Defendants' argument that, to prevail on Plaintiffs' Motion, Plaintiffs must present evidence of standing specific to the Self-Reported Violations.

Plaintiffs have presented evidence of the Navy's fuel discharges, and Plaintiffs have presented evidence from Doktor, Helelā, Frank, and Niheu of their reasonable concerns about the effects of the discharges, as well as evidence of how the discharges affect their recreational, aesthetic, spiritual, and cultural interests. This evidence is sufficient to establish that Doktor, Helelā, Frank, and Niheu have each suffered injuries in fact as a result of the Navy's acts. The CWA claim seeks injunctive relief prohibiting Defendants from discharging pollutants from the Facility to waters of the United States, except as authorized by permit, and it seeks civil penalties. See Third Amended Complaint at pg. 70, ¶¶ b-d. If such relief is awarded, it is likely to redress the injuries that Doktor, Helelā, Frank, and Niheu are suffering because preventing illegal discharges and requiring the remediation of past discharges are likely to allow them to utilize the affected areas again. Thus, all of the standing requirements are met. See Coastal Env't Rts., 115 F.4th at 1221.

Even viewing the evidence in the light most favorable
to Defendants,[12] there are no genuine issues of material fact,
and this Court concludes as a matter of law that Doktor, Helelā,
Frank, and Niheu have standing to pursue the CWA claim in this
case. See Fed. R. Civ. P. 56(a) ("The court shall grant summary
judgment if the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a
matter of law.").

Doktor, Helelā, Frank, and Niheu are all members of
the Alliance. See Doktor Decl. at ¶ 29; Helelā Decl. at ¶ 32;
Frank Decl. at ¶ 6; Niheu Decl. at ¶ 3. Further, the interests
at stake in Plaintiffs' CWA claim are germane to the Alliance's
purpose. See, e.g., Doktor Decl. at ¶ 30 ("The Alliance is
dedicated to protecting the sacred wai (in English 'water') of
Hawaii."); id. at ¶ 32 ("Wai Ola is a grassroots, voluntary
membership organization composed of citizens that seek to
protect the island water resources sacred to Native Hawaiians.
We organized ourselves to address past damage and future threats
posed by the Navy's Red Hill facility — including specifically
to Pu`uloa and the [Aquifer].").[13] Although individual members of

_____

[12] In considering Plaintiffs' Motion, this Court must view
the record in the light most favorable to Defendants as the
nonmoving party. See Harris v. Cnty. of Orange, 17 F.4th 849,
855 (9th Cir. 2021).
    [13] Peter Doktor is one of the co-founders of the Alliance.
See Doktor Decl. at ¶ 29.

the Alliance are participating in this action, there is no
evidence in the record suggesting that the individual members'
participation is **required** for either the CWA claim or the relief
sought. Thus, even viewing the evidence in the light most
favorable to Defendants, there are no genuine issues of material
fact, and this Court concludes as a matter of law that the
Alliance has standing to pursue the CWA claim in this case. See
Laidlaw, 528 U.S. at 181.

Plaintiff has not presented any evidence regarding the
injury in fact allegedly suffered by the other Individual
Plaintiffs - Mary Maxine Kahaulelio ("Kahaulelio"), Clarence Ku
Ching ("Ching"), Melodie Aduja ("Aduja"), Kim Coco Iwamoto
("Iwamoto"), Dr. Lynette Hiilani Cruz ("Dr. Cruz"), and James J.
Rodrigues ("Rodrigues"). Although Plaintiffs argue "each
individually named member and plaintiff [has] standing to
protect Pu`uloa and Hālawa Stream from the petroleum pollution
discharged by the Navy," [Pltfs.' Motion, Mem. in Supp. at 28-
29,] Plaintiffs have not identified evidence to support this
position. The fact that the Alliance, Doktor, Helelā, Frank, and
Niheu have standing to pursue the CWA claim in this case does
not automatically confer standing upon Kahaulelio, Ching, Aduja,
Iwamoto, Dr. Cruz, and Rodrigues. Cf. Lewis, 518 U.S. at 358 n.6
("standing is not dispensed in gross").

21

Plaintiffs' Motion is granted insofar as this Court concludes that the Alliance, Doktor, Helelā, Frank, and Niheu have standing to pursue the CWA claim in this case, but Plaintiffs' Motion is denied as to the request for a standing ruling regarding Kahaulelio, Ching, Aduja, Iwamoto, Dr. Cruz, and Rodrigues. The denial of Plaintiffs' Motion is without prejudice to Plaintiffs' introduction of evidence at trial regarding the issue of whether Kahaulelio, Ching, Aduja, Iwamoto, Dr. Cruz, and Rodrigues have standing.

