UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| WAI OLA ALLIANCE, A PUBLIC INTEREST ASSOCIATION, ET AL.<br><br>       Plaintiffs,<br><br>  vs.<br><br>UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES DEPARTMENT OF DEFENSE, JOINT TASK FORCE RED HILL, UNITED STATES NAVY REGION HAWAII, UNITED STATES NAVY FACILITIES ENGINEERING COMMAND - HAWAII,<br><br>       Defendants. | CIV. NO. 22-00272 LEK-RT |

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants[1] seek summary judgment as to Plaintiffs'[2]

Clean Water Act claims arising from the release of fuel into

_____

[1] The defendants are Defendants United States Department of the Navy ("the Navy"), United States Department of Defense, Joint Task Force Red Hill, United States Navy Region Hawaii, and United States Navy Facilities Engineering Command – Hawaii (collectively "Defendants"). [Third Amended Complaint for Declaratory Relief and Injunctive Relief, filed 6/13/24 (dkt. no. 130) ("Third Amended Complaint") at ¶¶ 50-63.]

[2] The plaintiffs are: Wai Ola Alliance ("the Alliance"); and individual members of the Alliance, Mary Maxine Kahaulelio, Clarence Ku Ching, Melodie Aduja, Kim Coco Iwamoto, Peter Doktor, Steven Hanaloa Helelā, Kalamaokaaina Niheu, Dr. Lynette Hiilani Cruz, James J. Rodrigues, and Jade Mahina Frank (all collectively "Plaintiffs"). [Third Amended Complaint at pgs. 10-16.] "The Alliance is a community-based organization composed of environmentally and culturally focused individuals and organizations dedicated to protecting the waters of Hawai`i from
(. . . continued)

bodies of freshwater on O`ahu. [Defendants' Motion for Summary
Judgment ("Defs.' Motion"), filed 5/19/25 (dkt. no. 182).]
Plaintiffs contend that Defendants are not entitled to summary
judgment because there is a reasonable likelihood that either
there were ongoing discharges at the time that this action was
filed or the actions and omissions that led to past discharges
are likely to recur. [Plaintiffs' Opposition to Defendants'
Summary Judgment Motion ("Pltfs.' Opp."), filed 8/18/25 (dkt.
no. 225), at 7.] As follows, Defendants' Motion is denied in its
entirety.

## BACKGROUND

The crux of Plaintiffs' Clean Water Act claim is their
allegation that the Navy's operation of the Red Hill Bulk Fuel
Storage Facility ("Red Hill") "has and will continue to
discharge pollutants, including but not limited to petroleum-
based pollutants (e.g., jet propellant-5, jet propellant-8,
marine diesel), from point sources at and near the Facility to
waters of the United States, including but not limited to Pearl
Harbor (hereinafter 'Pu`uloa') and Hālawa Stream" without the
required permits. [Third Amended Complaint at ¶ 5.] Plaintiffs
allege this constitutes "significant ongoing violations of the

---

the effects of past and ongoing releases, discharges, and
disposal of petroleum pollutants from [the] Red Hill [Bulk Fuel
Storage Facility] . . . ." [Id. at ¶ 39.]

Federal Water Pollution Control Act ('Clean Water Act' [or
'CWA']) 33 U.S.C. § 1251, *et seq.*" [Id. at ¶ 2.a.[3]]

It is undisputed that Red Hill is a petroleum storage
and conveyance system, owned by the Navy and operated by the
Navy Supply Systems Command Fleet Logistics Center. Red Hill
includes Hotel Pier, Kilo Pier, Sierra Pier, Mike Pier, and
Bravo Pier (collectively "the Piers"). See Order Granting in
Part and Denying in Part Plaintiffs' Motion for Partial Summary
Judgment, filed 7/31/25 (dkt. no. 219) ("7/31/25 Order"), at 4.[4]
Plaintiffs' CWA claim relates to the portion of the Red Hill
fuel distribution system that includes the Piers, six above-

---

[3] Plaintiffs also assert a claim for violations of the
Resource Conservation and Recovery Act ("RCRA"), Title 42 United
States Code Section 6901, *et seq.*" [Third Amended Complaint at
¶ 2.b.] Plaintiffs' RCRA claim is not currently before this
Court because it has been stayed. See order, filed 5/14/24 (dkt.
no. 127) ("5/14/24 Order"), at 29, *available at* 734 F. Supp. 3d
1034. The 5/14/24 Order addressed the Second Amended Complaint
for Declaratory Relief and Injunctive Relief, [filed 10/13/23
(dkt. no. 89),] and the stay was ordered for one year after
Plaintiffs filed the third amended complaint. 734 F. Supp. 3d at
1038, 1049. Based on the June 13, 2024 filing of the Third
Amended Complaint, the stay was to expire on June 13, 2025. On
May 16, 2025, an entering order was issued extending the stay to
December 12, 2025. [Dkt. no. 181.] Defendants' request to extend
the stay to June 13, 2026 was orally granted during a
September 23, 2025 hearing. See Minutes, filed 9/23/25 (dkt.
no. 243).

