William A. Harrison (HI Bar No. 2948)
HARRISON LAW CENTER
william@harrisonlawcenter.com
1001 Bishop Street
Honolulu, Hawai`i 96813
Tel: (808) 523-7041

Daniel Cooper (*pro hac vice*)
daniel@sycamore.law
Jesse C. Swanhuyser (*pro hac vice*)
jesse@sycamore.law
SYCAMORE LAW, INC.
1004 O'Reilly Avenue, Ste. 100
San Francisco, California 94129
Tel: (415) 360-2962
(Additional counsel listed on next page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| WAI OLA ALLIANCE, ET AL.<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES DEPARTMENT OF THE NAVY, ET AL.,<br>Defendants. | Civil Case No. 1:22-cv-00272-LEK-RT<br><br>**WRITTEN DIRECT TESTIMONY OF DR. WILLIAM ROGERS**<br><br><u>District Judge</u>: Leslie E. Kobayashi<br><u>Magistrate Judge</u>: Rom Trader |

Philip Gregory (*pro hac vice*)
pgregory@gregorylawgroup.com
GREGORY LAW GROUP
1250 Godetia Drive
Redwood City, California 94062
Tel: (650) 278-2957

Jason Flanders (*pro hac vice*)
jrf@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, California 94609
Tel: (916) 202-3018

Attorneys for Plaintiffs
WAI OLA ALLIANCE

## TABLE OF CONTENTS

I.    **EXECUTIVE SUMMARY OF FINDINGS AND RECOMENDATIONS** 7

II.   **QUALIFICATIONS**..................................................................................**11**

   A.   PROFESSIONAL LICENSES AND CERTIFICATIONS .........................11

   B.   EDUCATION..................................................................................12

   C.   WORK EXPERIENCE .....................................................................12

   D.   TEACHING EXPERIENCE ...............................................................24

   E.   RESEARCH AND PUBLICATIONS....................................................24

   F.   COPYRIGHTS.................................................................................26

   G.   PROFESSIONAL ORGANIZATIONS ..................................................27

   H.   GRANTS .......................................................................................27

   I.   COMMERCIAL SOFTWARE DEVELOPED ...........................................28

   J.   AWARDS.......................................................................................29

III.  **THE LOWER RED HILL FACILITY** ........................................................**31**

   A.   DESCRIPTION OF LOWER RED HILL INFRASTRUCTURE ...............31

   B.   FACILITY OWNERSHIP AND COMMAND STRUCTURE....................32

      i.    *Defense Logistics Agency*.................................................................33

      ii.   *Department of the Navy*....................................................................33

      iii.  *Fuels Department*..............................................................................34

*iv.   Public Works Department* ..................................................................*34*

C.   THE NAVY'S FRAMEWORK FOR MAINTENANCE, INSPECTION,

AND REPAIR OF THE FACILITY ....................................................................36

*i.   Governing Documents*....................................................................*36*

*ii.   Minor Inspection and Repair* .......................................................*37*

*iii.   RMMR* ............................................................................................*38*

*iv.   SRM* ...............................................................................................*38*

*v.   MILCON*.........................................................................................*39*

*vi.   CMPs*..............................................................................................*40*

**IV.  OPINIONS** .......................................................................................................**40**

A.   LACK OF A CENTRALIZED DATABASE TO TRACK REPAIRS ........40

*i.   Sharepoint Server/Spreadsheets*..................................................*41*

*ii.   FAMMS Database* ..........................................................................*42*

*iii.   DLA Database* ................................................................................*43*

*iv.   RMMR Database* ............................................................................*43*

*v.   SMR, CLM, MILCON Databases*..................................................*43*

B.   LACK OF CENTRALIZED COMMAND OR LEADERSHIP

OVERSEEING REPAIR AND MAINTENANCE ...........................................44

C.    THE NAVY FAILS TO IMPLEMENT ITS MAINTENANCE,

INSPECTION, AND REPAIR FRAMEWORK ..................................................49

  i. *Integrity Management Plans (IMPs)*......................................................*51*

  ii. *Deferred Repairs Identified in the 2015 IMP*...........................................*53*

  iii. *Deferred Repairs Identified in the 2019 IMP*..........................................*55*

  iv. *Deferred Repairs Identified in the 2023 IMP*..........................................*57*

  v. *SGH Report* ...........................................................................................*58*

  vi. *Pond Service Orders* ..............................................................................*61*

  vii. *Assessment Of The Infrastructure During Site Visit* ...............................*62*

D.    SPECIFIC EXAMPLES OF OPERATION AND MAINTENANCE

FAILURES LEADING TO HIGH RISK OF FAILURE AND DISCHARGE....64

  i. *Valve Station VS1C to Truck Fueling Station* .........................................*64*

  ii. *Pressure Management and Pressure Relief* ............................................*67*

  iii. *Skillets and Spectacles; Banding; Seeps* .................................................*71*

  iv. *Navy Self-Reported Discharges* ..............................................................*72*

  v. *Inadequate Booming* ..............................................................................*74*

  vi. *Corrosion and protective coating failures directly above surface water* *74*

**V.    RECOMMENDATIONS FOR LOWER RED HILL**

**REORGANIZATION ..........................................................................................75**

---

A.   CENTRALIZED DATA TRACKING ........................................................75

B.   UNIFIED COMMAND STRUCTURE AND CONCLUSION....................79

**I, William Rogers, declare as follows:**

The facts set forth in this declaration are based on my personal knowledge; if called to testify as a witness, I could and would competently testify thereto under oath. As to those matters that reflect an opinion, they reflect my personal opinion and judgment based on my education and experience.

I am more than eighteen years old and am competent to testify.

Plaintiffs Wai Ola et al. ("Wai Ola") designated me as an expert witness in this litigation. Specifically, Wai Ola asked me to evaluate the petroleum-related infrastructure of Defendants United States Department of the Navy, United States Department of Defense, Joint Task Force Red Hill, United States Navy Region Hawaii, and United States Navy Facilities Engineering Command - Hawaii (collectively, the "Navy") from the Upper Tank Farm via piping and valving to the receipt and fueling stations on land and at Hotel, Mike, Bravo, Kilo and Sierra Piers along Hālawa Stream and Pearl Harbor (for purposes of this testimony this subsect of the facility shall be known as "Lower Red Hill", or the "Facility").

## I.    EXECUTIVE SUMMARY OF FINDINGS AND RECOMENDATIONS

Based on my review of historical records, operational documents, maintenance and repair data, and other materials produced in this litigation, it is my professional opinion that Lower Red Hill has experienced a longstanding and recurring pattern

---

Dr. Rogers Written Direct                    7                    1:22-cv-00272- LEK-RT

of fuel releases due to deficiencies in Facility management. Poor operation and management of the Facility have led to vulnerabilities in the condition of the site's infrastructure that will continue unless the Navy develops a centralized database to track repairs and maintenance at the Facility and establishes a clearly defined chain of command with centralized oversight authority to ensure accountability, compliance, and enforcement of maintenance directives across all responsible units.

In response to several high-profile fuel releases, the Navy has undertaken efforts to replace or upgrade outdated infrastructure at Lower Red Hill, including pipelines and related components. These actions demonstrate recognition of physical asset degradation and the need for modernization. However, infrastructure replacement alone does not and will not address the underlying drivers of continued fuel releases.

My review of the Navy's governing operational, maintenance, environmental, and safety documents (OMES), including OMES Plans, Plaintiffs' Exhibit Nos. P16, P17, and Integrity Management Plans (IMPs), P20-25, indicates that these documents are technically sound, consistent with applicable engineering standards, and comparable to management frameworks used at other government-

operated fuel facilities. On their face, these documents provide an adequate and reasonable framework for inspection, maintenance, testing, and repair.

The primary issue is not the absence of appropriate operational guidelines, but rather the Navy's failure to consistently adhere to its own operational and integrity management requirements. Records demonstrate repeated disconnects between identified deficiencies, prescribed corrective actions, and actual implementation. Required inspections, maintenance activities, and repairs are frequently delayed, inadequately tracked, or not completed.

Even when repairs are completed, the Navy's records do not consistently reflect their completion. Documentation tracking the status of repairs is fragmented across multiple, poorly integrated databases that do not effectively communicate across project categories or maintenance systems. This lack of centralized project management makes it nearly impossible to determine whether identified deficiencies are being effectively addressed or resolved.

These systemic failures are compounded by the absence of a clearly defined and unified command structure responsible for maintenance oversight. Diffuse lines of authority and overlapping responsibilities across departments and contractors create gaps in accountability and decision-making. Without centralized

command responsibility and enforcement authority, corrective actions are inconsistently enforced, and compliance is unevenly monitored.

The Navy's failed operation and maintenance systems resulted in significant releases and discharges to the groundwater aquifer and to Pearl Harbor in 2020, 2021 and 2022. The poorly maintained and dangerous condition of the fueling infrastructure was well documented both before and after those events.

On September 20, 2024, I conducted a site investigation of Lower Red Hill. One objective of my visit was to determine whether deficiencies previously identified by third-party contractors in 2022 had been addressed and to make my own observations of current site conditions. Many of the same issues identified in 2022 remained during my site inspection in 2024.

While it is my understanding that the Navy has brought lower level maintenance under the local command, the majority of maintenance, repair, replacement and inspection programs continue to be contracted to "construction agencies" over which local command structure still lack oversight.

As a result of the Navy's systemic management failures, it is my opinion that fuel spills, releases, and discharges from the Facility are likely to continue, regardless of the Navy's current and proposed future investment in infrastructure

---

upgrades. Without fundamental improvements in management practices and a centralized tracking system, continued discharges are unavoidable.

## II.   QUALIFICATIONS

I have over 40 years of experience working in virtually all aspects of environmental planning, restoration and protection. I have worked extensively with the Work Bank, United Nations Food and Agriculture Organization and non-governmental organizations on global environmental issues in post-Soviet Russia, Romania, Mexico and Azerbaijan. I have also worked with the Department of Interior, Department of Energy, Department of Defense and the Texas Commission on Environmental Quality on environmental issues and policy. I have provided my expert opinion and/or testimony in approximately 120 cases.

### A. PROFESSIONAL LICENSES AND CERTIFICATIONS

- Certified Project Manager – A Systems Approach to Planning, Scheduling and Controlling.

- Certified NORM (Naturally Occurring Radiological Materials) Surveyor

- Certified Hazardous Materials Manager, Institute of Hazardous Materials Management #1694 Masters Level

- 1988- Instructor OSHA 40-hr Hazardous Waste Site Worker, 8-hr

---

Dr. Rogers Written Direct               11            1:22-cv-00272- LEK-RT

annual refresher and 8-hr supervisors training.

- Certified FWS Instreamflow (IFM)

- Certified Habitat Evaluation (HEP)

## B. EDUCATION

In 1974, I graduated with a Bachelor of Science in Biology from West Texas State University. In 1976, I received a Master of Science in Biology from West Texas State University. In 1999, I received my Ph.D. in Wildlife and Fisheries Sciences from Texas A&M University focusing on environmental toxicology and risk assessment and management. My dissertation addressed the risk assessment on the Department of Energy Pantex Nuclear Weapons Plant and over 144 contaminated solid waste units, industrial hazardous waste sites and areas of concern.

