William A. Harrison (HI Bar No. 2948)
HARRISON LAW CENTER
william@harrisonlawcenter.com
1001 Bishop Street
Honolulu, Hawai`i 96813
Tel: (808) 523-7041

Daniel Cooper (*pro hac vice*)
daniel@sycamore.law
Kristina Hambley (*pro hac vice*)
kristina@sycamore.law
SYCAMORE LAW, INC.
1004 O'Reilly Avenue, Ste. 100
San Francisco, CA 94129
Tel: (415) 360-2962

(Additional counsel listed on next page)

# UNITED STATES DISTRICT COURT
# DISTRICT OF HAWAII

| | |
|---|---|
| WAI OLA ALLIANCE, *et al.*,<br><br>    Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES DEPARTMENT OF THE NAVY, *et al.*,<br><br>    Defendants. | Civil Case No. 1:22-cv-00272-LEK-RT<br><br>**WRITTEN TESTIMONY OF LIEUTENANT COMMANDER SHANNON BENCS**<br><br>Trial Date: March 31, 2026 at 9:00 AM<br>District Judge: Leslie E. Kobayashi<br>Magistrate Judge: Rom Trader |

Philip Gregory (*pro hac vice*)
pgregory@gregorylawgroup.com
GREGORY LAW GROUP
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

Jason Flanders (*pro hac vice*)
jrf@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
8 Rio Vista Ave.
Oakland, CA 94609
Tel: (916) 202-3018


Attorneys for Plaintiff
WAI OLA ALLIANCE, *et al.*

## I.     BACKGROUND

1.   I am a lieutenant commander in the US Navy.

2.   I began my career as an officer on the United States Ship Vicksburg where I learned general engineering and how to fuel supplies to ships.

3.   I was then selected to do back-to-back sea tours on the USS Florida, SSGN guided missile submarine as one of the first women to integrate USS submarines. I was a supply officer on that ship tasked with sustaining the ship including buying diesel.

4.   I was then selected for a CIVINS program which is a Civilian Masters Program paid for by the United States Navy. Through that program, I studied at the University of Kansas for two years and received a master's in business and petroleum management. My courses covered fuels, fluid dynamics, corrosion, and environmental law.

5.   I was next assigned to NAVSUP Fleet Logistics Center of Pearl Harbor who was the command of the Red Hill Fuel Facility on Defense Fuel Support Point, Pearl Harbor (hereafter "Red Hill" or the "Facility").

6.   There, I became the fuel director overall in charge of oversight of the Facility. As fuel director, I oversaw the movement of fuel from a commercial pipeline in Kapolei to the JBPHH fuel turnover point to upper tank farm and the main underground fuel tanks at Red Hill. In that role I oversaw the storage of 250

million gallons of fuel at Red Hill. I also oversaw the supply of F-24 jet fuel to Hickam Airfield, lube oil, diesel, and JP-5 to naval vessels, and the receipt of fuels from oil tankers from Hotel and Kilo piers in excess of 10 millions gallons of fuel.

7. I was reassigned from Red Hill on May 12, 2021 but was not permanently reassigned until May 17, 2022.

8. Currently, I work as the Supply Officer at Marine Corps Base Hawaii, Marine Corps Installations Command Pacific. I oversee funding and execution and property management, the Defense Fuel Supply Point Kaneohe Bay, the Ammunition Supply Point, the Distribution Management Office, the Food Service Operation and the Waterfront Operations, which includes a small boats operation, environmental oil spill prevention and response and installation protection.

9. I have held this position since May 2022.

## II. 2020 HOTEL PIER RELEASE

10. I began working at Red Hill on or around May 15, 2020.

11. The Red Hill Fuel Facility is massive, it spans over 27 miles of pipelines in length. The main underground fuel tank storage compound is over 250 ft in depth and 1000ft long, which is similar in size to a U.S. Navy aircraft carrier, which has 2-Navy O-6 officers in charge and over 5,000 people onboard, which are needed to operate the complex ship. The entire Red Hill Fuel Facility is so massive that it is the equivalent to several aircraft carriers in size and complexity of its operation at

Red Hill proper, Pearl Harbor (tanks, pipelines and piers) and Hickam (tanks, pipelines and airfield).

12. My predecessor as fuels director was Blake Whittle. He was aware of the Hotel Pier fuel release and failed to report it to me at turnover and to the state and federal regulators, I also learned he briefed this issue along with the Red Hill Fire Suppression System, that never worked, to CAPT Trent Kalp and CDR Michael Carl, his Executive Officer at the time.

13. I first learned of the fuel release from Hotel Pier in June 2020, and learned it had been discharging fuel since March 2020, and reported it to the NAVSUP Pearl Harbor Chain of command.

14. I learned of the discharge by walking through the Facility tunnels, the piers and the airfield, which I did as often as possible, at least every day, as part of my visual observations of the Facility.

15. It was also in June 2020 that my employees first mentioned an unreported fuel leak at Hotel Pier.  Blake Whittle did not mention any release from Hotel Pier when he turned over the operation to me on approximately June 12, 2020.

16. I visited Hotel Pier as soon as I learned that there might be a release and sent my employees to view the area at and around Hotel Pier in kayaks.

17. I saw oil remnants in the soil and oil around the edges of the sea wall which is located at Pearl Harbor by Hotel Pier. The sea wall is located directly across from the Arizona Memorial, where the ferry lands and docks.