## II. <u>Mootness</u>

This Court next turns to Plaintiffs' argument that the portion of their CWA claim based on the Self-Reported Violations is not moot. <u>See</u> Pltfs.' Motion, Mem. in Supp. at 31-33. The CWA citizen suits provision states, in pertinent part:

> Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf –
>
>> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who **is alleged to be in violation** of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . .

33 U.S.C. § 1365(a)(1) (emphasis added).

22

Because § 1365(a)'s text requires that a
defendant "be in violation" of the Act, the
[Supreme] Court held that the citizen suit
provision only authorizes suits to abate **ongoing**
or **future** violations — it "does not permit
citizen suits for wholly past violations."
Gwaltney [of Smithfield, Ltd. v. Chesapeake Bay
Found.], 484 U.S. [49,] 64, 108 S. Ct. 376
[(1987)]. Thus, to authorize a citizen suit, the
plaintiff must allege that the defendant is in "a
state of either continuous or intermittent
violation" so that "a reasonable likelihood
[exists] that [the defendant] will continue to
pollute in the future." Id. at 57, 108 S. Ct.
376. Because of the requirement of an ongoing
violation, Gwaltney recognized that mootness
could upend the citizen suit while the litigation
remains pending. The allegations of ongoing
violations, for example, may cease to be true
"because the defendant begins to comply with the
Act." Id. at 66, 108 S. Ct. 376. In that
circumstance, "[l]ongstanding principles of
mootness . . . prevent the maintenance of suit
when there is no reasonable expectation that the
wrong will be repeated." Id. (simplified). Given
that it's the defendant's voluntary actions which
trigger mootness, the defendant's burden to prove
mootness "is a heavy one." Id. (simplified). To
dismiss a case as moot, "[t]he defendant must
demonstrate that it is **'absolutely clear'** that the
allegedly wrongful behavior could not reasonably
be expected to recur.'" Id. (simplified); see
also id. at 69, 108 S. Ct. 376 (Scalia, J.,
concurring) ("When a company has violated an
effluent standard or limitation, it remains, for
purposes of § [1365(a)] 'in violation' of that
standard or limitation so long as it has not put
in place remedial measures that clearly eliminate
the cause of the violation."). This heavy burden
"protects defendants from the maintenance of suit
under the Clean Water Act based solely on
violations wholly unconnected to any present or
future wrongdoing, while . . . also protect[ing]
plaintiffs from defendants who seek to evade
sanction by predictable protestations of
repentance and reform." Id. at 66–67, 108 S. Ct.
376 (simplified). Simply put, once an ongoing

> violation's abatement is "absolutely clear," then
> the citizen suit becomes moot.

Coastal Env't Rts., 115 F.4th at 1222-23 (some alterations in

Coastal Env't Rts.).

Plaintiffs take the position that Defendants have the

burden of proving that Defendants' conduct after the filing of

this action rendered moot the portion of Plaintiffs' CWA claim

based on the Self-Reported Violations. See Pltfs.' Motion, Mem.

in Supp. at 24. However, Defendants have not opposed Plaintiffs'

Motion by seeking the dismissal of the portion of Plaintiffs'

CWA claim based on the Self-Reported Violations on mootness

grounds; rather, Defendants argue Plaintiffs are not entitled to

summary judgment because Plaintiffs did not prove their

allegations of ongoing discharge or likelihood of recurrence.

See Defs.' Opp. at 11.

Had Defendants moved to dismiss on mootness grounds

the portion of the CWA claim based on the Self-Reported

Violations, the motion to dismiss would likely have been denied.

See Laidlaw, 528 U.S. at 189 ("A case might become moot if

subsequent events made it absolutely clear that the allegedly

wrongful behavior could not reasonably be expected to recur. The

heavy burden of persuading the court that the challenged conduct

cannot reasonably be expected to start up again lies with the

party asserting mootness." (brackets, citations and internal

quotation marks omitted)); <u>Coast. Env't Rts. Found.</u>, 115 F.4th
at 1223 ("To dismiss a case as moot, 'the defendant must
demonstrate that it is **absolutely clear** that the allegedly
wrongful behavior could not reasonably be expected to recur.'"
(some citations and internal quotation marks omitted) (quoting
<u>Gwaltney</u>, 484 U.S. at 66, 108 S. Ct. 376)).