[4] The 7/31/25 Order is also available at 2025 WL 2201066.
What was referred to in the 7/31/25 Order as "the Facility" will
be referred to in this Order as "Red Hill." See 7/31/25 Order,
2025 WL 2201066, at *1 & n.1. What was referred to in the
7/31/25 Order as "Lower Red Hill" will be referred to in this
Order as "the Facility." See id. at *2 & n.4.

ground storage tanks, and the pipelines that connect them

(collectively "the Facility").[5]

I.    **Undisputed Facts Relevant to Defendants' Motion**

    A.    **Hotel Pier Release and the Navy Response**

        On March 17, 2020, the Navy reported to the State of

Hawai`i Department of Health ("DOH") a release of oil from the

Hotel Pier area into Pu`uloa and Hālawa Stream. See Defs.'

Concise Statement of Facts in Supp. of Defs.' Motion for Summary

Judgment, filed 5/19/25 (dkt. no. 183) ("Defs.' Motion CSOF"),

at ¶ 1; Pltfs.' Concise Statement of Facts in Opp. to Defs.'

Motion for Summary Judgment, filed 8/18/25 (dkt. no. 226)

("Pltfs.' Opp. CSOF"), at ¶ 1 (admitting Defs.' ¶ 1). An

additional report was made to DOH on June 2, 2020. See Defs.'

Motion CSOF, Declaration of Paul Cirino ("Cirino Decl."), Exh. 1

(letter dated 6/30/21 to Rear Admiral Timothy Kott, Commander,

Navy Region Hawaii, from DOH's Deputy Director for Environmental

Health ("6/30/21 DOH Letter")) at 1. The release reported to DOH

on March 17, 2020 and June 2, 2020 will be referred to as the

"Hotel Pier Release."

---

    [5] In contrast, Plaintiffs' RCRA claim relates to "the 20-
field constructed bulk fuel [Underground Storage Tanks] ('20
USTs'), surge tanks, and the pumps, infrastructure, and
associated piping between the 20 USTs and the pumphouse at the
Red Hill Bulk Fuel Storage Facility." See Joint Position
Statement, filed 7/8/24 (dkt. no. 133), at 2-3 & n.1.

The Navy's response to the Hotel Pier Release included
the deployment of divers, the installation of booms, the digging
of interceptor trenches, and the digging of more than twenty
land observation wells. The purpose of these measures was to
identify the source of the leak into soil and groundwater and to
capture any free product. See Defs.' Motion CSOF at ¶ 3; Pltfs.'
Opp. CSOF at ¶ 3.

The Navy's testing revealed that an underground defuel
pipeline had leaked ("Defuel Line"),[6] releasing fuel into the
soil. The fuel comingled with a preexisting fuel plume, causing
the soil to become oversaturated. This caused the fuel mixture
to migrate and seep through cracks in the seawall under and
around Hotel Pier. See Defs.' Motion CSOF at ¶ 9; Pltfs.' Opp.
CSOF at ¶ 9. The Defuel Line was isolated on January 23, 2021.
See Defs.' Motion CSOF at ¶ 10; Pltfs.' Opp. CSOF at ¶ 10
(disputing other portions of Defs.' ¶ 10). There was a drastic
decrease in the amount of fuel recovered from the environment
after the Defuel Line was isolated, and the Defuel Line stopped
leaking by August 2021. The Defuel Line is currently isolated
and out of service, and it is being permanently decommissioned.
See Defs.' Motion CSOF at ¶¶ 12-13; Pltfs.' Opp. CSOF at ¶¶ 12-

---

[6] The Defuel Line is a "6-inch multi-product defuel line
located beneath Arizona Street between Valve Stations (VS) VS-3
and VS-1 C." [Cirino Decl., Exh. 1 (6/30/21 DOH Letter) at 1.]

13. The riser valves associated with the Defuel Line were
removed, the risers were filled with concrete, and the riser
piping was capped and welded shut. See Defs.' Supplemental
Concise Statement of Facts in Supp. of Motion for Summary
Judgment, filed 8/8/25 (dkt. no. 223) ("Defs.' Suppl. CSOF"), at
¶ 29; Pltfs.' Opp. CSOF at ¶ 29. The Navy expects to award a
contract during the 2025 fiscal year for the demolition of the
Defuel Line and for the replacement of the piping and relief
valves between Hotel Pier and the valve stations. See Defs.'
Suppl. CSOF at ¶ 33; Pltfs.' Opp. CSOF at ¶ 33.

     In its June 30, 2021 letter, DOH concurred with the
Navy's assessment of the source of the Hotel Pier Release, and
DOH noted that it and the Navy were moving from the "'joint
emergency response'" phase to the "'state oversight'" phase. See
Defs.' Motion CSOF at ¶ 15; Pltfs.' Opp. CSOF at ¶ 15; see also
Cirino Decl., Exh. 1 (6/30/21 DOH Letter) at 2.

     From June 2021 to June 2023, the Navy collected one
gallon of fuel or less per week from the observation wells, and
the Navy collected no fuel from June 2023 to December 2023. See
Defs.' Motion CSOF at ¶¶ 16-17; Pltfs.' Opp. CSOF at ¶¶ 16-17.
In connection with Plaintiffs' Motion for Partial Summary
Judgment, [filed 4/25/25 (dkt. no. 177),] the parties agreed
that "fuel product was measured at one observation well (OW3),
which is adjacent to Hālawa Stream, during the January 2024 and

February 2024 monitoring events." See 7/31/25 Order, 2025 WL
2201066, at *3 (citations omitted).