## C. WORK EXPERIENCE

The following is a summary of my work experience:

West Texas A&M University, Canyon, Texas (1997-Present)

- Past Associate Dean Environmental Safety, Health and Compliance, Environmental Science Program Director, Researcher, University Radiation Safety Officer, Regents Professor in Life, Earth and Environmental Sciences.

---

- Technical consultant to the World Bank and United Nations on environmental pollution, remediation, risk and global environmental sustainability.

- Lead in development of hazardous materials "ecological protective cleanup levels" for Texas Commission on Environmental Quality (TCEQ). Regional expert on pond, lagoon and landfill lining technology and materials applications.

Omega EnviroSolutions [2000 - Present]

- Technical support to the U.S. Department of Energy Pantex Plant, in implementation of risk-based remediation and closure of hazardous waste sites.

- Engaged in environmental projects in Azerbaijan, Russia, Romania, Argentina, Colombia, Mexico, and the U.S. states of New Jersey, Louisiana, Pennsylvania, Texas, Kansas, and Colorado, working closely with regional and international scientists.

- The World Bank's technical advisor and lead on one of the world's largest mercury cleanups in post-soviet Azerbaijan, construction of the Republic's first hazardous waste landfill, demonstration of Caspian Sea oil remediation technologies and the redrafting of their

Dr. Rogers Written Direct              13              1:22-cv-00272- LEK-RT

environmental regulations to international standards.

- Lead Technical Advisor to the World Bank to assist the Argentina Ministry of Industry in design for the environment and innovative environmental compliance strategies for the tanning, meat processing, dairy and electroplating industries to protect Matanza Basin water quality and inflow into the LaPlata River to protect human health and marine systems.

<u>Battelle Memorial Institute, Amarillo, Texas (1996-1997)</u>

- Served as Senior Program Manager and Battelle representative on the Chemical Manufacturers Association Committee on endocrine disruptors and persistent toxic bioaccumulators.

- Provided technical support to large corporate clients such as Allied Signal and Honeywell in the area of risked-based site cleanup and closure as well as strategic environmental planning.

- Member, Battelle Pacific Northwest Laboratory working committee on the expansion of the Battelle developed Multimedia Environmental Pollutant Assessment System (MEPAS) to integrate ecological assessment endpoints into the model resulting in a fully integrated human health and ecological risk assessment modeling tool.

---

- Participated in a joint Texas A&M/Battelle team working in Azerbaijan with Republic scientists on industrial pollution. Current studies are focused on the impacts of industrial pollution on the Caspian Sea Sturgeon.

<u>Battelle Memorial Institute, Amarillo, Texas (1993-1996)</u>

- Department Manager, Environmental Restoration at the U.S. Department of Energy, Pantex Plant.

- Managed a program budget of $144 million and an annual budget of over $30 million and a direct staff of over forty technical personnel. Responsible for budget and schedule of all RCRA/CERCLA projects and multiple contractors.

- Managed all aspects of the Environmental Restoration Program, including technology development, innovative site characterization methodologies, and *in-situ* remediation alternatives.

- Managed all aspects of the program using Oracle Primavera, a powerful project portfolio management (PPM) Software for planning, scheduling and managing the large complex programs.

- Published an environmental compliance guide for the oil industry entitled, "The Oilman's Environmental Quick Reference".

---

- Led an initiative to implement the "Streamlined Approach for Environmental Restoration (SAFER)" to the Pantex Environmental Restoration Program. This initiative resulted in a program cost reduction of 44% and accelerated the program by four years.

- Designed and managed the installation of an innovative dual-phased saturated and unsaturated zone treatability demonstration to remediate high explosives in a perched aquifer.  The effort was nominated as a "Texas 2000 Innovative Technology" by the local Texas Natural Resource Conservation Commission office and awarded "Best in Practice" by an independent review panel.

Science Applications International Corporation, San Antonio, Texas (1992 - 1993)

- Deputy Operations Manager and led technical project management and environmental business development with annual office revenues in excess of $30 million.

- Program manager of a $6.9 million-per-year environmental support contract to the Tennessee Valley Authority.  Under this contract, managed a staff of up to sixty technical experts and up to twenty concurrent RCRA remediation task orders, including a $3 million field effort in Alaska to the U.S. Air Force to remediate the "White

Dr. Rogers Written Direct    16    1:22-cv-00272- LEK-RT

Alice" early warning sites and King Salmon Base (Jet fuel

contamination of Bristol Bay).  Provided both management and

technical support to Kelly Air Force Base environmental restoration

program, including two U.S. EPA innovative technology

demonstrations.

- Managed a project for the Air Force Civil Engineer Center

  Environmental Resources Program Information Management System

  (ERPIMS) data management system input to validate and manage

  data from all Air Force Bases.  The database is housed at the Air

  Force Civil Engineer Center and is used as a base-specific

  environmental remediation management and tracking system. My

  team assembled the base-specificdata for entry into the ERPIMS data

  management system.

<u>Science Applications International Corporation, Golden, Colorado (1990 - 1992)</u>

- Environmental Services Manager, Assistant V.P.  Responsible for

  innovative technology and program development, project

  management, and client interface.  Staffed and managed an office of

  160 personnel.  Provided quality assurance support to EG&G Rocky

  Flats in support of environmental programs at the site.

---

Dr. Rogers Written Direct            17            1:22-cv-00272- LEK-RT

- Project Manager for the Rocky Flats Site Wide Quality Assurance Project Plan for CERCLA RI/FS and RCRA FI/CMS Activities.  This high--profile project was completed and approved by both the Federal and State agencies within eight months.  This effort was in response to the Federal Bureau of Investigation raids and findings at the facility.  Los Alamos National Laboratory subsequently adopted the plan.  Represented the DOE at regulator meetings and negotiations with federal and state regulators and interest groups and their counsel.  This project required a complete re-evaluation and management of the Rocky Flats plant operations and closure operations to ensure both State and National regulatory project deadlines were met.

- Managed the development of the work plan and sampling procedures for a deep stratigraphic test well in support of a RCRA and Safe Drinking Water Act disposal permit renewal and pending $1 billion class action law suit. The plan was completed in 60 days and was approved without revision or comment by federal and state agencies.  Subsequently, the no-migration petition and permits were also approved.

- Prepared and conducted training programs dealing with NEPA/CEQ,

ESA, Hazardous Waste Site Worker (OSHA 40 hr), RCRA, SARA,
Title III, CERCLA, and environmental regulatory compliance.

- Managed Environmental Compliance and Assessment System
(ECAS) team and protocol development, commended by DOD and
used as the model program.

- Managed a team of three ECAS managers that conducted
environmental assessments at over 1200 Department of Defense
facilities.

- Developed a systems approach to CERCLA environmental
evaluations and development of data quality objectives.

- Prepared a technical review of Canadian Environmental Impact
Statement (EIS) requirements as they compare to U.S. NEPA and
California Environmental Impact Assessment (EIA) requirements.

Science Applications International Corporation, Las Vegas, Nevada (1988 - 1990)

- Senior environmental scientist assigned to the Yucca Mountain
Project (planned underground high-level nuclear waste repository).
Developed Yucca Mountain hazardous materials management and
handling program (the first of its kind), which addressed federal, state,
and DOE Order requirements.

---

- Developed environmental regulatory compliance strategies, programs, schedules, and program tracking systems.  Served as a technical reviewer for the DOE in the area of environmental compliance, completed an integration study of state and federal environmental studies, environmental compliance regulations, DOE Orders, and requirements of the Nuclear Waste Policy Act, National Environmental Policy Act, Clean Water Act, Safe Drinking Water Act, Endangered Species Act, as well as the Atomic Energy Act.

- Provided technical review and comment on proposed regulations on both high-level radioactive and hazardous wastes. Served as the principal investigator on biological resources Utah Electronic Training Capability EIS to address the impacts of a combat training on terrestrial and aquatic resources. Other responsibilities included preparation of environmental protection and implementation plans, preliminary safety analysis reports, and environmental safety and health implementation plans.

<u>Battelle Memorial Institute, Amarillo, Texas (1987 - 1988)</u>

- Regulatory compliance specialist on the proposed Deaf Smith County nuclear waste repository project.

---

- Technical reviewer for DOE in the areas of environmental compliance and technical merit of site characterization study plans. Responsibilities included the integration of state and federal environmental compliance regulations with the requirements of the Nuclear Waste Policy Act.

- Prepared the surface-water sections of the Deaf Smith County Site Characterization Plan and Requirements Resolution and Strategy Plan, and developed and reviewed aquatic resource studies on the area playa lakes.

U.S. Department of Interior - Bureau of Reclamation, Amarillo, Texas (1985 - 1987)

- Served on the Director's staff as Regional Environmental Specialist accountable for environmental compliance and programs for a five-state area.  Accountable for regional hazardous waste and emergency response programs.

- Developed the "Regional Hazardous Materials Management and Contingency Plan" that was recommended for use Bureau-wide. Coordinated environmental studies and assessments, and prepared environmental assessments and impact statements on large-scale construction projects.

- Served as a regional coordinator on the Secretary of Interior's Selenium and Other Toxic Substance Task Force, which evaluated the impacts of irrigation return flows to aquatic systems.

- Served as the Regional Endangered Species Coordinator.  Responsible for the review, comment, and interpretation of environmental legislation as it related to Bureau of Reclamation construction and operation activities.

U.S. Department of Interior, Bureau of Reclamation, Amarillo, Texas (1979 - 1984)

- Regional Environmental Specialist and Wildlife Biologist for project planning and development.

- Responsible for NEPA and executive order compliance and managed the preparation of environmental assessments, impact statements, and endangered species assessments.

- Managed over 40 environmental assessments, EISs and endangered species studies and reintroduction programs.

- Developed a "Habitat Evaluation Procedures" training program and presented the program to Bureau of Reclamation and U.S. F.W.S offices throughout the southwestern U.S.

Petrolite Corporation, Great Bend, Kansas (1977 - 1979)

- Field Scientist/Engineer responsible for development and field-testing of chemical treatments for fresh- and salt-water problems in oil production and industrial applications.

- Designed treatment performance tests and analyzed corrosion, scaling, bacterial, and fungal contamination and thermal pollution.

- Conducted field studies on the effects and abatement of microbial corrosion on oil and gas facilities and piping.

- Evaluated performance of oil demulsifiers, dispersants and oil production treating chemicals.

- Reviewed and provided best-management recommendations for oil operations piping systems and protective monitoring plans and real-time monitoring using innovative instrumentation to monitor pipe corrosion and potential for failure. Innovative monitoring was confirmed using traditional "corrosion coupons" as well as pipeline pressure monitoring.

- Conducted detailed studies on hydrogen sulfide reducing bacteria ("SRBs") and potential for damage to pipeline tubing via both destructive and nondestructive testing. Testing and monitoring of corrosion and scaling of high-pressure piping and boiler systems in

---

power generation plants.