18. The specific site where I noticed the leaking is called the Hotel 5 area. It is a land map– a dirt area surrounded by two sides of water in what appears to be an L-shape or square.  Since there is a fuel valve station nearby, there are numerous pipelines that meet and change direction in the area. The valve stations allow operators to open and close valves and change the direction in which fuel flows or stops. The main pipeline in the Hotel 5 area runs to the tank farms at Upper Tank Farm and Red Hill, and also changes direction to connect to the piers. However, these components are not visible from the ground– only dirt is visible to the naked eye.  Underneath the ground is the water table, about 4 feet below, which the underground pipelines sit in, which is not ideal for stainless steel pipelines and corrosion control.

19. As I went around the edges of the pier and around the edges of the water line, I noticed an oil residue covering the dirt.  Under the pier, I saw fuel flowing from the concrete pile, or sea wall, as if from a hot tub jet directly into Pearl Harbor. There is documented history of the sea wall, a history of about 20 years, showing that it was neglected and required rebuilding and repairs as it is compromised due to its age.

20. I immediately reported my findings at Hotel Pier first to Derrel Saul who was the Navy's on scene coordinator, also called the Oil Spill Response Coordinator for the admiral in Navy Region Hawaii.

21. I made the same report to the NAVFAC Hawaii and Navy Region Hawaii environmental department head, Sherri Eng.

22. I also reported the active leak at Hotel Pier to DLA-Energy. Both DLA-Energy and NAVFAC Hawaii informed me that the leak was not active and that it was historical. NAVSUP actively communicated that same narrative.

23. Without support from the Navy's on-scene coordinator or DLA Energy, I placed an oil boom around Hotel Pier to minimize the spread of the fuel into the ocean.

24. I do not know how long fuel had been flowing before I began working at Red Hill but it was still actively flowing when I left the site in May 2021.

25. As soon as I learned about the leak, I made the following individuals aware: Commander Whittle, Mr. John Floyd, Mr. Scott Hedrick, Commander Karlie Blake, Captain Trent Kalp, and Sherri Eng. Follow on reports were made to Admiral Aquilino, Pacific Fleet Commander, through the chain of command and he immediately emailed all the commands involved to make this go away, at any cost, and made no mention of formalizing or ordering the commands to make an official oil spill report with the authorities. All these individuals assured me that

Declaration of Lt. Cmdr. S.Bencs          6          1:22-cv-00272-LEK-RT

the leak was historical, and that no additional action was necessary because the discharge did not qualify as an active leak.

26. John Floyd, a civilian U.S. Navy supervisor and my Deputy, became aware of the leak in at least March 2020 when initial reports were made, but there is a possibility that he was made aware of the leak even before then.

27. This response was shocking to me because my training taught me that proper reporting is required if even one drop of fuel enters the environment and, especially, if released into the water. I was trained that proper spill reporting includes a "CCIR", which is a commander's critical incident report that goes to his command, as well as multiple situational reports, including "SITREP" reports and an OPREP Navy Blue operational report to higher echelon commands and the Pentagon.

28. Beginning in September 2020, to better understand what I was seeing at Hotel Pier, I searched for Pipeline Integrity Management Plans for the piers.

29. Pipeline Integrity Management Plans, including American Petroleum Institute 570 Pipeline Inspections, are a review of regulatory compliance and required repairs conducted every five years at all fuel facilities. The Navy contracts with third-party entities, such as Enterprise Engineering, to conduct these inspections.

30. American Petroleum Institute 570 Pipeline Inspections require fuel pipelines to be visually inspected by an American Petroleum Institute 570 certified engineer and further require annual pipeline integrity leak detection tests, which are also conducted by companies external to the Navy.

31. However, I was unable to find the five-year American Petroleum Institute 570 Pipeline Inspection reports for the defuel line and fuel oil reclaim line at Hotel Pier or reports for other pipelines at Mike, Bravo, Hotel, and Kilo piers.

32. While I was able to find some pressure tests, I was unable to find pressure tests for the defuel line and the fuel oil reclaim line at Hotel Pier. As a result, I began to suspect that these were the lines leaking fuel.

33. I was concerned about corrosion of the defuel pipeline contributing to the leak and continued reporting the leak to senior leadership: NAVFAC Hawaii Captain Gordie Meyer; NAVSUP FLC Pearl Harbor CAPT Trent Kalp, NAVFAC Red Hill project coordinator Commander Darrell Frame, DLA Indo-Pacific CAPT Jason Adams, DLA-Energy Hawaii East-Pacific Commander Eric Lockett, Navy Petroleum Office Officer-in-Charge CAPT Christopher Light, Navy Petroleum Officer Assistant Officer-in-Charge Commander "Bill" Jakubowicz, Commander Navy Region Commander Admiral Robert Chadwick and Chief of Staff Captain Darren Guenther.

34. I pressed all of these individuals to elevate the issue and test the pipelines, specifically the defuel line, at Hotel Pier.

35. Due to leadership inaction, I reached out to DLA to request funding for the pipeline to be investigated and repaired, instead, leadership re-directed the funding to investigate and clean-up the oil spill and conduct remediation, when it wasn't yet reported as a oil spill. My local budget at Red Hill was insufficient to cover the pipeline pressure test, part of the efforts to identify the root cause of the oil spill and comprehensive repairs which had be outsourced.

36. It took me six months of arguing with Navy Petroleum Office and DLA Energy, the Officer's-in-Charge at the time, CAPT Christopher Light, Commander Jakubowicz and Commander Lockett, before DLA-Energy agreed to fund a pressure test. DLA-Energy initially refused to provide funding for updated pressure testing without a documented failed test.

37. As a result of DLA Energy's illogical reasoning and undue pushback, pressure testing of Hotel Pier pipelines, specifically the defuel line and the fuel oil reclaim line at issue, did not occur until January 2021.