The Third Amended Complaint contains factual
allegations describing the Self-Reported Violations. <u>See</u> Third
Amended Complaint at ¶¶ 209-14 (allegations regarding the Hotel
Pier discharges reported on March 17, 2020 and June 2, 2020);
<u>id.</u> at ¶¶ 269-80 (allegations regarding the Kilo Pier discharges
reported on July 16, 2021). Plaintiffs allege that, at the time
the Third Amended Complaint was filed, the Navy still had not
eliminated the source of the Hotel Pier discharge that started
in 2020. <u>See</u> <u>id.</u> at ¶ 250. By the filing of the Third Amended
Complaint, the source of the 2021 Kilo Pier discharge had been
identified as corrosion in a fuel line, <u>see</u> <u>id.</u> at ¶ 277, but
Plaintiffs allege that Kilo Pier was in active use, even though
it has multiple areas requiring repairs, and the repairs had not
been made, <u>see</u> <u>id.</u> at ¶¶ 281-84. These allegations are
sufficient to plead a claim that is not moot. If Defendants had
filed a motion to dismiss on mootness grounds the portion of
Plaintiffs' CWA claim based on the Self-Reported Violations,
Defendants would have had the heavy burden to prove that it was

25

"absolutely clear" that the actions and omissions that led to
the Self-Reported Violations "could not reasonably be expected
to recur." See Gwaltney, 484 U.S. at 66 (quotation marks and
citation omitted). This Court declines to speculate whether the
evidence that Defendants now present in opposition to
Plaintiffs' request for summary judgment would have been
sufficient to carry the burden of proof if Defendants had filed
a motion to dismiss based on mootness grounds.

　　　　To the extent that Plaintiffs' Motion asks this Court
to rule that the portion of their CWA claim based on the Self-
Reported Violations would survive a motion to dismiss alleging
mootness, this Court declines to make such a ruling because that
issue is not properly before this Court at this time.

## III. __Whether Plaintiffs Are Entitled to Partial Summary Judgment__

　　　　In the Laidlaw mootness analysis, the Supreme Court
made it clear that, in contrast to a case where the defendant
bears the burden to establish that the defendant's voluntary
compliance renders the plaintiff's claim moot,

> in a lawsuit brought to force compliance, it is
> the plaintiff's burden to establish standing by
> demonstrating that, if unchecked by the
> litigation, the defendant's allegedly wrongful
> behavior will likely occur or continue, and that
> the "threatened injury [is] certainly impending."
> Whitmore v. Arkansas, 495 U. S. 149, 158 (1990)
> (citations and internal quotation marks omitted).
> Thus, in [Los Angeles v.] Lyons, . . . we held
> that a plaintiff lacked initial standing to seek
> an injunction against the enforcement of a police

> chokehold policy because he could not credibly
> allege that he faced a realistic threat arising
> from the policy. 461 U.S.[ 95,] 105-110 [(1983)].
> Elsewhere in the opinion, however, we noted that
> a citywide moratorium on police chokeholds - an
> action that surely diminished the already slim
> likelihood that any particular individual would
> be choked by police - would not have mooted an
> otherwise valid claim for injunctive relief,
> because the moratorium by its terms was not
> permanent. Id., at 101. The plain lesson of these
> cases is that there are circumstances in which
> the prospect that a defendant will engage in (or
> resume) harmful conduct may be too speculative to
> support standing, but not too speculative to
> overcome mootness.

Laidlaw, 528 U.S. at 190 (alteration in Laidlaw).

Applying the Supreme Court's reasoning to the instant

case, this Court concludes that, although Defendants would have

the burden of proof in a motion to dismiss asserting mootness,

because Plaintiffs' Motion seeks a summary judgment ruling on

the issue of liability, Plaintiffs bear the burden of proving

that the Self-Reported Violations are "'either continuous or

intermittent violation[s]' so that 'a reasonable likelihood

[exists] that [the defendant] will continue to pollute in the

future.'" See Coastal Env't Rts., 115 F.4th at 1222 (some

alterations in Coastal Env't Rts.) (quoting Gwaltney, 484 U.S.

at 57, 108 S. Ct. 376).

It is undisputed that the Navy self-reported the Hotel

Pier release in 2020 and the Kilo Pier releases in July 2021.