          The Navy has not recovered fuel from either Puʻuloa or
Hālawa Stream since August 2022. See Defs.' Motion CSOF at ¶ 14
(stating "since September 2021"); Defs.' Supplemental Brief in
Supp. of Defs.' Motion for Summary Judgment, filed 8/8/25 (dkt.
no. 222) ("Defs.' Suppl. Brief"), at 9 n.5 (stating the date in
¶ 14 should have been August 2022); Pltfs.' Opp. CSOF at ¶ 14
(disputing Defs.' ¶ 14 only to point out the error that is noted
in Defs.' Suppl. Brief and the collections in observation
wells).

          In December 2023, "[a]t DOH's direction, the Navy
. . . transitioned from weekly passive recovery efforts to
monthly monitoring of the observation wells at Hotel Pier." See
Defs.' Motion CSOF at ¶ 18; Pltfs.' Opp. CSOF at ¶ 18; see also
Cirino Decl., Exh. 18 (Quarterly Release Response Report – Hotel
Pier Site, dated Mar. 2024) at 6.

     **B.    Kilo Pier Release and Mike and Bravo Piers**

          For one week during July 2021, a Kilo Pier pipeline
released fuel into a boomed area ("Kilo Pier Release"). The Navy
reported the release to DOH and deployed absorbent pads and
skimmers to recover the fuel. See Defs.' Motion CSOF at ¶¶ 19-
20; Pltfs.' Opp. CSOF at ¶¶ 19-20.

In 2021, the Kilo Pier pipelines were isolated, drained, and taken out of service for repairs. The Navy is not currently conducting fuel operations at Kilo Pier, and the Navy plans to replace all of the Kilo Pier fuel piping before resuming fuel operations. <u>See</u> Defs.' Motion CSOF at ¶¶ 21-22; Pltfs.' Opp. CSOF at ¶¶ 21-22. The Navy expects to complete the replacement of the Kilo Pier fuel piping in December 2025. <u>See</u> Defs.' Suppl. CSOF at ¶ 34; Pltfs.' Opp. CSOF at ¶ 34.

The fuel piping at Mike Pier and Bravo Pier has also been isolated, drained, and taken out of service for repairs. <u>See</u> Defs.' Motion CSOF at ¶ 22; Pltfs.' Opp. CSOF at ¶ 22. Fueling operations at Mike Pier and Bravo Pier stopped in 2022. <u>See</u> Defs.' Suppl. CSOF at ¶ 31; Pltfs.' Opp. CSOF at ¶ 31.

Kilo Pier, Bravo Pier, and Mike Pier will not be returned to service until all necessary repairs and replacements are complete. <u>See</u> Defs.' Suppl. CSOF at ¶ 36; Pltfs.' Opp. CSOF at ¶ 36.

C.    <u>**Current Operations**</u>

The Facility's six aboveground fuel storage tanks are situated inland of Pu`uloa, and the tanks "all sit within a secondary containment system designed to prevent release to the environment." [Defs.' Motion CSOF at ¶ 25; Pltfs.' Opp. CSOF at ¶ 25.] The Hotel Pier pipelines that are currently in use "are contained within a concrete trough on the topside of the pier

deck, which provides secondary containment in the event of a
release." [Defs.' Motion CSOF at ¶ 26; Pltfs.' Opp. CSOF at
¶ 26.] "Since 2020, the Navy has completed significant upgrades
and repairs at Hotel Pier, which were verified by EPA and DOH,
and, in 2023, successfully defueled about 104 million gallons of
fuel from the Red Hill Bulk Fuel Storage Facility via the
fueling infrastructure at Hotel Pier." [Defs.' Motion CSOF at
¶ 27; Pltfs.' Opp. CSOF at ¶ 27.]

  The Navy also intends to make improvements to the
Sierra Pier fuel piping. See Defs.' Motion CSOF at ¶ 24; Pltfs.'
Opp. CSOF at ¶ 24. "The Navy is repairing and replacing pipeline
infrastructure at the Facility, including at each of the piers,
which is ongoing and scheduled to occur over the next several
years." [Defs.' Suppl. CSOF at ¶ 32; Pltfs.' Opp. CSOF at ¶ 32.]
The Navy expects to award a contract during fiscal year 2026 to
"replace corroded fittings, piping segments, pipe supports,
thermal valves, and maintenance coatings at Bravo Pier and Mike
Pier along with any necessary repairs for Sierra Pier[.]"
[Defs.' Suppl. CSOF at ¶ 35; Pltfs.' Opp. CSOF at ¶ 35.]

  The active Hotel Pier and Sierra Pier pipelines all
passed annual pressure testing in May and June 2025. See Defs.'
Suppl. CSOF at ¶ 30; Pltfs.' Opp. CSOF at ¶ 30.

## II.  <u>Disputed Facts Relevant to Defendants' Motion</u>

Defendants argue Plaintiffs have not identified any evidence: that there is an ongoing discharge of pollutants into waters of the United States; or that the Navy has failed to remedy the Hotel Pier Release and the Kilo Pier Release (collectively "the Self-Reported Violations") during the pendency of this action. <u>See</u> Defs.' Motion CSOF at ¶ 23.