## D. TEACHING EXPERIENCE

I have taught at West Texas A&M University for over 20 years. I currently serve as the program coordinator for the West Texas A&M Environmental Science Program.  I teach undergraduate, graduate, and PhD-level classes in environmental law and regulations, environmental sampling and assessment, hazardous waste site assessment, ecological risk assessment, environmental science and agricultural risk assessment. I teach an undergraduate/graduate Project Management class resulting in a Project Management Certification.

## E.  RESEARCH AND PUBLICATIONS

In total, my professional record and *curriculum vitae* include approximately 70 peer-reviewed journal articles, conference proceedings, technical papers, posters, and invited presentations spanning more than three decades. This body of work reflects sustained research and applied practice in environmental science and engineering; ecological and human health risk assessment; contaminant fate and transport; petroleum- and chemical-related pollution; soil, groundwater; surface water, and air quality impacts; and the development of quantitative tools to support regulatory and operational decision-making. A substantial portion of this research addresses petroleum hydrocarbons, industrial chemicals, agricultural contaminants,

PFAS, and other pollutants, including their release mechanisms, transport pathways, exposure risks, and ecological and human health effects.

My work also includes the development and implementation of web-based databases, models, and calculators used by state and federal agencies to establish protective concentration levels, cleanup criteria, and remediation strategies, as well as research on fuel and energy systems, infrastructure performance, and operational risk management. Collectively, this research demonstrates extensive experience evaluating complex environmental systems, assessing operational and management failures, and translating engineering and scientific standards into practical frameworks for managing risk at large industrial and government-operated facilities. In addition to my peer-reviewed publications, I have authored or co-authored approximately 60 technical white papers, regulatory submissions, risk assessment reports, and guidance documents prepared for state and federal agencies, including the Texas Commission on Environmental Quality (TCEQ), U.S. Environmental Protection Agency (EPA), U.S. Department of Energy (DOE), U.S. Department of the Interior, U.S. Air Force, and the World Bank, as well as for regulated entities and public-interest organizations. This work includes peer-reviewed technical white papers submitted to the TCEQ Ecological Risk Assessment Working Group (2011–Current) for incorporation into the Protective Cleanup Modeling and Protective

Concentration Level (PCL) web-based tools, addressing the fate and transport, bioaccumulation, exposure pathways, and toxicological profiles of a wide range of contaminants, including PFAS compounds, petroleum-related chemicals, heavy metals, solvents, nutrients, and industrial pollutants.

My technical work also encompasses the development of standard operating procedures, data quality frameworks, and knowledge-management systems used by regulators to support ecological and human health risk assessments, as well as site-specific risk assessments, remediation evaluations, environmental impact statements, spill response assessments, and litigation support analyses for complex industrial and government-operated facilities. Collectively, this body of technical work reflects extensive experience translating scientific and engineering principles into regulatory-compliant, defensible decision-making tools, and directly informs my opinions regarding facility operations, infrastructure integrity, spill risk, and environmental management practices.

### F. COPYRIGHTS

- William J. Rogers.  Development and application of an integrated model for ecological risk assessment-employing the spatial habitat equivalency method.  Copyright TX5-158-309, 2000.

- William J. Rogers.  Ecological Protective Cleanup Level (PCL) User

---

Interactive Generator.  In process.

## G. PROFESSIONAL ORGANIZATIONS

I have been and am a member of a number of professional organizations, including:

- Society of Environmental Toxicology and Chemistry;

- Society of Risk Analysis;

- Associate Editor, Ecological Risk, Ecotoxicology for the journal *Ecotoxicology;*

- Topic Editor, *Encyclopedia of Water Science;*

- Member, *Institute of Hazardous Waste Management; and*

- Member, Texas Commission on Environmental Quality Ecological Risk Assessment working committee.

## H. GRANTS

My work has been supported through multi-year contracts and grants that have funded the development and maintenance of the Protective Concentration Levels (PCL) database and associated ecological risk assessment guidance. From FY 2000–2025, West Texas A&M University received contract amendments from the Texas Commission on Environmental Quality (TCEQ) under Contract No. 582-18-80583 to support the Ecological PCL Database and Ecological Risk Assessment

Guidance (ERAG) assistance, resulting in total contract funding of approximately $3 million over the life of the program. In 2025, I was given a 5-year extension, taking the project to 2030. These funds have supported ongoing database enhancements, scientific review, and regulatory integration of the PCL tool. In addition, I have pursued external research funding and was recently granted a $176,000 research project to develop remediation strategies and methods to clean up oil field brine releases in the Permian Basin.

## I.  COMMERCIAL SOFTWARE DEVELOPED

From 2000 through 2025, I led or co-led the development of multiple web-based software platforms and decision-support tools used by regulatory agencies to conduct ecological risk assessments and establish protective cleanup levels at contaminated sites. Most notably, between approximately 2000 and 2025, I directed the development and successive releases of the Protective Concentration Levels (PCL) Calculator and Model, a first-of-its-kind, web-based application developed over roughly 25 years with an investment of nearly $3 million. The PCL model has been formally adopted by the Texas Commission on Environmental Quality (TCEQ) as the statewide regulatory standard for ecological risk assessments, incorporated into TCEQ's Ecological Risk Assessment Guidelines, and used by state and federal agencies and private practitioners nationwide, with

more than 10,000 accesses annually in recent years.

Earlier in my career, I led the development of an integrated spatial ecological risk assessment model (2000–2002) that combined contaminant fate and transport modeling with habitat equivalency analysis in collaboration with Battelle Memorial Institute and the U.S. Department of the Interior, resulting in a patented methodology. I also directed development of the Ecological Protective Cleanup Level Generator (2008) under contract with TCEQ, followed by successive interactive web-based ecological risk assessment tools and generators (2001–to Present with a 5-year extension in 2025to 2030) selected by TCEQ for statewide regulatory use. In addition, I developed the Vegetation Establishment Guidance for Decisions Assistance Tool (VEGDAT) (2010) for the Texas Department of Transportation to support science-based vegetation restoration decisions. Collectively, these tools demonstrate sustained experience over more than two decades in translating scientific, engineering, and regulatory requirements into operational software platforms that inform environmental management, remediation, and regulatory compliance.

## J. AWARDS

I have received a number of awards throughout my career, including:

- 2015: Texas A&M University System Regent Professor Award.

---

- 2010: Profession Service Excellence Award for 2009-2010 awarded by the College of Agriculture, Science and Engineering, West Texas A&M University.

- 2009: Meritorious Paper Award for presented paper entitled, Superfund Site Analysis Using Web 2.0 Technologies Association of Information Technology Professionals.

- 2004: Exceptional Leadership in Teaching Environmental Science. Texas Commission on Environmental Quality.

- 2003: Awarded the Deleos Pugh - Outstanding Member Award. Zeta Kappa Chapter.

- 2002: Awarded the Deleos Pugh - Outstanding Member Award. Zeta Kappa Chapter.

- 2000: Best in Practice - Texas 2000 Innovative Technology. Designer, Dual-phased saturated and unsaturated zone treatability demonstration to remediate high explosives. Texas Natural Resource Conservation Commission.

- 1997: Peer Recognition Award, U.S. Department of Energy.

- 1996: Greening the Government - Closing the Circle Certificate of Achievement. Department of Energy Washington D.C.

- 1989:  Outstanding Employee Award. SAIC.

- 1988: Secretary of the Interior Award, Laguna Atascosa Study and contributions to the Selenium and Other Toxic Substance Task Force Secretary of Interior, U.S. Department of the Interior.

- 1984: Performance Award for Exceptional Work, Velarde Project, U.S. Department of the Interior.

## III.    THE LOWER RED HILL FACILITY

### A. DESCRIPTION OF LOWER RED HILL INFRASTRUCTURE

The Facility at issue here consists of portions of the Navy's permanent fuel distribution system at Joint Base Pearl Harbor Hickam ("Joint Base") between the underground pumphouse and five existing fuel piers in Pearl Harbor and specifically includes six aboveground storage tanks (known as the "Upper Tank Farm") as well as Hotel Pier, Kilo Pier, Sierra Pier, Mike Pier, and Bravo Pier (the "Piers") and approximately 10 miles of pipelines that connect them, which are owned and operated by the Navy. P26 at NAVY_0004605-06. The Facility's fuel infrastructure includes the physical assets used to store, transfer, and distribute fuel, such as tanks, pipelines, valves, pumps, and associated monitoring and control systems, but also the organizational and human elements responsible for their operation. This includes the personnel who manage, operate, inspect, and

---

Dr. Rogers Written Direct                 31              1:22-cv-00272- LEK-RT

maintain the Facility, as well as their training, decision-making, and adherence to governing operational, maintenance, and safety documents. Effective fuel infrastructure, therefore, depends on both the condition and performance of engineered systems and the consistent compliance of facility staff with established plans, procedures, and regulatory requirements that collectively ensure safe, reliable, and environmentally protective operations.

## B. FACILITY OWNERSHIP AND COMMAND STRUCTURE

Joint Base Pearl Harbor–Hickam was established in 2010 through the consolidation of the former Hickam Air Force Base and Naval Station Pearl Harbor into a single joint installation. The Facility at issue comprises a portion of the Defense Fuel Support Point ("DFSP") located on the Joint Base. The DFSP is a government-owned, government-operated (GOGO) fuel storage and distribution system where fuel is received, stored, and distributed for military use. P26 at NAVY_0004605-06; P16 at NAVY_30B6_4037.

Although the Facility operates within a single geographic installation, its ownership, operation, maintenance, and mission execution are divided among multiple Department of Defense entities with separate chains of command. At least seven distinct entities share responsibility in varying respects.

---

### i.    <u>**Defense Logistics Agency**</u>

The Defense Logistics Agency ("DLA") owns the fuel stored at the Facility. DLA does not report to the Department of the Navy; rather, it reports directly to the Secretary of Defense. P16 at NAVY_30B6_0004036; ECF No. 282-1 (Deposition Transcript of Eric Wiedemann, "Wiedemann Deposition") 20:9-23. Thus, ownership of the fuel commodity itself lies outside Navy authority.

### ii.    <u>**Department of the Navy**</u>

The Department of the Navy owns and operates the Facility's physical infrastructure, including tanks, pipelines, and associated fueling systems. P26 at NAVY_0004605. Until some point in October of 2025, operational responsibility for the fueling infrastructure fell under Naval Supply Systems Command ("NAVSUP"), Fleet Logistics Center Pearl Harbor (FLCPH). P26 at NAVY_0004604; P17 at NAVY_0006636. After October 2025, the Joint Base Fuels Department ("Fuels Department") was brought under the Joint Base Commander.  The Joint Base Commander reports to Commander, Navy Region Hawai'i, who is under the Commander, Navy Installations Command.

The fueling mission at Joint Base supports operations across the United States Indo-Pacific Command ("INDOPACOM"), which is headquartered at the installation. P16 at NAVY_30B6_4036, 4042. INDOPACOM is a unified

---

Dr. Rogers Written Direct                33                1:22-cv-00272- LEK-RT

combatant command responsible for military operations throughout the Indo-Pacific region and reports to the Department of Defense. It is not part of the Department of the Navy. Accordingly, while the Facility supports INDOPACOM's operational mission, INDOPACOM does not exercise ownership or direct supervisory authority over the Navy's maintenance of Facility infrastructure.