38. The pipeline testing came back as failed on January 21, 2021 and again on January 23, 2021. Only at that point did leadership, specifically Captain Meyers, begin to suspect that there was an active leak.

39. Captain Meyers agreed that sending a spill report through DLA, call a P-40 Report, was necessary. A P-40 report allows DLA-Energy to immediately release environmental funds to remediate and respond appropriately to the spill.

40. Captain Kalp did not agree with my decision to send a P-40 Report to DLA Energy and requested that we continue to search for the source of the spill. He chose to excavate the pipelines or pressurized the pipelines despite neither of those methods being appropriate response protocol to a spill. The appropriate response is stopping the source of the spill, which would have included removing fuel from the active pipelines. I explained that we should immediately remove the fuel, not add additional fuel, as part of the pressurization process. Adding fuel to an active leak is not an appropriate response protocol under any regulatory guidance.

41. DLA-Energy eventually provided approximately two million dollars to NAVSUP and NAVFAC Hawaii for a contract to excavate the pipelines instead of conducting additional leak detection. Their plan was to dig holes at random until they uncovered the source of the leak.

42. I pushed back against this decision without support from my commanding officer, my executive officer, my deputy, John Floyd and the executive director Scott Hedrick. Neither had fuel commercial certifications or professional petroleum management or engineering education to understand fuel spill response protocol.

43. I continued reporting the spill to leadership at the state, regional, and federal level. Subsequently, between 2020 and current day, I made the same reports and more to disclose all the waste, fraud and abuse occurring within the Red Hill fuel facility, along with the original records and fraudulent records. These were sent to: CAPT Meyer NAVFAC Hawaii, CAPT Guenther Navy Region Hawaii, Admiral Chadwick Navy Region Hawaii, Admiral Timothy Kott Navy Region Hawaii, Admiral Stephen Barnett Navy Region Hawaii, CAPT Trent Kalp NAVSUP FLC Pearl Harbor, Admiral Kristin Aquavella NAVSUP Headquarters, Admiral Peter Stamatopoulis NAVSUP Headquarters, Admiral Kenneth Epps (prior NAVSUP Pearl Harbor commanding officer and currently NAVSUP Headquarters), Admiral Aquilino Pacific Fleet Command, Admiral Paparo Pacific Fleet Command, Admiral Koehler Pacific Fleet, Admiral Franchetti Chief of Naval Operations, HON Meredith Berger ASN EI&E, and HON Carlos Del Toro Secretary of the Navy and no action was taken. All O-6 and above officers re-routed my complaints and reports to dead ends.

44. As a result of my pushback against the course of action leadership had taken at Hotel Pier, I was given a Letter of Instruction (LOI) in February 2021, which stated that I was not to conduct my normal course of work without express permission and to only work on professional development. Professional development included providing detailed tours of the Facility.

Declaration of Lt. Cmdr. S.Bencs                   11                   1:22-cv-00272-LEK-RT

45. My role at Hotel Pier was limited following receipt of the LOI, but ultimately I learned that at least 7, 700 gallons of fuel was recovered from Hotel Pier.

46. Fuel from the Hotel Pier release was observed and recovered from the surface of the water at Pearl Harbor through September 3, 2021.

47. To my knowledge, the Navy has not yet removed the defuel line which was the source of the Hotel Pier release event, and the last course of action on record I saw, the Navy was abandoning the pipeline in place and then changed the status to removing the defuel line.

## III.    RMMR PROJECT & POND CONTRACTING

48. Smaller routine maintenance and repairs at the Facility fall under the routine maintenance and minor repair program at the Facility, known as Recurring Maintenance and Minor Repair ("RMMR").

49. Pond & Company ("Pond") was the RMMR contractor when I was employed at Red Hill. Through the U.S. Marine Corps chain of command, U.S. Army Corps of Engineers and DLA-Energy, I had been working to fire Pond, and as of May 1, 2025, APTIM became the new RMMR contractor.

50. Pond was also the RMMR contractor at the Marine Corps base where I currently work. I continued to submit service orders, which were fulfilled by Pond,

and interacted with Pond employees on a weekly basis until their contract was terminated approximately May 2025.

51. Pond has held the RMMR contract since 2014 which requires them to repair and maintain the entire Facility consistent with the Unified Federal Code for Fuel Facilities ("UFC") 3-460-01(Design) and 3-460-03 (Maintenance).

52. Since 2014, Pond's regional RMMR contract has changed in scope adding and removing various U.S. fueling facilities in Alaska, Hawaii and Japan, but they held contracts for Department of Defense Fuel Facilities throughout the world. The last iteration I saw was dated 2021, which included fueling facilities in Hawaii and Alaska. In 2024 the U. S. Army Corps of Engineers, by direction of DLA-Energy, publicly released a new statement of work for contractors to bid on, knowing they would not renew Pond's contract at the next option year in 2025. DLA-Energy and U.S. Army Corps of Engineers did not disclose this to anyone working at the DoD Fuel Facilities.

53. Pond's contract was managed by the Army Corps of Engineers ("Army Corps") and paid for by DLA-Energy. To my knowledge, this structure remains unchanged, however, the contractors and contracts were swapped out from Pond to APTIM.

54. The contracting process for RMMR projects is as follows: the local base-level operator submits a service repair request to the Army Corps. The Army Corps

Declaration of Lt. Cmdr. S.Bencs         13         1:22-cv-00272-LEK-RT

submits the same request to DLA-Energy to be approved, then the Army Corps

sends it to Pond, which then determines the parts and funding it requires to

implement and carry out the request. The Army Corps then submits the service

order with the required funding to DLA Energy. DLA Energy then issues funding

if it approves the service order.