See Pltfs.' CSOF, Exh. I (letter dated 7/14/21 to Roxanne Kwan

27

of the DOH Solid and Hazardous Waste Branch, Underground Storage
Tank Section ("Kwan"), from Sherri R. Eng, Director of the
Navy's Regional Environmental Department ("Eng") transmitting
the Confirmed Release Notification Form regarding the Hotel Pier
releases reported on 3/17/20 and 6/2/20); Cirino Decl., Exh. 9
(letter dated 7/23/21 to Kwan from Eng transmitting the
Confirmed Release Notification Form regarding the Kilo Pier
release reported on 6/16/21). Plaintiffs assert that the Navy's
self-reports admit to "unpermitted discharges at Hotel Pier
continued for at least 536 days — from March 17, 2020, to
September 3, 2021" and 7 days of discharges at Kilo Pier
beginning on July 16, 2021, for a total of 543 days. See Pltfs.'
Motion, Mem. in Supp. at 34.

　　　　Plaintiffs have chosen to seek partial summary
judgment as to discharges that occurred during a specific period
before the filing of this action. In other words, the discharges
at issue in Plaintiffs' Motion that are not currently occurring.
Thus, in order to obtain the requested summary judgment ruling
on liability, Plaintiffs must prove that there is a reasonable
likelihood that the actions and omissions that led to the Self-
Reported Violations will occur in the future. See Coastal Env't
Rts., 115 F.4th at 1222.

　　　　Defendants present evidence that the Defuel Line
believed to have caused the Hotel Pier Self-Reported Violation

"was emptied and isolated in January 2021" and has been inactive ever since. [Cirino Decl., Exh. 8 (Rogers Depo.) at 71-72.] Further, the Navy plans to permanently decommission the Defuel Line. [Id. at 72.] As previously noted, the parties agree that the Kilo Pier pipelines have been out of service since July 2021. [Pltfs.' Motion CSOF at ¶ 36; Defs.' Opp. CSOF at ¶ 36.] Defendants also present Summers's opinion that, based on his assessment of the Facility's structural integrity, there are no ongoing discharges and there is no reasonable likelihood of future discharges. See Cirino Decl., Exh. 10 (Summers Report) at 17. Further, Claudill, who assessed JBPHH's fuel system operations, agreed that there are no ongoing discharges. See Pltfs.' CSOF, Exh. AA (Claudill Report) at 7. Claudill acknowledged that there is a negligible risk of future fuel releases, but he opined that the existing safety measures in the JBPHH system "effectively reduce the likelihood and impact of any such event to the greatest extent practicable." [Id.]

Viewing the record in the light most favorable to Defendants as the nonmoving party, this Court must find that there are genuine issues of material fact as to whether there is a reasonable likelihood that the actions and omissions which led

29

to the Self-Reported Violations will occur in the future.[14]
Plaintiffs therefore are not entitled to summary judgment on the
issue of liability for the portion of the CWA claim based on the
Self-Reported Violations.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for
Partial Summary Judgment, filed April 25, 2025, is GRANTED IN
PART AND DENIED IN PART. Plaintiffs' Motion is GRANTED insofar
as this Court concludes that the Alliance, Doktor, Helelā,
Frank, and Niheu have standing to pursue the CWA claim in this
case. Plaintiffs' Motion is DENIED in all other respects.

IT IS SO ORDERED.

---

[14] This Court notes that the denial of Plaintiffs' Motion is
not necessarily an indication that Defendants are entitled to
summary judgment. Where Defendants seek summary judgment in
their favor, the record will be viewed in the light most
favorable to Plaintiffs as the nonmoving party. For example,
although this Order relies upon the fact that the Hotel Pier
Defuel Line and the Kilo Pier pipelines are not currently in
service to find a triable issue of fact, that evidence would not
be as persuasive when Defendants seek summary judgment. Cf.
Laidlaw, 528 U.S. at 189 ("It is well settled that a defendant's
voluntary cessation of a challenged practice does not deprive a
federal court of its power to determine the legality of the
practice. If it did, the courts would be compelled to leave the
defendant free to return to his old ways." (alterations,
citations, and internal quotation marks omitted)).

DATED AT HONOLULU, HAWAII, July 31, 2025.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
Senior U.S. District Judge

**WAI OLA ALLIANCE, A PUBLIC INTEREST ASSOCIATION, ET AL. VS.
UNITED STATES DEPARTMENT OF THE NAVY, ET AL**; CV 22-00272 LEK-RT;
**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**