In addition to the facts discussed *supra*, Plaintiffs rely upon a July 2, 2025 DOH press release stating that DOH "responded to a contained release of approximately 300 gallons of fuel at an underground fuel pump house located on Joint Base Pearl Harbor-Hickam." [Cooper Decl., Exh. 8 at PageID.6285.] According to the Navy's report, the release occurred on July 1, 2025 during maintenance work on a fuel line that was still being used in fuel distribution operations. [<u>Id.</u>]

Plaintiffs also rely upon a spreadsheet, produced by the Navy, that documents releases at the Facility that were reported to DOH ("Spill Spreadsheet"). <u>See</u> Cooper Decl., Exh. 6 (Spill Spreadsheet). Plaintiffs argue the Spill Spreadsheet "records discharges extending from 2015 to the end of 2024, confirming a decade-long pattern of fuel, oil, and pollutant leaks and systemic infrastructure deficiencies that validate and confirm the findings of Plaintiffs' expert[.]" [Pltfs.' Opp. CSOF at ¶ 23.]

10

Plaintiffs' expert, William J. Rogers, Ph.D., has a doctoral degree in Wildlife and Fisheries Sciences, and he describes his expertise as: "Environmental assessment and decision support modeling, human health and ecological environmental risk modeling, toxicology, environmental remediation, waste management and handling with emphasis on oil production, industrial and agriculture related natural resource and environmental quality issues." See id., Declaration of Daniel Cooper in Supp. of Pltfs.' Opposition to Defs.' Motion for Summary Judgment and Concise Statement of Facts ("Cooper Decl."), Exh. 7 (excerpts of Dr. Rogers's Amended Expert Report on Red Hill Fueling Operations and Maintenance, amended 2/14/25 ("Amended Rogers Report")), App'x A (Curriculum Vitae) at 1.

According to Dr. Rogers, there may be an ongoing discharge of oil into Pu`uloa or Hālawa Stream because of a leaking collar next to the truck-fueling facility.[7] A collar band was applied, but, in Dr. Rogers's opinion, the band is inadequate. See Cirino Decl., Exh. 8 (excerpts of trans. of Oral Deposition of Dr. William James Rogers, taken 4/24/25 ("Rogers Depo.")) at 156-57; id. at 158-59 (clarifying that he observed

---

[7] Dr. Rogers testified that the location of leaking collar is noted in his report. See Cirino Decl., Exh. 8 (Rogers Depo.) at 162. That portion of the Amended Rogers Report is not included within Plaintiffs' Exhibit 7.

11

the leak during a site visit,[8] that the leak would continue
unless it was repaired, and that he had no evidence of such
repairs); see also id. at 160 (identifying the general area of
the ongoing discharge). Dr. Rogers described a fuel stain on the
ground and explained that the fuel is carried into a drainage
system when it rains. The fuel is a floating material that is
carried from the drainage system into the stream and then into
waters of the United States. [Id. at 157-58.] Dr. Rogers
estimated that the fuel traveled approximately twenty to thirty
feet before entering waters of the United States. [Id. at 158.]

Dr. Rogers has also opined about the likelihood that
past fuel releases will recur. During questioning about the Kilo
Pier Release, Dr. Rogers testified that:

> The retaining wall failed because of
> corrosion, the pipeline failed because of
> corrosion, and some of the upper tanks failed
> because of corrosion. So if you look at that
> record, and you also look at the spill response
> that we have up through 2023 where we still see
> incidental spills, I think there's a high
> probability that we'll see spills in the future.
>
> . . . .
>
> Q.   And you're not able to say when an
> infrastructure failure will occur, right?
>
> A.   God only knows when that will occur, I
> think. I mean, I can give you a probability. The
> fact that they haven't implemented
> recommendations, such as secondary containment

---

[8] Dr. Rogers's site visit occurred on September 20, 2024.
See Cooper Decl., Exh. 7 (Amended Rogers Report) at 6.

> over flanges and valves that are over the water,
> and we see that the sheer number of those are in
> poor maintenance, then I would be shocked not to
> see additional reported spills within the next
> year to two years.

[Id. at 99-100.] Although he could not identify a specific

location at the Facility where a future release was likely,

Dr. Rogers stated: "It's going to happen somewhere. You've got

miles and miles of pipeline that they've not implemented the

recommended mitigative procedures that they need to do, and

there's no documentation of that, so any one of those could have

a release to the environment." [Id. at 160.]

Similarly, in his report, Dr. Rogers opined that

"future oil product releases are virtually certain." [Cooper

Decl., Exh. 7 (Amended Rogers Report) at 39.] As the basis for

this opinion, Dr. Rogers cited the Self-Reported Violations and

the Navy's reporting and actions after those events. See id.

Dr. Rogers stated:

> Despite the 2020 and 2021 release events from
> Hotel Pier and Kilo Pier, the Navy continues to
> neglect the repairs and maintenance of critical
> infrastructure and has a demonstrated pattern of
> deferring such responsibility to unspecified
> future times.
>
> Given the above, the absence of a single point of
> command for the Facility, and the severe lack of
> Facility management and oversight, additional
> infrastructure failure is likely. Future oil
> releases are therefore virtually certain.
> Petroleum exposure from the Navy's discharges to
> Pearl Harbor and Hālawa Stream has and will
> continue to impact aquatic resources.

13

[Id.] During his deposition, Dr. Rogers identified a number of probable causes of the likely infrastructure failure:

> One could be operational errors. Some of those would be fuel operation and lack of training for some of the individuals on how to handle the improper use of skillets in isolation of pipelines, lack of corrosion protection on some of the valves and fittings, temporary repairs, those types of things. There are many aspects that could cause basically a release of fuel to the environment.

[Cirino Decl., Exh. 8 (Rogers Depo.) at 100.]