### iii.    Fuels Department

At the installation level, the Fuels Department conducts day-to-day fueling operations for U.S. Navy vessels and aircraft, U.S. Air Force aircraft, and visiting allied vessels and aircraft. P16 at NAVY_30B6_4038, 4041. The Fuels Department also performs some inspections intended to identify maintenance and repair needs and conducts limited minor repairs within its in-house capability.

When the Fuels Department identifies maintenance or repair needs beyond its internal capacity, it refers those matters to the Joint Base Public Works Department ("Public Works Department"). P17 at NAVY_0006637-38.

### iv.    Public Works Department

The Public Works Department is part of the Naval Facilities Engineering Systems Command ("NAVFAC") Hawai'i. P17 at NAVY_0006637-38. NAVFAC Hawai'i reports to NAVFAC Pacific, which in turn reports to NAVFAC Headquarters, which reports to the Secretary of the Navy. The Public Works

---

Department does not report to INDOPACOM or to a Joint Base command structure for maintenance authority. The Navy has stated that, at some point in 2026, the Navy intends to move Public Works to the command and control of the Joint Base Commander.  This will place the Public Works Department's repair and maintenance mission under the Joint Base Commander's supervision and oversight, including work it does directly and its management of referrals to construction agencies.

If the Public Works Department cannot complete required maintenance or cannot do so within the necessary timeframe, the work may be further referred to either the United States Army Corps of Engineers ("Army Corps") or other components of NAVFAC. The Army Corps reports to the Department of the Army and ultimately to the Department of Defense—not to the Department of the Navy.

As a result, until at least October of 2025, responsibility for fuel ownership (DLA), infrastructure ownership (Department of the Navy), fueling operations (Fuels Department/NAVSUP), installation-level public works (NAVFAC Hawai'i), higher-level facilities command (NAVFAC Pacific and NAVFAC Headquarters), combatant command mission support (INDOPACOM), and certain engineering execution (Army Corps) were distributed across separate organizations with distinct reporting chains. P16 at NAVY_0004210.

---

Dr. Rogers Written Direct                35                1:22-cv-00272- LEK-RT

In October of 2025, when the Fuels Department came under the base commander, operation of the fueling infrastructure, and minor inspections and maintenance, came under local control. If and when the Navy also moves the Public Works Department under the Joint Base Commander, then an additional element of local, relatively minor inspection and maintenance will be under local control. Thus, the Navy will have taken a partial, first step towards centralized command of the fueling infrastructure.

However, responsibility for larger inspection and maintenance projects will continue to be divided between various government entities for the foreseeable future. This layered and non-unified command structure diffuses authority and fragments accountability. No single entity maintains comprehensive control over fuel ownership, infrastructure integrity, maintenance execution, operational mission requirements, and regulatory compliance. The complexity of this arrangement materially complicates coordination, oversight, and enforcement of maintenance and repair obligations at the Facility.

## C. THE NAVY'S FRAMEWORK FOR MAINTENANCE, INSPECTION, AND REPAIR OF THE FACILITY

### i. <u>Governing Documents</u>

The documents that are intended to describe and regulate operations at Lower Red Hill—including overall Facility management, fuel release response

---

Dr. Rogers Written Direct        36        1:22-cv-00272- LEK-RT

protocols, and infrastructure testing, maintenance, and repair schedules and requirements—are primarily captured in two core documents. These include: 1) successive iterations of the Operations, Maintenance, and Environmental Services Plan ("OMES Plan" or "Safety Plan"), which establishes overarching operational and management requirements for the Facility; and 2) the Integrity Management Plans ("IMPs") for petroleum, oil, and lubricant ("POL") pipelines, which define inspection, testing, monitoring, and corrective action requirements to ensure the continued safe operation of fuel infrastructure. *See generally*, P16, P17, P20-25.

My review of the 2018 and 2023 OMES Plans, as well as the 2015, 2019, and 2023 IMPs, reveals that the Navy has a reasonable framework in place for the maintenance, inspection, and repair of Lower Red Hill. These management plans themselves are well-developed, reflect adherence to applicable engineering standards and industry best practices, and are consistent with the types of operational and integrity management documents I have reviewed at other government-run fuel storage and distribution facilities.

Repair and maintenance projects at the Facility are divided into various categories, which are funded, tracked, and contracted out differently:

### ii.    **Minor Inspection and Repair**

As described above, minor repairs fall under the jurisdiction of the Fuels

---

Dr. Rogers Written Direct            37            1:22-cv-00272- LEK-RT

Department and/or the Public Works Department, which will also execute those repairs. P16 at NAVY_30B6_0004210-11; P17 at NAVY_0007031. The Fuels Department refers maintenance and repairs that it is not equipped to perform in-house to the Public Works Department. The Public Works Department refers maintenance and repairs that it cannot perform or cannot complete in the necessary time frame to the Army Corps or NAVFAC.

### iii. **RMMR**

Certain routine maintenance and repairs at the Facility fall under the routine maintenance and minor repair program at the Facility, known as Recurring Maintenance and Minor Repair ("RMMR"). P17 at NAVY_0007028. DLA Energy funds RMMR projects at the Facility, but has no other enforcement authority over the execution. *Id*. Rather, the Army Corps manages contracting for RMMR. As the "Execution Agent" or "Contract Agency" or "Construction Agent" for RMMR at the Facility, the Army Corps, oversees the issued RMMR contract and holds the authority to enforce the RMMR contract. The Army Corp contracts with third-party contractors, typically Pond & Company, to execute the RMMR project. ECF No. 282-2 (Deposition Transcript of Guy Pasco, "Pasco Deposition") 38:15-18.

### iv. **SRM**

Large-scale deficiency correction projects and significant Facility upgrades

---

fall under the Sustainment, Restoration, and Modernization ("SRM") program. P16 at NAVY_30B6_4210; P17 at NAVY_0007028-29. While also funded by DLA Energy, NAVSUP Energy has the overall responsibility to manage and execute DLA funds in support of projects under the SRM program. *Id*. NAVFAC Hawaiʻi is one of several Construction Agencies responsible for executing more substantial repairs of the petroleum infrastructure via contracts with NAVSUP through the SRM program. P16 at NAVY_30B6_4221. Depending on the repair, NAVFAC will either complete the repair itself or contract the repair to a contractor with the required capabilities. Only NAVFAC has contract enforcement authority for SRM contracts. Wiedemann Deposition 27:21-25.

### v.   **MILCON**

DLA Energy also funds Facility upgrades and large-scale deficiency correction projects under the Military Construction ("MILCON") program through specific Congressional appropriations in the annual National Defense Authorization Act. P16 at NAVY_30B6_4210. NAVSUP Energy has the overall responsibility to manage and execute DLA funds in support of MILCON projects and holds enforcement authority over contractors executing the MILCON project. *Id*.

---

Dr. Rogers Written Direct                39                1:22-cv-00272- LEK-RT

### vi.  **CMPs**

Certain RMMR, SRM, and MILCON projects that relate to hydrostatic testing, cathodic protection, and leak detection are funded by DLA through Centrally Managed Programs ("CMPs"). P16 at NAVY_30B6_4210. The CMPs are initiated by NAVSUP, which has the overall responsibility to manage and execute DLA funds, and contracts out repairs to other entities or third-party contractors. *Id*. For example, specialized recurring maintenance, such as API 570 inspections, and annual pressure testing, are funded via the CMP program. NAVFAC Engineering and Expeditionary Warfare Center (EXWC) is one Contract Agency for CMP API 570 Inspections. Pasco Deposition 28:25-29:16. However, the Contract Agency for annual pipeline pressure testing is the Naval Facilities Engineering Systems Command Atlantic ("NAVFAC Atlantic"). Pasco Deposition 30:2-15. Where NAVFAC EXWC and NAVFAC Atlantic issue contracts to conduct specialized testing, enforcement authority rests solely with those entities.

## IV.  OPINIONS

### A. LACK OF A CENTRALIZED DATABASE TO TRACK REPAIRS

Repair and maintenance projects at Lower Red Hill are not managed within a single, centralized tracking system or database. This is true regardless of the project type- RMMR, SRM, or MILCON. Instead, the Navy simultaneously uses

---

Dr. Rogers Written Direct                    40                    1:22-cv-00272- LEK-RT

multiple databases and project-tracking spreadsheets for different aspects of day-to-day operations. Deposition Transcript of Ted Caudill ("Caudill Deposition) 91: 15-95:25. As a result, the Facility lacks the ability to effectively track repairs, testing schedules, and maintenance needs in a coordinated and efficient manner.

For example, the Navy has stated that spending on its RMMR program which handles minor maintenance and repair work at the Facility "is not maintained in a manner that can easily be identified" and that "spending records are not maintained in a manner that can be queried by year." P170 at pp. 3-4.

### i.    Sharepoint Server/Spreadsheets

At the Facility level, a SharePoint platform is used that includes several distinct components: (1) an "Action Tracker," which is not regulatory-driven but is used to log and monitor incidents and related follow-up actions; (2) a separate database that tracks regulatory-driven deadlines for local compliance purposes; (3) a training matrix that Navy expert Ted Caudill testified he created in 2024 to monitor personnel qualifications and training requirements. Caudill Deposition 91:15-95:25.

Although automatic notifications can be set up to alert users of upcoming deadlines or critical items, any items not already on the SharePoint lists would still require input from other sources, such as the FAMMS database (described in

---

Dr. Rogers Written Direct              41              1:22-cv-00272- LEK-RT

section IV.A.ii.). While SharePoint can interface with other Microsoft and third-party tools, it is not designed for heavy data processing or complex data relationships and is not a substitute for a relational database. Additionally, it has more limited query capabilities and reportedly struggles to accommodate complex filtering and analytics/reporting. To satisfy its complex relational requirements of entity, budget, and project nature and status tracking, the Navy would need to integrate any SharePoint lists with its external databases. Even in such a scenario, however, there exist several distinct, cross-agency databases that do not interface with each other and therefore only provide a disjointed method of tracking and management, where a comprehensive tool is needed.

### ii.   **FAMMS Database**

The Fuels Asset Management and Maintenance System ("FAMMS") database, a cross-agency database that has been in place for at least a decade, is used to record local maintenance projects at Lower Red Hill. FAMMS does not appear to record data on SRM, MILCON or CMP projects despite the requirement in the 2023 OMES Plan that FAMMS store local, SRM, and MILCON projects. FAMMS does not store or record any data on RMMR projects. See P16 at NAVY_30B6_0004211.

---

Dr. Rogers Written Direct             42             1:22-cv-00272- LEK-RT

### iii.    **DLA Database**

DLA maintains a database recording all projects funded by DLA.

### iv.    **RMMR Database**

A separate database, independent from the FAMMS or DLA databases, is used by the Army Corps for recording RMMR projects.