55. The contracting officer with the Army Corps is tasked with overseeing the

contract to completion and assigns a Contracting Officer Representative (COR) on

the region. DLA-Energy is also tasked with auditing the request to determine

completeness. Many times, there was not a contracting officer or COR actively

coming to the fuel facility to verify the maintenance, repairs or the quality

assurance of each service order which is a violation to "accept" and "inspect" the

supplies and services "unseen" for the contract.

56. If a service order is not completed, then the Contracting Agency should

issue the contractor a bad rating in the contracting rating system called CPARS,

issue a letter of concern and cure letter and then terminate the contract if not

satisfactory. However, in practice, I would see Army Corps and DLA-Energy

continuously route and approve service orders to the system and roll them over for

years without completing the work associated with those service orders.

57. I realized over the course of my employment at Red Hill, that Pond would take the funding for specific maintenance and repair work but never actually complete the project or provide maintenance and repair reports.

58. For example, the Army Corps had conducted an inventory of the entire Facility which was later discovered to be incomplete. Pond, the contractor, was then tasked with conducting an updated inventory of the Facility and all the components to inform its maintenance of the Facility.

59. By reviewing service orders and outstanding work at Red Hill, I learned in mid-2020 that Pond simply recycled the same minimum inventory generated by the Army Corps. Pond never added back to the inventory list the components that the Army Corps had failed to include.

60. In August or September of 2021, I discovered that over 3,500 components at Red Hill were not maintained under the Pond RMMR contract.

61. I maintained a record of those components in my email.

62. I raised this issue with my contact at DLA-Energy, Amanda Muscavage, as DLA Energy is the entity that funds the Fuel Facility maintenance, repairs and associated POL contracts.

63. After my initial discovery, Ms. Muscavage had also found approximately 10, 000 components and counting after my removal, which were not maintained

under the Pond contract despite the contract requirement that Pond maintain the entire Facility.

64. Both Ms. Muscavage and I felt morally obligated to double check the work that Pond was doing to hold the company accountable.

65. Together we found that DLA-Energy would then modify the contracts to add those unmaintained components and incomplete service orders back into the contract. This would cause the contract to balloon in scope and value, allowing Pond to be paid a second or third time for work it had failed to perform.

66. For example, Pond's 2021 contract had baseline funding in the amount of approximately $42 million, which grew to approximately $75 million when the missing components were added back. Red Hill also consumed funding on the contract meant for all the fuel facilities in the pacific region, for all military services, and was in fact stealing money away from other fuel facilities that required repairs. Due to Red Hill being a ticking time bomb and being high visibility to the State of Hawaii, the Navy was not disclosing this information to other military services that owned fuel facilities, under the same regional contract. I made sure to report what was occurring, up the chain of command, through the U.S. Marine Corps, so their own fuel facilities would not have catastrophic failures due to RMMR funding being re-routed. This was also occurring with SRM and MILCON funding.

67. The components to be maintained were located in Appendix K of the 2021 Pond contract.

68. Appendix K was modified several times to add back components that Pond intentionally excluded from its review.

69. In doing so, I exposed that Pond's failure to implement repair and maintenance work as contracted was actually an issue that went beyond Red Hill as it was also happening at the Marine Corps Base Hawaii where I presently work and other Navy and DoD fuel facilities worldwide.

### A. Pressure and Thermal Relief Valve Failures and Use of Skillets

70. An example of Pond's failure to conduct maintenance, which I saw on multiple occasions, is that Pond would cap fuel leaks with a skillet.

71. Skillets are solid pieces of metal used to block pipelines in their entirety. They are meant to be used temporarily to section off a pipeline for repair.

72. However, Pond would insert a skillet into the pipeline to stop the leak rather than repair it. Pond would leave the skillets in the pipelines as a permanent solution to the leak.

73. Pond would not document the issue, for example, a leaky or weeping pipeline, by filing a required spill report or by documenting its method of "repair" using a skillet.

74. Leaking pipelines blocked with skillets were rarely, if ever, taken out of service.

75. Additionally, this inappropriate use of skillets puts pressure on pipelines, which are not meant to be blocked for extended periods. This internal pipeline pressure was not appropriately managed due to the high number of failed pressure and thermal relief valves. Thermal and pressure relief valves are made so that fuel pipelines have room to breathe when heated by the sun or when they cool at night or relieve pressure during normal operations. PRVs also prevent pressure build up when valves open and close as the volume of gas increases in the pipes. The gas inside the pipeline expands and contracts and when skillets are placed within the pipeline, with no access to the thermal or pressure relief valves in the pathway, the gas has no where to escape.

76. I believe that this is what led to the failure of the defuel line at Hotel Pier in 2020 and failure of the JP5 pipeline in May 2021.

77. Using a skillet in place of conducting required repairs is not engineering best practice and the Navy, nor the contractors, were practicing proper lock out tag out procedures to ensure infrastructure was not compromised, damaged, or that there were not inadvertent oil spills by maintenance or repairs.

78. To better understand the extent of the issue of incomplete repairs being rolled over year after year despite DLA-Energy and U.S. Army Corps continuing

to issue payment to Pond, I kept a written log of repairs in the database that appeared year after year. I would narrow down my suspicions to a specific component, part identification number, and serial number to track how many times the part failed and was repaired over several years. In some cases, Pond would document the part being replaced when in reality it was never repaired or replaced. The pressure and thermal relief valves were on the top of my list that kept reappearing and these were the life blood of the system.