As to the lack of centralized command, Dr. Rogers explained:

> There's no single command. There's nobody tracking repair. There's no unity of command.
>
> There are plans out there that are very good, but they're not implemented. When we see urgent repairs that have gone unanswered for 13 years or more, that gives one pause about the ability to manage that facility.
>
> . . . .
>
> [] If you have unity of command, you have one individual that is responsible for making sure that findings are implemented. Just putting them in a report doesn't fix the problem. What you have to do, is you have to document that those issues have been addressed. If they've not been addressed, the longer they go unaddressed, the greater the probability of a failure.
>
> When you look at the spill reporting, the facility has a long record of incidental spills. Some of those are operational, some of those are based on training, and some of those are due to corrosion, and they've not been addressed.

14

[Id. at 101-02.] Dr. Rogers testified that, although he could not identify what specific point in the Facility's fuel distribution system was likely to fail, "based on the past trend and the history of not implementing the required recommendations by [the Navy's] own experts, and not tracking those, basically that leads to the probability of a failure," and "[t]he entire facility is at risk." [Id. at 102-03.]

One of Defendants' expert witnesses, Paul B. Summers, P.E., S.E., CPEng, F.ASCE ("Summers"), addressed the Amended Rogers Report. See Cirino Decl., Exh. 24 (excerpts of Expert Rebuttal Report – Fuel System Integrity – Joint Base Pearl Harbor-Hickam – Hawaii, dated 3/28/25 ("Summers Rebuttal Report")) at 1. Summers's team examined the area shown in the photograph that Dr. Rogers described as depicting a fuel leak, and Summers's team found that the alleged leaking fuel was actually "the inhibitor grease, albeit dirty grease, that is injected into the flange band to expel air voids and mitigate crevice corrosion." [Id. at 6.] Summers opined that this use of inhibitor grease is consistent with the recommendations of the flange band manufacturer and "represents good maintenance practice." [Id.]

Defendants' position is that the Third Amended Complaint only pleads a CWA claim based upon the allegations that: the Self-Reported Violations are ongoing; and, even if the

15

Self-Reported Violations are not ongoing, they constitute
intermittent releases that are likely to recur because of what
Plaintiffs argue is inadequate operation and management of the
Facility. See Defs.' Motion at 1; id., Mem. in Supp. at 8.
Defendants argue they are entitled to summary judgment as to
Plaintiffs' CWA claim because: there is no ongoing violation
because the leaks that led to the Hotel Pier Release and the
Kilo Pier Release were repaired before Plaintiffs commenced this
action; and Plaintiffs have not identified sufficient evidence
to raise an issue of fact for trial as to the alleged likelihood
that prior intermittent violations will recur. See Defs.' Motion
at 1.

## STANDARDS

### I.    Clean Water Act Citizen Suits

The Clean Water Act provides a comprehensive
scheme "to restore and maintain the chemical,
physical, and biological integrity of the
Nation's waters." Gwaltney [of Smithfield, Ltd.
v. Chesapeake Bay Found., Inc.], 484 U.S. [49,]
52, 108 S. Ct. 376 [(1987)] (quoting 33 U.S.C.
§ 1251(a)). To meet this goal, the Act prohibits
"the discharge of any pollutant" into navigable
waters unless expressly authorized. 33 U.S.C.
§ 1311(a). The EPA or a State (with EPA approval)
may authorize the discharge of pollutants into
navigable waters through an NPDES permit. See id.
§ 1342(a)-(b).

The Act includes a citizen suit provision
that authorizes a citizen to commence a civil
action "against any person . . . who is alleged

16

> to be in violation of . . . an effluent standard
> or limitation." 33 U.S.C. § 1365(a). . . .

Coastal Env't Rts. Found. v. Naples Rest. Grp., LLC, 115 F.4th

1217, 1222 (9th Cir. 2024) (some alterations in Coastal Env't

Rts.). Because of the "in violation" requirement,

> the citizen suit provision only authorizes suits
> to abate **ongoing** or **future** violations — it "does
> not permit citizen suits for wholly past
> violations." Gwaltney, 484 U.S. at 64, 108 S. Ct.
> 376. Thus, to authorize a citizen suit, the
> plaintiff must allege that the defendant is in "a
> state of either continuous or intermittent
> violation" so that "a reasonable likelihood
> [exists] that [the defendant] will continue to
> pollute in the future." Id. at 57, 108 S. Ct.
> 376. . . .

Id. (some alterations in Coastal Env't Rts.).

## II.  **Section 301(a)**

Plaintiffs allege the Navy has violated, and is

engaged in ongoing and continuous violations of, Section 301(a)

of the CWA, _i.e._, Title 33 United States Code Section 1311(a).

See, e.g., Third Amended Complaint at ¶¶ 434-36. Section 1311(a)

states: "Except as in compliance with this section and

sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title,

the discharge of any pollutant by any person shall be unlawful."

"The discharge of any pollutant" includes "any addition of any

pollutant to navigable waters from any point source." 33 U.S.C.

§ 1362(12)(A); see also Pac. Coast Fed'n of Fishermen's Ass'ns

v. Glaser, 945 F.3d 1076, 1083 (9th Cir. 2019) ("To establish a

violation of the CWA, a plaintiff must prove that defendants
(1) discharged, i.e., added (2) a pollutant (3) to navigable
waters (4) from (5) a point source." (citation and internal
quotation marks omitted)).