### v.    **SMR, CLM, MILCON Databases**

Yet more, independent, tracking systems are used for SRM, CLM and MILCON projects by the construction agencies contracting for these projects. Caudill Deposition 91-94. While some projects are recorded across databases, my analysis indicates these are few, and therefore there is no database, spreadsheet, or other source providing a comprehensive view of corrective maintenance, capital improvements, or project-based repair work. The existence of these parallel, non-integrated systems prevents leadership from maintaining a unified, real-time understanding of Facility conditions, regulatory obligations, and project completion status. For example, to use any of the databases to track a repair, Mr. Caudill testified that an individual must identify the repair type (RMMR, SRM, MILCON), then determine the Contracting Agency, and then contact the identified Contracting Agency to inquire about the repair. Caudill Deposition 91-94. An automatic reporting system to report project status does not appear to exist.

Compounding this issue, the current command structure does not clearly

---

Dr. Rogers Written Direct            43            1:22-cv-00272- LEK-RT

identify a single individual responsible for overseeing Facility operations and exercising full authority over urgent or critical-path items. Consequently, when such items are identified, they are not consistently addressed in a timely manner.

Even where repairs are planned or reportedly completed, Navy personnel themselves often cannot determine the status of individual projects, the expected or actual completion timelines, or whether the recommended remedies were properly implemented. Caudill Deposition 91-95. This uncertainty is evidenced by the absence of photographic documentation or detailed post-mitigation inspection notes prepared by a qualified individual. Additionally, very little maintenance or repair activity can be reliably tracked across reports or cross-referenced with Navy records, further demonstrating the lack of an effective centralized system for managing Facility conditions.

Based on these findings, I reached the following opinion (the numbering of which corresponds with my Expert Report dated February 24, 2025):

**Expert Opinion 3:** The Facility lacks the project management capability to track, cost and schedule needed maintenance, especially for urgent or critical path issues.

### B. LACK OF CENTRALIZED COMMAND OR LEADERSHIP OVERSEEING REPAIR AND MAINTENANCE

Oversight of Lower Red Hill is divided among multiple entities operating

---

Dr. Rogers Written Direct                44                1:22-cv-00272- LEK-RT

under separate chains of command, resulting in diffuse authority and no single point of accountability for infrastructure integrity. Fuel ownership resides outside the Navy, while infrastructure ownership, operational control, facilities engineering, and certain project execution functions are distributed across distinct Navy components and, at times, other Department of Defense entities. Maintenance responsibilities move sequentially—from the Fuels Department, to the Public Works Department within NAVFAC Hawai'i, and in some instances to higher NAVFAC commands or the Army Corps—each with its own reporting hierarchy. P16 at NAVY_30B6_0004036-38, 4041, 4210; P17 at NAVY_0006636-38; P26 at NAVY_0004604.

Within this framework, funds allocated for work at the Facility have not been consistently tracked across responsible entities, making it difficult to verify whether identified repairs were completed, deferred, or transferred between commands. Reporting has been limited and uneven, with partial and non-integrated recordkeeping systems that cannot be reliably cross-validated across departments. P26 at NAVY_0004593. Because no centralized authority maintains a comprehensive view of project status, even senior leadership has lacked visibility into ongoing work, planned repairs, and the location of missing or incomplete documentation. Caudill Deposition 91-95. For example, the authority to enforce

---

Dr. Rogers Written Direct                 45                 1:22-cv-00272- LEK-RT

completion of specific repair contracts rests with the agency that issued the contract—whether that be NAVFAC, the Army Corps, the Public Works Department, or another entity—meaning that oversight and enforcement are fragmented along the same lines as operational control. Wiedemann Deposition 18:13-23, 27:21-25.

This degree of fragmentation falls short of the diligence expected in managing critical fuel infrastructure of this scale and strategic importance. P29 at pp. i-ii, 69. (The Dep't of Defense Inspector General found that DoD officials did not effectively manage and oversee the operations, maintenance, and safety of the Facility). The failure to timely update governing operational documents, including the OMES Plan, to reflect changes in command relationships, as Mr. Pasco testified, further institutionalizes uncertainty regarding reporting lines and responsibility, reinforcing the absence of clear accountability. Pasco Deposition 78:23-82:13; P29 at pp. i-ii, 69 (The Dep't of Defense Inspector General recommended in 2024 that the Secretary of Defense designate a single point of command at the Facility.); As Rear Adm. Christopher Cavanaugh stated in a letter to the Vice Chief of Naval Operations dated January 20, 2022, "[a]s revealed by the investigation, Red Hill does not represent a failed command and control structure. Instead, Red Hill represents the failed execution of command and control

---

Dr. Rogers Written Direct                    46              1:22-cv-00272- LEK-RT

exemplified by poor on-scene leadership combined with inadequate Immediate Superior in Charge (ISIC) oversight."[1] Rear Admr. Cavanaugh further stated "[w]hen everyone is in charge, no one is in charge."

As another example, the most recent IMP, dated October 2023, and prepared for NAVFAC EXWC, does not establish clear lines of responsibility for the execution of required actions. *See generally,* P23-P25. Although NAVFAC EXWC is listed as the report recipient, the IMP states that its purpose is to "provide an Enhanced Integrity Investigation and Assessment," which "must be coordinated with the program manager of the DLA-E[2] Cathodic Protection CMP," and that any items related to cathodic protection will be reported to that program for future initiatives. P24 at NAVY_0043020. The scope further requires the development of "DLA-E programming documents suitable for deficiency entry into the DLA-E SRM database," and specifies that "all projects that directly relate to enhancing

---

[1] The letter, beginning at page 127 of the linked PDF, signed by the Commander of the US Pacific Fleet, is publicly available on the EPA's webpage at:

https://www.epa.gov/system/files/documents/2022-07/FOIA-Release-Red%20Hill-CI-%28June%202022%29.pdf.

[2] DLA-E refers to DLA Energy.

---

Dr. Rogers Written Direct                47                1:22-cv-00272- LEK-RT

piping integrity" will be defined so that DLA-E can enter the deficiencies into its

SRM database and develop the corresponding projects, typically for funding in the

next fiscal year. *Id*. Yet, in Table 3.2-1, which sets out Pipeline Integrity

Management Activities, responsibility for action items is divided among "DLA-E,"

"Local," "Local or DLA-E," and "DLA-E/CMP," without assigning a single

accountable authority. *Id*. at NAVY_0043031. Collectively, these provisions

demonstrate that the IMP disperses responsibility across multiple entities, leaving

no clearly identified individual or organization with defined authority to ensure

that required actions are executed.

As an additional example, in response to an Interrogatory to pinpoint

persons responsible for leak detection at the Facility, the Navy has stated that "the

person who causes the leak, release or discharge, or the person who discovers a

leak, release or discharge at the facility is responsible for reporting the leak, release

or discharge.  Because the responsibility to report fuel leaks, releases and

discharges at the facility is not vested in a specific person, Defendants do not

identify any specific people." P170 at pp. 5-6.

Based on these findings, I reached the following opinions (the numbering of

which corresponds with my Expert Report dated February 24, 2025):

**Expert Opinion 4:** The Facility lacks a "unity of command" structure with

---

Dr. Rogers Written Direct              48              1:22-cv-00272- LEK-RT

no one entity or organizations responsible for the Facility.

**Expert Opinion 5:** The Facility has written and adopted adequate management plans, such as "Integrity Management Plans," but those plans lack clear lines of responsibility.

### C. THE NAVY FAILS TO IMPLEMENT ITS MAINTENANCE, INSPECTION, AND REPAIR FRAMEWORK

While the operational documents generally establish an adequate framework for repair and maintenance at the Facility, a review of the Navy's spreadsheets and reports reveals a twofold problem: first, necessary repairs are either not being implemented or are so poorly documented that completed work is not readily apparent in the records; second, corrective actions are repeatedly deferred. *See,* P20-P45, P48-P74, P122-P169. My examination of the Facility's outstanding structural deficiencies and pipeline testing further indicates a substantial failure to perform and/or document required inspections, maintenance, and repairs in a timely and effective manner. *See generally*, P48-P4. The Navy's failure to maintain accurate and complete records of completed repairs is as hazardous as failing to perform the repairs themselves, because without reliable documentation, critical infrastructure deficiencies may go unrecognized and unaddressed, increasing the risk of operational failures.

The Navy has not consistently executed the inspections, repairs, and upkeep

Dr. Rogers Written Direct                    49                  1:22-cv-00272- LEK-RT

specified in its OMES Plan and its IMPs, resulting in compromised infrastructure.

The issue does not stem from the design or content of the OMES Plan or the IMPs;

rather, it arises from the Navy's failure to follow its own procedures and

requirements for maintaining the Facility's safety and operational standards.

Deficiencies identified as far back as 2010 (and incorporated by reference

into the 2015, 2019, and 2023 IMPs), as well as deficiencies documented in the

2022 report generated by engineering company Simpson Gumpertz & Heger

(referred to hereafter as the "SGH Report"), show that little general maintenance

has been undertaken to address these longstanding issues. *See* P20-P26.

Based on my review of repairs left unaddressed or deferred as provided in

the IMPs and SGH Report, I reached the following opinions (the numbering of

these opinions corresponds with my Expert Report dated February 24, 2025):

**Expert Opinion 2:** Navy reports and management documents establish

reasonable inspection, testing, and maintenance timelines, protocols, and

requirements. The Navy has consistently failed to implement the required

inspections, testing, and repairs. The implementation schedule must be tied to the

urgency of the needed repair. A system to identify "imminent" risks and needed

timely mitigation is not implemented, although many are identified in the facility

audits.

---

Dr. Rogers Written Direct            50            1:22-cv-00272- LEK-RT

**Expert Opinion 7:** Based on my review of service orders and spreadsheets documenting repair work, and project tracking conducted by third-party auditors compiled in Navy reports, many Facility repairs identified in 2010 have been neglected for well over 16 years.

**Expert Opinion 8:** Many deficiencies once considered minor have now become urgent due to the time that has passed since the initial identification of the issue.

**Expert Opinion 9:** Based on my September 20, 2024 site inspection and my review of numerous Navy-retained engineering inspections, future releases of oil product at the Facility are virtually certain.

### i.    Integrity Management Plans (IMPs)

The 2015, 2019, and 2023 IMPs describe the then-current conditions of the Red Hill Facility and update the earlier 2010 plan prepared by Enterprise Engineering Inc. (EEI) for DLA Energy. P20-P25. The stated purpose of the IMP program was to "reduce the risk of POL piping system failures resulting in unacceptable environmental and mission readiness consequences by completing a planned and methodical pipeline integrity assessment and evaluation." P23 at NAVY_0042887. Each IMP required an integrity or condition assessment that included identifying deficiencies and recommending remedies to support continued

---

Dr. Rogers Written Direct    51    1:22-cv-00272- LEK-RT

operations and installation sustainment. As part of this process, the inspections involved "hands-on API-570 inspection of all accessible pier piping systems," and all piping located over or near water was classified as API Service Class 1—requiring expanded inspection requirements and shortened inspection intervals. P23 at NAVY_0042988.