79. PRL-PND-078 is an example of a Pond contracted service order that was first issued in 2014 and remained in the system as incomplete when I reviewed outstanding repairs in 2020. I identified at least 32 other service orders that remained incomplete for multiple years.

80. The pressure relief valves ("PRV") I identified at Red Hill were not maintained or repaired by Pond. I found that the entire Facility was in need of repair as a result of Pond's failure to maintain the Facility in a manner consistent with the terms and scope of its RMMR contract.

81. I also identified PRVs at Marine Corps Base Kaneohe, where I presently work, that were not maintained or repaired by Pond. This indicates that Pond's practices, namely failing to maintain the Facilities that it is contracted with to maintain in working order, remain unchanged. Other things I found at Kaneohe, Pond would replace fuel tank bolts and fasteners with cheap knock-off's vice the

specifically rated bolts that are stamped with specifications into the metal. At Hickam Airfield, another SRM contractor had installed a fuel hydrant system and due to bad design, built a one fuel hydrant in a grassy field, not in containment, which was off the beaten path. Pond never checked or maintained that piece of equipment because they assumed it was out of commission, but it was still operational, just never used by aircraft.

82. PRVs are critical safety devices designed to prevent over-pressurization of tanks, pipelines, pumps, and associated equipment. Their primary function is to automatically release excess pressure before it can cause equipment failure, leaks, fires, or explosions.

83. I discovered that approximately 80 percent of the PRVs at Red Hill and Kaneohe do not work. I submitted those valves for repair multiple times over the last few years at both Red Hill and Kaneohe but the Army Corps and DLA Energy continued to deny the service orders. Despite raising the concerns at Kaneohe that this was waste, fraud and abuse, Pond walked away from the contract in May 2025 without ever repairing or replacing the PRVs.

84. I was told by DLA Energy to submit the repair work for PRVs through the RMMR contract, but DLA continued to deny my requested repairs even when I did so. DLA-Energy also stalled the process at both facilities asking for new "studies"

to understand the proper PRV line-up throughout the system, which was already documented in operating manuals and the PIMP.

85. Specifically, Captain Bill Jakubowich at DLA-Energy headquarters continued to deny my work orders and instead re-routed them for consideration as SRM projects. My understanding is that this was a delay tactic to avoid paying for the repair work. At Kaneohe, DLA-E continued to use delay tactics as asking for another PRV study and waiting for Naval Facilities Engineering and Expeditionary Warfare Command (EXWC) to complete a second study, on top of the first, via the Pipeline Integrity Management Plan (PIMP) Study, which is to occur every 5-years. The PIMP has blown through the 5-year cycle and still not completed after 6-years at Kaneohe. At the Red Hill Fuel Facility, the PIMP was extremely detailed and outlined the mandatory repairs that never occurred, and PIMP after PIMP would document the same recurring issues. The centrally managed SRM program that included the pipeline and tank inspections were significantly past due, not just for Red Hill, but the DoD Fuel Facilities worldwide. I can say this is the norm for all of DLA-Energy's programs under the SRM program umbrella.

86. These SRM programs forced me to submit the repairs through NAVFAC, as the contracting agent, as opposed to the Army Corps which is better suited to complete the repairs. I did not, and still do not agree with this time-consuming and

ineffective process for processing and funding repair work at Red Hill and

Kaneohe.

87. Over the course of my employment at Red Hill I also found multiple

deficiencies on thermal relief valves ("TRV") in need of repair due to Pond's

failure to complete contracted work.

88. TRVs manage pressure created by thermal expansion of the exterior

elements of the pipeline. Thermal expansion is often caused by the sun shining on

exposed pipeline. Thermal expansion can cause a pipeline to over-pressurize.

89. When a pipeline over-pressurizes, it over-expands, and can weaken

components. Over-pressurization can even cause a system to overflow, with fuel

coming out of components that exceed the normal operating pressure. This is

where oil spills can occur or cause weeping out of valves. Ultimately, this could

cause the pipeline to explode, leading to leaks and other significant damage to

people and equipment.

90. This is precisely what happened at the Red Hill Underground Storage Tanks

in May 2021, where the JP-5 line broke.

91. I believe the unusually high number of incomplete service orders resulted

from a combination of factors rather than a single cause. First, I believe Pond's

conduct was fraudulent. The pattern of incomplete work, billing practices, and

documentation deficiencies suggests intentional misconduct rather than isolated

administrative errors. This conduct directly contributed to service orders being left unfinished while funds were expended. Additionally, a retired Naval Supply Officer Captain, named Mr. Willie Robohn, is Pond's Vice President and was the Officer in Charge at the Navy Petroleum Office before retirement and oversaw the RMMR program for the Navy. He knew exactly how to use the Navy and his fellow active-duty Supply Corps Officers to game the system for this contract.

92. However, Pond's actions alone do not fully explain the systemic scope of the problem. Poor base-level command management also played a significant role. Red Hill had and continues to have a toxic climate which allows and perpetuates incomplete and scattered record keeping across multiple databases. This led to insufficient monitoring, and failure to reconcile completed work with billed work. This allowed deficiencies to persist without early detection or correction. Personnel working at the facility were not trained to understand the complexity of the systems, design and integration which was engineering based and required to ability to read as-builts or engineering drawings.