Defendants acknowledge that fuel is a pollutant for
purposes of Section 1362(12)(A). See Defs.' Motion, Mem. in
Supp. at 9. In connection with Plaintiffs' Motion for Partial
Summary Judgment, the parties agreed that Pu`uloa and Hālawa
Stream are navigable waters that are waters of the United States
for purposes of the CWA. See Plaintiffs' Concise Statement of
Material Facts in Support of Motion for Partial Summary
Judgment, filed 4/25/25 (dkt. no. 178) ("Pltfs.' Motion CSOF"),
at ¶¶ 4-5; Defendants' Concise Statement of Material Facts,
filed 5/30/25 (dkt. no. 194) ("Defs.' Opp. CSOF"), at ¶¶ 4-5
(admitting Pltfs.' ¶¶ 4-5).

For purposes of the CWA, a "point source" is "any
discernible, confined and discrete conveyance, including but not
limited to any pipe, ditch, channel, tunnel, conduit, well,
discrete fissure, container, rolling stock, concentrated animal
feeding operation, or vessel or other floating craft, from which
pollutants are or may be discharged." 33 U.S.C. § 1362(14). The
point source definition is interpreted broadly. Cmty. Ass'n for
Restoration of the Env't v. Henry Bosma Dairy, 305 F.3d 943, 955
(9th Cir. 2002).

"[A]n addition falls within the statutory requirement that it be 'from any point source' when a point source directly deposits pollutants into navigable waters, or when the discharge reaches the same result through roughly similar means." Cnty. of Maui v. Haw. Wildlife Fund, 590 U.S. 165, 183–84 (2020). In determining whether the discharged pollutant reached navigable waters "through roughly similar means,"

> some of the factors that may prove relevant (depending upon the circumstances of a particular case): (1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or area in which the pollutant enters the navigable waters, (7) the degree to which the pollution (at that point) has maintained its specific identity. Time and distance will be the most important factors in most cases, but not necessarily every case.

Id. at 184-85.

**DISCUSSION**

I.    **Ongoing Violations**

A.    **Self-Reported Violations**

This Court turns first to Plaintiffs' argument that the Self-Reported Violations constitute ongoing violations because there is evidence that the violations were ongoing when Plaintiffs filed this action. See Pltfs.' Opp. at 12-13. Even assuming that a CWA claim survives summary judgment if the

plaintiff presents evidence supporting the complaint's
allegation that the violation was ongoing when the citizen suit
was initiated, Plaintiffs have failed to raise a genuine issue
of material fact for trial.

It is undisputed that the Kilo Pier Release lasted for
one week. See Defs.' Motion CSOF at ¶ 19; Pltfs.' Opp. CSOF at
¶ 19. It is also undisputed that the Defuel Line ceased leaking
in August 2021. See Defs.' Motion CSOF at ¶ 12; Pltfs.' Opp.
CSOF at ¶ 12. Plaintiffs have disputed in part Defendants'
statement of fact 10 that includes a statement that the Defuel
Line was the source of the Hotel Pier Release. See Defs.' Motion
CSOF at ¶ 10 ("On January 23, 2021, the Navy isolated the defuel
pipeline, preventing it from receiving fuel and **cutting off the
source of the Hotel Pier leak,** and it is currently isolated and
out of service." (emphasis added)). Plaintiffs appear to suggest
that the Defuel Line was not the source of the Hotel Pier
Release because "[f]uel continued to discharge from Hotel Pier
even after the Navy isolated the defuel pipeline," and "[t]he
Navy had not identified the source of the release as of
February 4, 2021 and had not delineated the subsurface petroleum
plume at Pearl Harbor as of November 2021." See Pltfs.' Opp.
CSOF at ¶ 10. In support of this proposition, Plaintiffs cite:

-a February 4, 2021 email from Navy Captain James G. Meyer
    stating that tests of fuel leaking daily into Pu`uloa
    "could be from an active fuel line"; [Cooper Decl., Exh. 11

20

(emails dated 2/4/21 and 2/5/21 between various Navy
personnel) at RH004086;]

-findings in a November 2021 report that the Defuel Line "did
   not appear to be source" of the discharge to Hālawa Stream
   and that the source of the current release was unknown;
   [id., Exh. 4 (excerpts of Final Hotel Pier Plume
   Delineation Pearl Harbor Naval Supply Center report, dated
   November 2021, by AECOM Technical Services Inc. ("AECOM
   Report")) at NAVY_0042018;]

-Defendants' statement of fact 23 in their opposition to
   Plaintiffs' Motion for Partial Summary Judgment; [Defs.'
   Opp. CSOF at ¶ 23;] and

-the statement in the 7/31/25 Order that the parties did not
   dispute that the active collection of oil product from
   observation wells near Hotel Pier was ongoing when this
   action was filed on June 14, 2022, 2025 WL 2201066, at *3.

      As Defendants point out, the AECOM Report "summarizes

investigative activities from December 11 to 21, 2020, which

occurred **before** the Navy definitively identified the defuel

pipeline as the source" of the Hotel Pier Release. Defs.' Opp.