Across the 2015, 2019, and 2023 IMPs, numerous deficiencies and corresponding repair recommendations were documented. However, many deficiencies were not addressed at the time they were first identified and appeared again in subsequent inspections years later—for example, items noted in 2015–2016 remained uncorrected during 2021 inspections, and some deficiencies persisted into reports issued in 2022. *See generally,* P21-P25.

This recurring pattern of deferred repairs is consistent across all third-party reports. Although certain repairs are reported as completed, the IMPs did not provide before-and-after photographs to substantiate the work, and in several instances I observed photographic evidence showing the same deficiencies in multiple inspection years. The IMPs therefore establish not only a long history of identified deficiencies but also that many recommendations from the 2010 plan remained unimplemented five to thirteen years later.

I additionally completed an Above-Ground Piping Inspection Checklist

reflecting that all items were marked as "unacceptable condition" based on deficiencies identified in the 2015, 2019, and 2023 IMPs, as well as those I documented during my September 20, 2024 inspection for all segments observed.

### ii.    Deferred Repairs Identified in the 2015 IMP

The following list provides examples of repairs identified in the 2015 IMP:

- Not all piping receives periodic pressure testing.

- The JP-8 pipeline between the VC-1 area and Hickam was constructed to be piggable; however, no records were found that indicate it has been internally inspected since construction in 2000.

  - Action item: perform cleaning and intelligent pigging of the Hickam AFB pipeline.  It is worth noting that I discovered no other references to pigging except for a single one that took place on Oct 30 2015 (FY2016) under work order PRL-PND-183E – "fuel pipelines are being pigged" (reference to JP-5 and JP-8 lines).

- Non-standard components (primarily field-fabricated and custom flanges) were found throughout the installation.

- Internal pitting of the branch lines to the Red Hill tanks have been observed during other projects.

- Several areas with significant corrosion were discovered on the 16-inch F-

76 line along North Road.

- A full thermal relief study was performed in 2010, which made system-wide recommendations for repairs. A copy of the thermal relief study was not provided for review.

- The 2015 Integrity Management Plan again referenced the 2010 thermal relief study, and states that its recommendations were not implemented.

- The 2023 IMP attaches and references a new thermal relief study. P23 at NAVY_0042967 ("October 2023 Thermal Relief Study"). The October 2023 Thermal Relief Study, found extensive corrosion, improper installation, non-compliant globe valves and sight flow indicators, and dangerously, thermal cascade issues, as well as complete absence of venting in many areas. The October 2023 Thermal Relief Study recommends replacing 98 thermal pressure relief valves ("TRVs"), and installing 70 new TRVs, in the system.

- During his deposition in December 2024, Mr. Pasco testified that all TRVs had been tested and most replaced. However, Mr. Pasco also testified that TRVs are still installed in horizontal orientation. Pasco Deposition 96:22-97:4. Thus, 14 years after serious thermal pressure venting issues were identified, the Navy's recommendations have not been completely

---

implemented.

### iii. Deferred Repairs Identified in the 2019 IMP

The following list provides examples of repairs identified in the 2019 IMP (P22):

- Not all piping receives periodic pressure testing.

- The JP-8 pipeline between the VC-1 area and Hickam was constructed to be piggable; the pipeline was reportedly pigged as part of a project and pigging reports reportedly submitted separately. Of note, copies of these reports were not provided for review.

- Non-standard components (primarily field-fabricated and custom flanges) were found throughout the installation.

- Internal pitting of the branch lines to the Red Hill tanks have been observed during other projects.

- A full thermal relief study was performed in 2010, which made system-wide recommendations for repairs. An SRM project has been developed to remedy the thermal relief issues outlined in the 2010 report and the 2015 IMP reports. These issues were therefore being prepared to be addressed 9 and 4 years later, respectively. I was unable to confirm the implementation of this SRM project.

---

- Repair items from the 2015 report that have not been addressed include VC-31, VC-32 and underground pumphouse pipe repairs.

- Hotel Pier findings: Deficiencies concerning coating and corrosion that were identified in 2015 were also identified in 2019. The third-party contractor recommendations remained the same.

- Sierra Pier findings: A deficiency concerning risers submerged in water identified in 2015 was also identified in 2019. The third-party contractor recommendations remained the same.

- General Pier findings: A deficiency concerning flanges above water without spill containment identified in 2015 was also identified in 2019. The third-party contractor recommendations remained the same.

- Valve Chamber/Pit Findings: The same deficiencies concerning piping coating and sealant at wall penetrations at VC-31 and water in LPD/HPV pits and degraded coating in valve pits were observed in 2015 and 2019. The third-party contractor recommendations remained the same.

- Deadlegs: Three deficiencies listed in 2015 were also observed in 2019. The third-party contractor recommendations remained the

same.

- Additional findings: Three deficiencies listed in 2015 were also observed in 2019. The third-party contractor recommendations remained the same.

iv.    **Deferred Repairs Identified in the 2023 IMP**

The following list provides examples of repairs identified in the 2023 IMP (P23-P25):

- Hotel Pier findings:

    o   There was extensive pipe and pipe support coating failure and corrosion, mirroring 2015 and 2019 findings. Additionally, coating failure and corrosion staining was observed on all valves and associated flanges and all small-bore piping, flanges, and valves (e.g., TRVs, LPDs, and HPVs).

    o   TRVs were found to be installed horizontally in the piping trench; the same deficiency is discussed in the 2015 report, which also references the 2010 report for the same issue.

- North Road: Observed were coating failure and corrosion on the pipe; this issue was also identified in 2015.

- Kilo Pier: Observed were coating failure and corrosion on the pipe;

---

the pipe not also supported in places. Similar observations were made at the time of the 2015 inspection.

- Sierra Pier: Water was discovered in the riser containment in contact with the pipe. as the same issue was reported in 2015 and 2019.

- Mike Dock: Observed were coating failure and corrosion on the pipe, as well as failure of multiple pipe supports; LPD piping under the pier was submerged in water. This issue was also identified in 2015.

- Bravo Dock: Observed were coating failure and corrosion on the pipe; this issue was also identified in 2015.

### v.    **SGH Report**

A review of the Navy's own recommendations across multiple sections of the SGH Report demonstrates a long-standing failure to address identified deficiencies. *See generally,* P26. Collectively, these findings demonstrate a consistent and systemic pattern of failing to implement required corrective actions across multiple reporting periods and categories.

- In Table 8-1 (Defueling Recommendations), 6 of 27 items appear unaddressed, including 2 items ranked as Risk Rank 1 ("Critical") with High priority, and 16 additional items could not be cross-referenced. P26 at NAVY_0004903.

---

- In Table 8-2 (Ongoing Operations Recommendations – Without Red Hill), 56 of 63 items appear unaddressed, 11 of which are Risk Rank 1 ("Critical") with High to Medium priority; 7 items could not be cross-referenced. P26 at NAVY_0004908. P26 at NAVY_0004915.

- In Table 8-3 (Ongoing Operations Recommendations – Red Hill), all 46 identified items appear unaddressed, including 11 items ranked as Risk Rank 1 with High to Medium priority. *Id.*

- Section 8.2 (Structural and Mechanical Integrity Recommendations) likewise shows that 5 of 6 items appear unaddressed. P26 at NAVY_0004922.

- In Appendix A.1 (Site Visit Observations and Recommendations – Sorted by Location), 164 of 248 items appear unaddressed, and Appendix A.2 (Sorted by Priority) similarly reflects that at least 164 of 248 items remain unaddressed. P26 at NAVY_0004938.

### vi.    2022 Fuel Transfer System Inspection Report

I conducted a similar review of recommendations within multiple sections of a Fuel Transfer System Inspection Report dated August 2022. *See* P27.  I again found deficiencies that have remained unaddressed, or undocumented, over the course of years.  Collectively, these findings demonstrate a consistent and systemic

pattern of failing to implement required corrective actions across multiple

reporting periods and categories.

- In Table 7 (F-24 Findings and Recommendations) shows 25 of 51

  unaddressed items (P27 at NAVY_0005545); Table 9 (JP-5 Pipe

  Support Findings and Recommendations) shows at least 46 of 77

  unaddressed items, including 2 marked as "Urgent" (P27 at

  NAVY_0005552); and Table 10 (F-76 Findings and

  Recommendations) shows at least 62 of 75 unaddressed items, 34 of

  which are marked "Urgent" (P27 at NAVY_0005561.)

- Table 14 (Validation of Deficiencies from the 2016 and 2019

  Inspection and Repair of Red Hill Pipelines Report) further shows that

  at least 33 of 192 items remain unaddressed, and 97 of 192 items

  exhibited the same deficiencies and recommendations in August 2022

  as in 2016—91 of which still appear unaddressed. P27 at

  NAVY_0005583.

- Table G (Validation of Repairs/Inspection Findings, based on the

  2015 and 2016 EEI/APTIM reports) indicates that 86 of 170 items

  reflected the same findings in 2021–2022 as in 2015–2016, with the

  validating party, InterSpec, LLC, typically concurring with the 2016

---

Dr. Rogers Written Direct         60         1:22-cv-00272- LEK-RT

recommendations, confirming that those actions had not been

implemented upon original discovery. P27 at NAVY_0005779.

### vii.    Pond Service Orders

I reviewed thirty-four (34) POND/PONDCO service orders dated 2014-2021

identified by Lieutenant Commander Bencs[3]. The service orders were meant to

address deficiencies concerning pipeline leaks, failing bulk storage tank piping

seals, faulty sumps, repair/replacement of damaged and/or leaking flanges/ball

valves/gaskets, and other immediate or potential environmental hazards. Of those,

15 did not match Navy records for completed work and thus I must assume have

---

[3] I reviewed the following service orders for a record of completion in Navy

databases: PRL-PND-078; PRL-PND-121; HIC-PND-023; PRL-PND-157; PRL-

PND-150; PRL-PND-203; PRL-PND-223; PRL-PND-240; PRL-PND-242; PRL-

PND-245; PRL-PND-254; HCK-PND-043; PRL-PND-207; HCK-PND-045; PRL-

PND-518; PRL-PND-008; PRL-PND-009; PRL-PND-040; HCK-PND-053; HCK-

PND-057; PRL-PND-422; HCK-PND-063E; PRL-PND-429; PRL-PND-430;

RHL-PND-045; RHL-PND-046; HCK-PND-070; PRL-PND-485; PRL-PND-499;

RHL-PND-048; PRL-PND-538; PRL-PND-557LL; and PRL-PND-556ll.

---

not been addressed.

### viii.    Assessment Of The Infrastructure During Site Visit

On September 20, 2024, I conducted a site investigation of Lower Red Hill. In preparation for that inspection, I extensively reviewed the SGH Report dated April 2022, as well as the Facility schematics (P15) provided by the Navy. I enlarged the schematics to 30" × 40" waterproof plates to facilitate my field review and to identify specific locations to be examined during the inspection.

One objective of my visit was to determine whether deficiencies identified by SGH in 2022 had been addressed and to make my own observations of current site conditions. The Navy provided access, on-site transportation, and a work boat to tour the piers. During the inspection, I took 81 photographs (*see* P7), many taken at or near the same locations documented in the SGH Report. After the site visit, the Navy provided additional documents, which I reviewed in forming my opinions.