93. A structural oversight gap worsened the issue. Responsibility for oversight of RMMR projects primarily rests with the Army Corps of Engineers. As a result, neither the Navy nor DLA-Energy maintained direct authority to enforce or independently oversee Pond's service order contracts. This division of responsibility limited contract oversight and clear enforcement authority. However,

the Navy owned all Petroleum Oil and Lubricants "POL" Infrastructure and was responsible for the completed maintenance and repairs and upkeep of the facility, not DLA-Energy or any other organization. DLA-Energy, U.S. Army Corps of Engineers and the Navy never provided commercial level training, professional maintenance certifications or pipeline and tank inspector courses to the organic civilians and military workforce operating the facility, despite my efforts. If this initiative was adopted, personnel would have recognized all these failures from the get-go. It was only recently, in Jan 2026, the Navy finally opted to align with commercial integrity management practices and to start hiring Petroleum Engineers at NAVFAC and EXWC to work on specific SRM program teams for Navy and Marine Corps.  The Navy has not implemented commercial level POL certifications for its workforce to my knowledge. As soon as I was transferred to Marine Corps Base Hawaii, in 2021, and was able to get a handle on the situation, I briefed leadership and the Marine Corps immediately implemented the commercial level POL certifications and training for civilian and military personnel, which was light years ahead of the Navy changing their ways. The Marine Corps even broke away from the Navy Petroleum Office in Feb 2025 and created its own Marine Corps Petroleum Office. I believe this was done because the Navy refused to change policy, training requirements and provide more oversight over the fuels program.

SRM PROJECTS

94. Larger repair and maintenance projects at Red Hill are categorized as Sustainment, Restoration and Modernization ("SRM") projects.

95. SRM projects are also funded by DLA Energy.

96. When projects or service orders are estimated to cost more than approximately $700,000, then they are no longer categorized as RMMR and are categorized as SRM.

97. NAVFAC Hawaii holds the responsibility to contract out work that falls under SRM. A recurring issue during my time at Red Hill, was that NAVFAC Hawaii would contract out much of the work to individuals without petroleum expertise, NAVFAC would hire architect engineers that would purposely submit a "bad design"and NAVFAC would approve it not knowing any better. This fraudulent scheme allowed SRM project contractors that were hired to underbid and then submit modification after modification to the contracts, via the NAVFAC contracting officer, to gain millions in added revenue in "unforeseen" issues that would arise.

98. The contracting process provided NAVFAC the right of first refusal, as the contracting agent, for service orders and, consequently, funding from DLA-Energy for Navy and Marine Corps fuel facilities. Even when NAVFAC lacked the skill set and the people to proficiently manage and complete the work associated with a

particular project or service order. I was not able to seek a different contracting office. I was only able to use the Army Corps, a more proficient contractor in my experience, if NAVFAC refused the work. In 2025, the Marine Corps recognized the shortcomings with NAVFAC Hawaii's contracting office and held discussions with NAVFAC Headquarters and Army Corps and was able to break away from using NAVFAC Hawaii as a sole contracting agent for POL projects.

99. DLA Energy, which operates at the federal level, provides the funding for both SRM and RMMR projects. DLA Energy defaults to NAVFAC for all project types except those that fall under the RMMR category, which is contracted to Army Corps.

100.     I argued during my time at Red Hill, and now at the Marine Corps Base, against DLA Energy's default to contracting with NAVFAC because, in my experience, NAVFAC workers consistently lacked and continue to lack, the appropriate expertise and skill set to carry out contract work effectively and safely. As I stated previously, only a few months ago did the Navy decide to hire Petroleum Engineers to some SRM project teams, which was my recommendation when I was assigned at Red Hill in 2021. It took over 4 years, after recognizing there was a problem, for the Navy to course correct. Meanwhile, projects kept going off track.

101.     I raised this issue with my superiors multiple times during the course of my employment at Red Hill.

102.     I have specifically found that the contracting officers with NAVFAC are not trained in petroleum engineering or engineering in general, and specifically working with compressible fluids and gasses. Regional Petroleum Engineer, Amy Ebesu, is one such individual with NAVFAC who managed the majority of NAVFAC contracted projects at Red Hill, although she carries no background in petroleum engineering or management. The Navy gave a title to someone that was knowingly not qualified. In 2025, Amy Ebesu took the Deferred Resignation Program (DRP) and resigned and left the position vacant for many months. The Navy and NAVFAC Hawaii left the fuel facilities in the region blindsides and to fend for themselves during this transition. The contractors carrying out SRM projects were left with little to no oversight.

103.     I still attend SRM meetings which discuss funding for projects across all of the regional sites, including Red Hill and the Marine base. The new Regional Petroleum Engineer is better, but still not proficient, when carrying out projects requiring petroleum expertise.

104.     Hotel Pier is discussed at that recurring meeting and, to my knowledge, Hotel Pier is still under repair and continues to increase in cost. Despite being under repair, I still pass the pier from time to time and Navy still

berths ships there despite the amount of repairs being conducted. The fuel pipelines were "out-of service" but the pier is still being utilized.

105.     Funding for repairs at Hotel Pier were issued during the course of my tenure at Red Hill and continued to balloon from $16M to over $22M. However, initial funding for Hotel Pier was issued to Pond via the RMMR process which routinely exceeded the RMMR cost thresholds. This was also the norm for other repairs that were technically in the SRM umbrella, but the Navy bypassed the system by submitting service orders to RMMR regardless.

106.     Because Pond did not complete repairs the repairs worsened and compounded to above the RMMR threshold to become SRM projects. This changes oversight and enforcement authority over the repairs.

107.     Pipeline Integrity Management Plan reports which include pipeline testing required by the Pipeline Integrity Management Plans for POL Pipelines at Red Hill ("IMP") are funded by centrally managed SRM projects.

108.     As SRM projects, the PIMPs are funded by DLA Energy and contracted out by NAVFAC Hawaii and Naval Facilities Expeditionary Warfare Center Command to contractors.