CSOF at ¶ 23; see also Pltfs.' Motion CSOF, Exh. C (redacted

version of the complete AECOM Report) at iv. Further, the fact

that Navy personnel stated in one internal communication that

the source of the Hotel Pier Release **could be** an active fuel

line, [Cooper Decl., Exh. 11 at RH004086,] is insufficient to

raise a genuine issue of material fact regarding the source of

the Hotel Pier Release in light of the undisputed facts about

the Defuel Line discussed supra Background Section I.A. and in

light of the fact that the Navy has consistently identified the

Defuel Line as "the likely source of the release of new

21

product." See, e.g., Cirino Decl., Exh. 3 (Initial Release
Response Report – Hotel Pier, dated Oct. 2021) at 11, § 3.0;
id., Exh. 9 (Quarterly Release Response Report – Hotel Pier,
dated Jan. 2022 ("Jan. 2022 Quarterly Report")) at 3, § 3.0;
id., Exh. 10 (Quarterly Release Response Report – Hotel Pier,
dated Apr. 18, 2022 ("Apr. 2022 Quarterly Report")) at 3, § 3.0.
Further, Plaintiffs admit that DOH concurred with the Navy's
assessment of the source of the Hotel Pier Release, see Defs.'
Motion CSOF at ¶ 15; Pltfs.' Opp. CSOF at ¶ 15, and Plaintiffs
have not identified any evidence that there was another source
of the Hotel Pier Release other than the Defuel Line.

        In the 7/31/25 Order, this Court noted that it was
undisputed that there was an ongoing **collection** of oil product
from observation wells near Hotel Pier when this action was
filed on June 14, 2022. 2025 WL 2201066, at *3. However, the
fact that release response was ongoing at the time this action
was filed does not necessarily mean that the CWA violation was
ongoing. See, e.g., Wild Fish Conservancy v. Cooke Aquaculture
Pac., LLC, CASE NO. C17-1708-JCC, 2019 WL 2616640, at *4 (W.D.
Wash. June 26, 2019) ("Section 301(a) specifically prohibits the
unpermitted discharges of pollutants from point sources—it does
not govern the failure to clean up pollutants after they have
been discharged from a point source." (citing 33 U.S.C.
§ 1311(a))); N. Cal. River Watch v. Fluor Corp., Case No. 10-cv-

05105-MEJ, 2014 WL 3385287, at *10-11 (N.D. Cal. July 9, 2014)
(concluding that the plaintiff failed to allege an actionable
CWA claim because the plaintiff relied upon the continuing
effects of wholly past activities); Ctr. for Biological
Diversity v. Marina Point Dev. Assocs., ED CV 04-413 RT(SGLx),
2004 WL 7341338, at *8 (C.D. Cal. May 20, 2004) ("the current
sediment flows are better characterized as residual effects of
wholly past violations, rather than a continuing CWA
violation"). For the same reasons, this Court rejects
Plaintiffs' argument that the Navy's recovery of petroleum from
observation wells at Hotel Pier while this litigation has been
pending establishes ongoing violations. See Pltfs.' Opp. at 17.

Even viewing the record in the light most favorable to
Plaintiffs,[9] there is no genuine issue of material fact as to the
source of the Hotel Pier Release. This Court therefore finds
that the Defuel Line was the source of the Self-Reported
Violations at Hotel Pier. It is undisputed that the Defuel Line
ceased leaking by August 2021. See Defs.' Motion CSOF at ¶ 12;
Pltfs.' Opp. CSOF at ¶ 12. This Court concludes, as a matter of
law, that the Hotel Pier Release did not constitute an ongoing

---

[9] In considering Defendants' Motion, this Court must view
the record in the light most favorable to Plaintiffs as the
nonmoving party. See Harris v. Cnty. of Orange, 17 F.4th 849,
855 (9th Cir. 2021).

discharge at the time this action was filed.[10] Similarly, because the Kilo Pier Release ended prior to the commencement of this action, this Court also concludes, as a matter of law, that the Kilo Pier Release did not constitute an ongoing discharge.

B.    **Leaking Collar**

Dr. Rogers testified that there may be an ongoing discharge of oil into waters of the United States because of a leaking collar next to a truck-fueling station at the Facility. See Cirino Decl., Exh. 8 (Rogers Depo.) at 156-60. Defendants respond that Dr. Rogers failed to collect samples of the purported oil that he believed was being discharged, and Defendants point to Summers's opinion that the purported oil is inhibitor grease. Defendants also argue that Dr. Rogers did not provide a supported analysis of how the purported oil could reach either Pu`uloa or Hālawa Stream.[11] [Defs.' Motion, Mem. in Supp. at 18 n.7.] In ruling on Defendants' Motion, this Court

---

[10] In light of the ruling that the Hotel Pier Release did not constitute an ongoing discharge, it is not necessary to address Defendants' alternative argument that the Hotel Pier Release was not from a point source at the Facility. See Defs.' Motion, Mem. in Supp. at 15-16.

[11] Dr. Rogers addressed how the fuel he observed leaking from the collar could reach Pu`uloa during his deposition. See Cirino Decl., Exh. 8 (Rogers Depo.) at 156-57. Viewing the record in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether the purported release from the leaking collar satisfies the analysis in Hawaii Wildlife Fund. See 590 U.S. at 184-85.

cannot determine whether Dr. Rogers's testimony or Summers's is
more credible or which should be given more weight. See Est. of
Lopez ex rel. Lopez v. Gelhaus, 871 F.3d 998, 1009 n.10 (9th
Cir. 2017) ("At the summary judgment stage, '[c]redibility
determinations, the weighing of the evidence, and the drawing of
legitimate inferences from the facts are jury functions, not
those of a judge.'" (alteration in Lopez) (quoting Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.
Ed. 2d 202 (1986))). This is particularly the case because
Defendants did not file a motion to strike one or more of
Dr. Rogers's opinions. Cf. Grenier v. United States, CIV.
NO. 22-00396 LEK-KJM, 2024 WL 4287990, at *2 (D. Hawai`i
Sept. 25, 2024) (describing the Fed. R. Evid. 702 and Daubert v.
Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), standards
applicable to a motion to strike expert testimony); Second
Amended Rule 16 Scheduling Order, filed 9/11/25 (dkt. no. 241),
at ¶ 7 (stating the deadline to file "non-dispositive motions
including any motion requiring an evidentiary hearing (including
Daubert motions)" is closed).