During the September 20, 2024 inspection, I completed the same Above-Ground Piping Inspection Checklist used by contractors in conducting infrastructure assessments as part of reporting required under the IMPs. For each segment observed, I noted items previously identified in the 2015, 2019, and 2023 pipeline IMPs. I also located and inspected nearly all of the areas identified in the

Dr. Rogers Written Direct            62            1:22-cv-00272- LEK-RT

SGH site visits conducted on January 19, 2022, and April 18, 2022, marking the field maps accordingly. *See* P26 at NAVY_0004720-4749. A principal purpose of my inspection was to evaluate whether the Navy had implemented SGH's recommendations. Based on my observations and photographic documentation, I did not detect evidence of remediation, and most SGH recommendations remained unaddressed.

Based on my review of the materials listed in my report and my personal observations on September 20, 2024, it is apparent that although inspections are performed, little—if any—remedial work is planned or carried out. The period between SGH's 2022 site visits and my own inspection—approximately two years and seven months—was sufficient for corrective action to be taken, yet I observed no such action.

From my site inspection and document review, I reached the following opinions (the numbering of these opinions corresponds with my Expert Report dated February 24, 2025):

**Expert Opinion 2:** Navy reports and management documents establish reasonable inspection, testing, and maintenance timelines, protocols, and requirements. The Navy has consistently failed to implement the required inspections, testing, and repairs.

Dr. Rogers Written Direct                    63                    1:22-cv-00272- LEK-RT

**Expert Opinion 9:** Based on my September 20, 2024 site inspection and my review of numerous Navy-retained engineering inspections, future releases of oil product at the Facility are virtually certain.

### D. SPECIFIC EXAMPLES OF OPERATION AND MAINTENANCE FAILURES LEADING TO HIGH RISK OF FAILURE AND DISCHARGE

My review of Navy management documents, by my site inspection of September 20, 2024, and the testimony of Lieutenant Commander Bencs and Navy witness Mr. Pasco, confirm my conclusion that management failures at Lower Red Hill continue through the present, and given these failures future discharges to Pearl Harbor are virtually certain. The following are specific examples of imminent failure and/or discharge of petroleum.

#### i.   <u>Valve Station VS1C to Truck Fueling Station</u>

According to the 2022 Fuel System Inspection Report, produced by the Navy (P28 at NAVY_0070363), a third-party inspection identified four pipes conveying petroleum from VS1C to the truck refueling stand as deficient. The report identifies four metal pipes with 45-degree angle in contact with the ground. P28 at NAVY_0070442. The Navy inspection noted that ground contact is not engineering best practice, increasing corrosion. The report recommended eliminating the ground contact.

---

During my 2024 site inspection, I observed and photographed the same pipelines, VS1C to the truck fueling station, with the 45-degree angle still sitting in the dirt. *See* P7 at WOA_INSPECTION_PHOTO0000024. I also observed that these pipes are flanged where they connect to underground pipes leading to the truck fueling station, *see* P7 at WOA_INSPECTION_PHOTO0000025, and that the pipelines have no secondary containment. Secondary containment, such as walls, berms, or catchments to contain any leaks or spill before discharge to waters, and are required for flanged petroleum pipelines directly over water or with potential to flow into surface water at Lower Red Hill. *See* P16 at NAVY_30B6_0004052-53. I further observed and photographed the pathway of any release and lack of secondary containment from these pipelines to a freshwater swale downgradient. P7 at WOA_INSPECTION_PHOTO0000028; 00000031.

Navy witness Mr. Pasco testified in December of 2024 that he walks by the four pipes at issue "frequently." Pasco Deposition 63:10-12. Mr. Pasco further testified that the dirt under the pipes were shoveled out approximately in September of 2025, but as a "housekeeping event" that he did not know whether this was recorded. Pasco Deposition 83:21-83:6; 109:17-110:9. Mr. Pasco further stated given the flanging on those petroleum pipes, secondary containment would be appropriate, Pasco Deposition 110:10-111:9, and that no secondary containment

---

was in place. Pasco Deposition 113:1-11. Finally, Mr. Pasco confirmed that the downstream swale is the receiving water of any petroleum spill from the four petroleum pipes, Pasco Deposition 113:12-114:20, and that a discharge into the swale would flow into Pearl Harbor. Pasco Deposition 114:21-116:15.

These four pipelines illustrate the failures at Lower Red Hill I have observed. A Navy inspection report observed petroleum pipes in contact with dirt at a 45-degree angle in 2022, and recommended action. P28 at NAVY_0070442. Two years later I observed the same condition unchanged—thus the Navy had not addressed the issue, and the risk of discharge, identified by its own report. P7 at WOA_INSPECTION_PHOTO0000024. One month after my inspection, and after we focused on and provided copies of photos of these four pipes to the Navy, the Navy finally shoveled out those pipes. Yet the Navy has no recurring maintenance for this issue, no record of the response, or other method of ensuring the pipes will remain out of ground contact in the future. Finally, despite walking by the pipes "frequently," Mr. Pasco did not observe the lack of required secondary containment—a very serious concern given the direct pathway to discharge to harbor waters for any petroleum release. Lower Red Hill is located in a tropical climate, adjacent to Pearl Harbor, and therefore is a highly corrosive environment, and ground contact can result in rapid degradation of metal pipes. Given the

Dr. Rogers Written Direct                66                1:22-cv-00272- LEK-RT

Navy's divided management at Lower Red Hill, the four petroleum pipelines connecting valve station VS1C and the truck fueling station represent a high risk of failure and discharge to Pearl Harbor, and represent the risks of discharges site-wide.

### ii.    Pressure Management and Pressure Relief

The Navy Integrity Management Plan-POL Pipelines of 2015 (*see* P21) stated at Annex 2.1, Table 2.1 Summary of Integrity Evaluation Items and Findings:

"14. Adequacy of thermal relief system to prevent overpressure condition. A full thermal relief study was performed in 2010 which made system-wide recommendations for repairs. The majority of the recommendations from the study have not been implemented. See discussion below regarding Thermal Relief for additional information and recommendations." *See* P21 at Navy_30b6_0001352.

The 2015 report goes on:

Thermal Relief Findings

> "l. The pressure safety valves (PSVs) on the two filter/separators at the Lube Oil system are piped incorrectly. The PSVs relieve the pressure from the piping into the vessels; instead of relieving the pressure from the vessels into the piping. This configuration may result in unacceptably high pressure in the vessels and is a violation of the ASME pressure vessel code. *EII recommends re-piping the PSVs to relieve pressure in the vessels to the top of each Lube Oil Tank.*

---

2.    Multiple deficiencies were observed with the thermal relief systems. EEI performed a Thermal Relief Analysis in 2010 for the entire system. The recommendations from that study have not been implemented. Additionally, two projects have changed the piping system and affected the thermal relief system since the Thermal Relief Analysis: the P-200 project and a project that added meters at VS-14. The deficiencies observed included the following:

a. The TSVs [thermal safety valves] at Hotel Pier and at the TFS discharge to open containment areas and not to a produce recovery tank (PRT) or back to a fuel line.

b. The majority of the thermal relief at this installation consists of threaded components. Many of the TSV isolation valves are closed and not locked or sealed open.

c. Many of the TSVs cascade to potentially unacceptably high pressure. Many TSV nameplates are unreadable because the tags are covered with paint or do not exist.

d. Multiple TSVs throughout the facility are installed in a horizontal orientation. Sediments and debris can accumulate in the components of the TSVs when piped horizontally and cause TSVs for malfunction over time.

*EEI recommends performing the modifications recommended in the 2010 Thermal Relief Assessment and adding additional TSVs at VS-3 and VS-14. Type, quantity, location, and set pressures of TSVs should be verified in a design stage of an SRM project. See Annex 3.2 for more information on the recommended projects."* P21 at NAVY_30B6_0001357.

In October of 2023 the Navy completed another Thermal Relief Study. P25 at NAVY_0042542. The 2023 Thermal Relief Study identifies the same failures cited in the 2015 study (P21) and identifies additional failures. The 2023 Thermal Relief Study states:

"The study determined that there are significant issues with the thermal relief system at JBPHH. Many piping segments were

---

Dr. Rogers Written Direct                    68                    1:22-cv-00272- LEK-RT

identified without thermal relief, exposing these segments to potential damage from the high pressures of thermal expansion. The existing thermal relief assemblies provide only a minimal level of protection and have many minor deficiencies including improper valve type and inconsistent set pressures." P25 at NAVY _0042543.

The 2023 Thermal Relief Study found extensive piping without thermal pressure relief, corrosion, improper installation, incorrect valve types, and other issues. The report recommends replacing 98 existing thermal relief valves, and installing an additional 70. P25 at NAVY_0042544.

During his deposition, Mr. Pasco stated he had no knowledge of the 2010 Thermal Relief Study, and no knowledge as to whether the recommendations of the 2010 study had been implemented. Pasco Deposition 93:18-94:12. Mr. Pasco stated that as of December of 2024, deficiencies "(a)" and "(d)" reflected current conditions. Pasco Deposition 94:13-97:4. As to unacceptably high cascading pressures in the system, Mr. Pasco testified that starting 18 months ahead of the deposition date of December 2024, all TSVs had been tested, and most had been replaced—at least those without nametags. Pasco Deposition 96:7-21. Mr. Pasco stated that the TSV testing and replacement was an RMMR program. *Id.*

Therefore, at a minimum significant, dangerous failures in thermal relief management went unaddressed from at least 2010 through 2023, or 13 years. In any event, TSV are still located in the incorrect horizontal position. Further, my

---

Dr. Rogers Written Direct               69               1:22-cv-00272- LEK-RT

review of the Navy's service orders does not indicate that the TSVs were actually tested or replaced as recommended in 2010 and 2015. *See* Thermal Relief Findings Section IV.D.ii above. Mr. Pasco testified he does not know how, or if, the testing or replacement of TSVs are recorded. Pasco Deposition 95:4-96:2. When running complex systems such as the fueling infrastructure at Lower Red Hill, if an action is not documented, the safe assumption is that the action did not occur.

The Navy's haphazard approach to thermal and pressure control at Lower Red Hill is further illustrated by the defueling line and thermal pressure management at Hotel Pier. When the Navy suspected that a defueling line was the source of the Hotel Pier discharges in 2021-2022 (based on a failed pressure test) the Navy blanked the defuel line using a skillet. *See* P28 at Navy_0070454-55. The defuel line was used for pressure relief using a TSV. Pasco Deposition 63:13-64:18. The Navy's blocking of the defuel line eliminated automatic thermal pressure control for Hotel Pier. Pasco testified that as of December 2024, two years later, the TSV was still valved out at Hotel Pier, and instead pressure relief is provided manually—meaning an operator has to observe pressure gauges and manually vent Hotel Pier pipe when pressures exceed safe levels. Pasco Deposition 64:15-65:22. Mr. Pasco is unaware if the protocol for manual venting at Hotel Pier is written down—instead he states "Yeah I just know it's our operational practice."