## IV.   LOCAL PROJECTS

109.     Where the local staff had the capabilities to complete maintenance or repair, such as gasket repairs, those repairs were implemented by local operators

and maintainers on site at Red Hill. Those projects did not require funding from DLA Energy through RMMR or SRM. These maintenance actions and repairs also required specific POL certifications, training and engineering knowledge, which the operators and maintainers did not have at the Red Hill Fuel Facility. Many engineers or maintainers that were given those specific roles were hired without the proper schooling or experience and it was plagued the "good ol' boy network." Civilians were hired simply because they knew the hiring supervisor, at red Hill, it was John Floyd and Scott Hedrick.

110.     However, I found that local operators at Red Hill were not trained to conduct even minor repairs, and when local operators and maintainers did repair work they were often not qualified. Nor did they have the skills or knowledge to test the system for tank tightness or pipeline pressure testing and integrity and simply just looked for weeping or leaking pipes or components after repairs occurred. Secondary containment was another issue, secondary containment by definition must be hydro-tested to be watertight for a set time period, by State of Hawaii, Hawaii Administrative Rules. Many times, secondary containment was not adhered to within the fuel facility for maintenance actions or repairs or for normal operations.

111.     Local operators were not able to conduct pressure testing, so those tests were contracted to PPSI and Hansa when I was at the Facility.

112.    Visual inspections and repairs of the pipelines in the Facility are required to be conducted by American Petroleum Institute 570 Inspectors. However, a full-time internal 570 Inspector was never hired, so I would walk the Facility daily. Tank tightness tests and tank inspections must be conducted by an American Petroleum Institute 653 inspector. A 653 inspector was never hired nor did anyone know, except myself, that pipelines and tanks were required by law to adhere to standards and had to be certified to be operational and in-service.

113.    To my knowledge, this contracting structure has not changed, however, to me it seems that many personnel including the contracting officers and contracting officer representatives at Army Corps were secretly changed out, same with NAVFAC Hawaii and DLA-Energy during the course of these contracts.

## V.    FACILITY RECORDKEEPING

114.    Repair and maintenance projects at the Facility are not managed within a single, centralized tracking system or database. They are in fact, not being managed with DLA-Energy's, Army Corps or NAVFAC Hawaii's oversight, when looking at the fuel facility as a whole. The named agencies didn't have the expertise on staff to understand each fuel facility, especially Red Hill, and consistency lost track of or didn't understand the scope of work of each project or how the project effected the fuel facility and changed the configuration once installed. This was a complete failure despite

reporting these issues. Many times these POL projects are Frankenstein'd together and the fuel facility is the originator of the projects. The operators and maintainers submit projects to be inducted to DLA-Energy SRM and MILCON programs and the personnel are not trained in project management or POL engineering. At Red Hill, the projects would be submitted to NAVSUP Headquarters to DLA-Energy via the Navy Petroleum Office to be funded. In my time at Red Hill, I attempted many times to stop or slow these projects as they were flawed from the moment inducted into the SRM program and were not validated by any petroleum engineer that I knew of. The Navy Petroleum Office and DLA-Energy did not understand that each project being submitted to be built at Red Hill ultimately led to its operational failure.

115.    This is true regardless of whether the repair or maintenance is funded locally or falls under RMMR, SRM, or MILCON.

116.    The Navy simultaneously uses multiple databases and project-tracking spreadsheets for different aspects of day-to-day operations.

117.    As a result, the Facility lacks the ability to effectively track repairs, testing schedules, and maintenance needs in a coordinated and efficient manner and is routinely behind on law mandated pipeline and tank

inspections, DoD-wide.

118.    The Facility uses Sharepoint to store records related to local maintenance and repair work. The Sharepoint includes components such as an "Action Tracker" to log and monitor incidents.

119.    The Facility also uses a database called Fuel Asset Management Maintenance System (FAMMS) to record and track local maintenance and repair work. This system is a "garbage in" and "garbage out" system operated by the government employees at the fuel facility. Due to the lack of engineering training and commercial POL certifications, the operators and maintainers didn't know what they didn't know. Therefore, many systems and components within the Red Hill Fuel System were never tracked at all. For example, there was no record of the expansion valves and the motor-pirated valves (MOVs), at the base of the Red Hill tanks, ever being maintained or repaired and they routinely weeped. The operators instead would place a "oil drip pan" similar to those you buy at AutoZone under the weeping valve and forgot about it. Another example, the pipelines throughout the fuel facility never received a documented pipeline API 570 inspection, when mandated, and this wasn't being tracked at the local level or monitored. Many employees didn't even know what a API 570 or API

653 inspection was.

120.    DLA has a separate database to track RMMR and SRM projects, which are funded by DLA Energy. Army Corps tracked the RMMR work, while NAVFAC Hawaii tracked the SRM projects exceeding $700,000 and the MILCON projects and Navy EXWC tracked the pipeline integrity and pressure tests, tank inspections, pipeline inspections and the Pipeline Integrity Management Plan. All under the management of non-petroleum engineer and management professionals.

121.    A separate database, independent from the FAMMS or DLA-Energy databases, is used by the Army Corps for recording RMMR projects. Army Corps can only track the records in which Pond, or now APTIM, gives them and Pond, for years, neglected to provide the Army Corps, DLA-Energy, and the Navy routine preventative maintenance reports, completed repair reports, and quality control reports. The governments failure to hold the contractor accountable to the contract led to negligence and purposeful breakdown of systems and equipment resulting in failure and a catastrophe at Red Hill.