 Viewing the evidence in the light most favorable to
Plaintiffs, there is a genuine issue of material fact as to
whether the leaking collar near the truck-fueling station
constitutes an ongoing discharge for purposes of the CWA, and
therefore Defendants are not entitled to summary judgment as to

25

the portion of Plaintiffs' CWA claim alleging ongoing
violations. See Fed. R. Civ. P. 56(a) ("The court shall grant
summary judgment if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law.").

### C.    **Spill Spreadsheet**

The Spill Spreadsheet lists spills and discharges at
Red Hill from October 4, 1997 to December 2, 2024 that the Navy
reported to DOH. See Cooper Decl. at ¶ 10; id., Exh. 6 (Spill
Spreadsheet). However, Plaintiffs rely upon the "discharges
extending from 2015 to the end of 2024." See Pltfs.' Opp. at 15.
Plaintiffs argue those spills and discharges "provide clear
evidence that fuel releases from the Facility are ongoing." [Id.
at 14.] This Court finds that the Spill Spreadsheet is not
evidence of ongoing, *i.e.*, continuous, violations either at the
time this action was filed or as of the current date. Rather,
the Spill Spreadsheet is evidence of various intermittent
violations, some of which may be relevant to Plaintiffs'
argument that prior intermittent violations are reasonably
likely to recur.

### D.    **Ruling**

Because there is a genuine issue of material fact as
to one of Plaintiffs' theories of an ongoing violation,

Defendants' Motion is denied as to the portion of Plaintiffs'
CWA claim alleging ongoing violations.

## II.  <u>Intermittent Violations that Are Likely to Recur</u>

Dr. Rogers has opined that "future oil product
releases are virtually certain" because: the Navy's response to
the Self-Reported Violations has been inadequate, including the
deferral of "the repairs and maintenance of critical
infrastructure"; and further infrastructure failures are likely
to occur because Red Hill lacks "a single point of command" and
Red Hill has a "severe lack of . . . management and oversight."
[Cooper Decl., Exh. 7 (Amended Rogers Report) at 39.]

Summers, Defendants' expert witness who addressed Red
Hill's structural integrity, opined that future discharges were
not reasonably likely to occur. <u>See</u> Defs.' Opp. CSOF,
Declaration of Paul Cirino ("Cirino Opp. Decl."), Exh. 10
(Summers's Expert Report Fuel System Integrity Joint Base Pearl
Harbor-Hickam Hawaii, dated 1/24/25 ("Summers Report")) at 17-
18. Defendants' expert witness who addressed the reliability of
Red Hill's fuel systems operations also opined that future
discharges were not reasonably likely to occur. <u>See</u> Pltfs.'
Motion CSOF, Exh. AA (Expert Report of Ted Caudill, PE, dated
1/24/25 ("Caudill Report")) at 7.

As previously noted, in ruling on Defendants' Motion,
this Court cannot determine issues of credibility or relative

weight of evidence. Viewing the record, including relevant incidents noted in the Spill Spreadsheet and the July 2, 2025 DOH press release,[12] in the light most favorable to Plaintiffs, this Court finds that there are genuine issues of material fact regarding the issue of whether prior intermittent discharges of fuel products at the Facility are reasonably likely to recur. Defendants' Motion is therefore denied as to the portion of Plaintiffs' CWA claim based on prior intermittent violations that are reasonably likely to recur.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, filed May 19, 2025, is HEREBY DENIED.

---

[12] This Court notes that some of the incidents reflected in the Spill Spreadsheet appear to be irrelevant to Plaintiffs' CWA claim, as the claim is pled in the Third Amended Complaint. For example, there are numerous incidents where the "spiller" was an entity other than the Navy or other federal agency. See, e.g., Cooper Decl., Exh. 6 (Spill Spreadsheet) at PageID.6247 (10/14/24 spill from an Orion Engineers & Assoc. barge); id. at PageID.6248 (7/5/24 spill attributed to Hawaiian Electric Co.); id. at PageID.6249 (6/3/24 spill from a Seaward Services LLC vessel). Additional evidence would be required to establish the relevance of such incidents. Further, many of the incidents reflected in the Spill Spreadsheet involve a vessel. A vessel can be a point source for purposes of the CWA, see 33 U.S.C. § 1362(14), but there are no allegations in the Third Amended Complaint regarding CWA violations with a vessel as the point source.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, September 29, 2025.



/s/ Leslie E. Kobayashi

Leslie E. Kobayashi
Senior U.S. District Judge

**WAI OLA ALLIANCE, A PUBLIC INTEREST ASSOCIATION, ET AL. VS.
UNITED STATES DEPARTMENT OF THE NAVY, ET AL.; CV 22-00272 LEK-
RT; ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**