---

Dr. Rogers Written Direct               70               1:22-cv-00272- LEK-RT

Pasco Deposition 65:1-8. Relying on manual pressure venting may be appropriate when dealing with an emergency such as the Hotel Pier petroleum discharges—however relying on manual venting at the primary fueling pier at Pearl Harbor four years after the defueling line and its TSV was isolated is not good engineering practice and poses very significant risk of a discharge.

Pressure management is critical to safe operation of the Lower Red Hill fueling infrastructure. Inadequate pressure management and resulting over-pressurization stresses the entire system, weakening components including valves, gaskets, and pipes themselves, resulting in leaks and discharges. More significant over-pressurization can result in explosive failure—such as the May 2021 pipe failure in the upper Red Hill system. The Navy's failed operation and management of pressure relief at Lower Red Hill essentially creates a ticking time bomb in the system—a discharge is a matter of time.

### iii.    Skillets and Spectacles; Banding; Seeps

During my inspection on September 20, I observed numerous leaking flanges that had temporary flange bands positioned over the flange.  These bands are placed over the leaking flange to seal the leak. They have a grease zerk for grease to be pumped in to assist in sealing the gasket.  However, good engineering practice is to replace compressed gaskets, not to cover them. Further, the bands

---

prevent regular and timely inspection of the gaskets and flanges. My photos at P7

at WOA_INSPECTION_photos 0000032 and 000033 illustrate the band and

obvious leaking, as evidenced by the oil staining on and below the band.

Skillet and Spectacle blinds are used to "isolate" or "turn off" portions of

piping systems as a positive shut-off.  These shut-offs must be placed with

consideration of not isolating essential pressure relief or monitoring equipment,

potentially resulting in over-pressurization of piping isolated from the project

pressure relief and monitoring equipment. Installation of skillets/spectacles must

follow a procedure to assure that critical safety systems are not isolated. No such

procedure was produced by the Navy and as evidenced by the skillets used to

isolate the fuel return line at Hotel Pier, line isolation is not coordinated. *See supra*

Section IV.D.ii.

### iv.    <u>Navy Self-Reported Discharges</u>

The Navy's spill records, as produced in discovery and reported to the

Hawai'i Department of Health ("DOH"), confirm that fuel and oil discharges from

the Facility are ongoing and intermittent. *See* P46 ("Spill Spreadsheet"). On July 2,

2025, the Navy self-reported to DOH a confirmed release of approximately 300

gallons of fuel from an underground fuel pump house located at Joint Base Pearl

Harbor–Hickam during maintenance of a fuel line used for active fueling

---

operations. *See* P47. The information the Navy has provided about this fuel spill from the fueling infrastructure is limited. The Navy reported that the release was largely contained. However, spill prevention, not containment, is the appropriate measure of system integrity. Successful containment of a fuel discharge at Lower Red Hill, located immediately adjacent to Pearl Harbor, and in significant measure overwater, is to a large extent a matter of luck. Had this spill occurred outside of a contained, underground pumphouse, a discharge is highly likely. The Navy's self-reported spill is confirmation that the Navy's operation and maintenance of the system is inadequate.

The Spill Spreadsheet further documents self-reported discharges from 2015 through the end of 2024, reflecting a decade-long pattern of fuel and oil releases that is consistent with my findings of systemic infrastructure and operational deficiencies at Lower Red Hill. These records further indicate that fuel spills at Lower Red Hill continue to occur during routine fueling and maintenance activities as a result of preventable operational failures. For example, the Navy reported petroleum discharges into Pearl Harbor on October 21, 2024, and August 19, 2024, during fueling operations at Berth B16 and H Pier, respectively, each associated with procedural lapses and equipment handling errors. *See* P46.

---

Dr. Rogers Written Direct                    73                    1:22-cv-00272- LEK-RT

v.    **Inadequate Booming**

The final line of defense for limiting the harms from a petroleum discharge is booming. Lieutenant Commander Shannon Bencs has testified to the failure of the Navy to properly install booming to contain and mitigate the harms from the 2020 Hotel Pier discharges. Bencs Deposition 54:13-55:24. My observations of the booming around selected piers at Lower Red Hill was consistent with Lieutenant Commander Bencs' observations at to the Navy's haphazard boom installation. Photos I took during the 2024 site inspection illustrate half sunken booming (P7 at WOA_INSPECTION_PHOTOS0000041-42, and 53), and booming open to the Harbor (P7 at WOA_INSPECTION_PHOTO0000053-54, 63). Booming I observed—during a site inspection conducted as part of litigation—showed ineffective booming at numerous locations. To be effective, booming must be in place *before* a spill occurs. Navy booming fails to meet this basic requirement.

vi.    **Corrosion and protective coating failures directly above surface water**

Throughout the facility, I observed highly corroded piping, protective coating failures as well as valves and couplers without secondary containment directly over and often in the surface water.  My photos P7 at WOA_INSPEVCTIONS_PHOTOS0000040, 45,

---

48,49,50,51,52,55,56,57,67,69,71,75,76,77,79, and 81clearly show degraded piping and protective coating failure as well as many lacking secondary containment under flanges and valves.  It should be noted that, even though some of the photos show containment booming, in many cases the booming was not closed, so a release could reach open surface water.

## V.    RECOMMENDATIONS FOR LOWER RED HILL REORGANIZATION

### A. CENTRALIZED DATA TRACKING

The current management system is disorganized and relies on a confusing matrix and functional approach to project management, without clearly defined lines of responsibility and authority. To ensure effective oversight and accountability, a projectized management approach is required, with a single responsible entity and unity of command. Implementing this approach will require a comprehensive inventory of Navy and contractor resources and capabilities, followed by the development and execution of a formal communications and coordination plan. The lead authority for this unified project management structure should be the base commander, supported by a dedicated project management staff responsible for tracking all base maintenance activities and capital investments.

Based on my review of proposed and funded projects, there is no auditable tracking system in place to monitor the initiation, progress, completion, and close-

---

out of critical maintenance and repair activities. For example, of the more than 1,055 planned and funded projects reviewed, I was only able to verify the status of approximately 461 projects across the available maintenance and repair spreadsheets. To ensure accountability and effective execution, the single point-of-contact project management team must develop and implement a site-wide critical-path tracking system that consolidates all projects, reports to the designated single authority, and provides verifiable progress and deliverables accounting. All project data should be entered into a centralized system to enable consistent monitoring, reporting, and auditability. The single point of contact should then establish an integration team to prioritize maintenance, repair, and system upgrades based on critical and imminent risk-based criteria, ensuring that resources are directed to the most urgent and high-consequence needs.

**Step 1.** Base command to assume the role as program lead, with responsibility of tracking all projects for routine maintenance, repairs, testing schedules, implementation and close-out tracking.

**Step 2.** Develop an integration critical-path management system capable of collecting and tracking other Navy and contractor project management tracking systems such as FAMMS.

**Step 3.** Conduct a comprehensive, documented review of all deficiencies

---

identified in the 2010 documentation (as referenced in the 2015 IMP), the 2015 IMP, the 2022 SGH, and the 2023 Pond report. The Navy must compile and reconcile all projects and work orders—covering inspection, routine maintenance, repair, and replacement of infrastructure components—across these reports, existing Navy spreadsheets, and any additional relevant documents. Using the integrated critical-path management system, convert the compiled deficiencies into actionable work orders, establish realistic schedules, and assign accountability for implementation and close-out. Each project must be classified as "Completed," "In Progress," or "Not Initiated," and the process must include verification and auditing to ensure that deficiencies are tracked through completion and corrective actions are fully implemented.

Step 4. The Navy must then close out all projects that are "Completed" and assign a priority status to all outstanding projects that are "In Progress" or "Not Initiated". The status of each project should be ranked in order of priority ("Low", "Medium", "High") based on the risk severity to surface water.

Step 5. All projects must be added to a centralized critical path tracking system, where project status and work progress can be tracked by the base commander. Any existing databases (e.g., FAMMS) must either a) be rendered capable of interfacing with the new centralized tracking system, or b) should be

replaced by the centralized tracking system.

The Navy should accomplish the task of compiling and prioritizing all existing projects in one place within six (6) months, with full integration into a centralized tracking system accomplished within one (1) year from date of judgment.

As stated above, I have managed high-profile and very complex programs with virtually hundreds of subprojects. For example, I managed all aspects of the DOE Pantex Plant program using Oracle Primavera, a powerful project portfolio management (PPM) Software for planning, scheduling and managing the large complex programs.

In addition, I also managed a project for the Air Force Civil Engineer Center ERPIMS data management system input to validate and manage data from all Air Force Bases. The database is housed at the Air Force Civil Engineer Center and is used as a base-specific environmental remediation management and tracking system. My team assembled the base-specific data for entry into the ERPIMS data management system.

In summary, I have managed complex programs with multiple projects using both patent (Primavera) and command developed management programs (ERPIMS). The key to successful program management is "Unified Command"

---

with a centralized project tracking system. While the Navy has made significant

improvements in establishing a "Unified Command", there are still significant

broken lines of communication and lack of unified oversight.

## B.  UNIFIED COMMAND STRUCTURE AND CONCLUSION

Figure 1. Pre-October 2025 Repair and Maintenance Project Structure at Red Hill



Figure 1 illustrates the lack of "Unified command".  Figure 1 illustrates the

fractured lines of responsibility and direct lines of communication to the Unified

Command which, in my opinion, should be the Base Commander or his designated

responsible direct report. In my experience, gathering all of the responsible entities

together as a team, reporting lines could be established with assignment of clear

lines of authority and lines of communication to the Unified Command. This is the approach that I used when I inherited the Pantex Program.  Each reporting entity would have clear lines of responsibility to the Unified Command with clear assignment of tasks, periodic task tracking as to priority, and then funding and scheduling which would be imported to a comprehensive program tacking system. I required monthly "earned value" reports on all projects and subprojects essential to operating the program i.e., the Naval Base. This team approach and establishment of Unified Command is essential to successful operation of the base and does not require massive reorganization, but the development of reporting lines providing the Unified Command with progress and attainment of critical base operations.

**I declare under penalty of perjury that the foregoing is true and correct.**

Dated: 24 February 2026                              Respectfully submitted,

_____
Dr. Willian (Jim) Rogers

## CERTIFICATE OF SERVICE

I hereby certify that, on February 24, 2026, and by the methods of service noted

below, a true and correct copy of the foregoing:

WRITTEN DIRECT TESTIMONY OF DR. ROGERS

was served Electronically through CM/ECF on the following at their last known

addresses:

BRYAN HARRISON: BRYAN.HARRISON@USDOJ.GOV

DAVID D. MITCHELL: DAVID.MITCHELL@USDOJ.GOV

DANA A. BARBATA: DANA.BARBATA@USDOJ.GOV

LESLIE MARIE HILL: LESLIE.HILL@USDOJ.GOV

ALEXANDER M. PURPURO: ALEXANDER.PURPURO@USDOJ.GOV

ALEXANDER HARDEE: ALEX.HARDEE@USDOJ.GOV


Dated: February 24, 2026                    By: */s/Kristina Hambley*
                                            Kristina Hambley