122.    Additional independent tracking systems are used for SRM and MILCON projects by the construction agencies, contracting for these projects, however, they lack the details required for successful sustained preventative maintenance and safe operation. The projects were flawed

when accepted by the government and rarely operated as designed. On a routine basis, the construction agencies did not ask for or share the as-builts or drawings, of the new construction, with the fuel facilities and did not add or layer the prior infrastructure onto the drawings. As a result, since 1940, when the Red Hill fuel facility was built, I had to routinely grab multiple as-builts and guess what projects occurred in the specific part of the facility. I would pull each drawing and physically look for the changes to know what truly existed within that section of infrastructure.

123.    There are no integrated tracking systems and there are no single centralized database to access information on as-builts, drawings, operating manuals, maintenance or repair work that has been completed or in progress at the Facility. This was true when I worked at Red Hill and remains true today based on my experience working with the same systems at the Marine Corps base.

124.    Tracking the status of a service order often requires contacting the contracting agency, Army Corps, or NAVFAC, for example, rather than simply accessing that information via a centralized database.

125.    To make matters worse, personnel at the Facility did not update the databases in a timely or complete manner.

126.    While working at the Facility, I was unable to effectively track

RMMR service orders assigned to Pond because the records in from 2014 to 2021 were incomplete, inconsistently entered, and in some cases entirely missing. Key information, such as service order status, assignment details, funding amounts, dates, and supporting documentation, was not reliably documented, which prevented accurate monitoring, follow-up, and verification of work performed. Pond would intentionally submit paper records, in size 1 Font, so the records were illegible to myself or other fuel facility personnel. As a result, the facility couldn't challenge the work. After months of asking Pond, I would finally receive reports electronically, but they were incomplete and missing systems and components.

127.     These records continue to be incomplete and lack sufficient information to allow proper tracking.

## VI.   CURRENT FACILITY COMMAND

128.     Until October of 2025, operational responsibility for the fueling infrastructure fell under Naval Supply Systems Command ("NAVSUP"), Fleet Logistics Center Pearl Harbor ("FLCPH"). After October 2025, the Joint Base Fuels Department ("Fuels Department") was brought under the Joint Base Commander.  The Joint Base Commander reports to Commander, Navy Region Hawaii, who is under the Commander, Navy Installations Command.

129.    My understanding is that at some point in 2026, the Navy intends to move Public Works to the command and control of the Joint Base Commander. This will place the Public Works Department's repair and maintenance mission under the Joint Base Commander's supervision and oversight, including work it does directly and its management of referrals to construction agencies. However, Public Works have trained Civil Engineering Corps Officers and not Petroleum Engineer trained officers.

130.    In addition to the change of fuel infrastructure ownership, within the Navy structure, Navy Installations Command staff is not trained to manage bulk petroleum, oil and lubrication (POL) commodities safely and with efficiency, as only the supply corps trains petroleum management officers under their subspecialty programs. I am unaware of any other Navy officer community that trains for this subspecialty. Even NAVSUP, when they owned the fuels program mismanaged approximately 30 million gallons of JP-5 jet fuel of the approximately 70 million gallons in storage. This was because NAVSUP ordered and stockpiled the fuel without having a plan for issuing the fuel and turning it over to customers in a timely manner. Because the fuel remained in bulk storage for an estimated years 10-15 years, the fuel was stored "off-specifications" at Red Hill. No one on staff could tell me the age of the fuel in question. This was the condition of the JP-5 jet fuel I inherited. The fuel had to be "doped up,"to be physically brought into

satisfactorily specifications, with additives, and a deal made between NAVSUP and the Air Force to take doses, to eventually get rid of the "bad fuel." Off-spec jet fuel, if issued to an aircraft can literally cause equipment malfunctions and cause aircraft to crash. The first thing that is investigated when an aircraft crashes is the fuel and the Navy was hiding this other side of mismanagement of fuel and tax-payers funds. This was hidden from its own Navy counterparts and customers of the Red Hill fuel facility. We were ordered by the Navy Petroleum Office to "dope it up," make sure it tests "on spec" and issue as much as possible to lower the quantities in storage. While this is not a direct link to failures that occurred mechanically within the facility, it highlights the Navy's inability to manage bulk POL products while also struggling to maintain fuels infrastructure and environmental compliance.

131.    However, this change in command structure is limited to local maintenance and repair and does not solve the problem of a lack of centralized command with control over fuel ownership, infrastructure integrity, maintenance execution, operational mission requirements, and regulatory compliance.

132.	This change in structure also does not solve the issue of divided repair and maintenance contract enforcement between DLA-Energy, NAVFAC, and the Army Corps for SRM, RMMR, and MILCON projects.

**I declare under penalty of perjury that the foregoing is true and correct.**

Dated: 24 February 2026	Respectfully submitted,

_LCDR Shannon K. Bencs, Supply Corps, U.S. Navy

---

CERTIFICATE OF SERVICE

I hereby certify that, on February 24, 2026, and by the methods of service noted

below, a true and correct copy of the foregoing:

WRITTEN TESTIMONY OF LT. CMR SHANNON BENCS

was served Electronically through CM/ECF on the following at their last known

addresses:

BRYAN HARRISON: BRYAN.HARRISON@USDOJ.GOV

DAVID D. MITCHELL: DAVID.MITCHELL@USDOJ.GOV

DANA A. BARBATA: DANA.BARBATA@USDOJ.GOV

LESLIE MARIE HILL: LESLIE.HILL@USDOJ.GOV

ALEXANDER M. PURPURO: ALEXANDER.PURPURO@USDOJ.GOV

ALEXANDER HARDEE: ALEX.HARDEE@USDOJ.GOV


Dated: February 24, 2026                    By: */s/Kristina Hambley*
                                            Kristina Hambley