UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| WAI OLA ALLIANCE, A PUBLIC INTEREST ASSOCIATION, ET AL.<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES DEPARTMENT OF DEFENSE, JOINT TASK FORCE RED HILL, UNITED STATES NAVY REGION HAWAII, UNITED STATES NAVY FACILITIES ENGINEERING COMMAND - HAWAII,<br><br>Defendants. | CIV. NO. 22-00272 LEK-RT |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER**

It is axiomatic that clean water is essential for human life, public health and the environment. The matter at hand arises out of a citizen action filed out of concern for clean water and alleging that the fuel distribution system at Joint Base Pearl Harbor-Hickam discharges petroleum-based pollutants into the navigable waters of Pu`uloa, the saltwater lagoon harbor, which is also known as Pearl Harbor. The trial in this matter involved two issues: whether the plaintiffs carry their burden to prove that defendants were in violation of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA") at the time that this citizen action was filed; and whether the defendants carry their burden to prove that the plaintiffs'

Clean Water Act claim is now moot. The answer is in the affirmative to both. As follows, the Court finds in favor of the defendants on the Clean Water Act claim and that, at the time of trial, the defendants established there is no reasonable likelihood that the defendants will release fuel into Pu`uloa or Hālawa Stream nor that the violations of the Clean Water Act can reasonably be expected to reoccur.

## I. BACKGROUND

A non-jury trial was conducted from March 31, 2026 to April 2, 2026 in this citizen suit brought pursuant to the Clean Water Act. The plaintiffs are: Wai Ola Alliance ("the Alliance"); and individual members of the Alliance, Mary Maxine Kahaulelio, Clarence Ku Ching, Melodie Aduja, Kim Coco Iwamoto, Peter Doktor, Steven Hanaloa Helelā, Kalamaokaaina Niheu, Dr. Lynette Hiilani Cruz, James J. Rodrigues, and Jade Mahina Frank (all collectively "Plaintiffs"). Plaintiffs bring their Clean Water Act claim against Defendants United States Department of the Navy ("the Navy"), United States Department of Defense, Joint Task Force Red Hill, United States Navy Region Hawaii, and United States Navy Facilities Engineering Command – Hawaii (collectively "Defendants"). Plaintiffs allege that the Navy's operation of the Red Hill Bulk Fuel Storage Facility ("Red Hill") violates the Clean Water Act because Red Hill has discharged, and will continue to discharge, petroleum-based

pollutants into bodies of freshwater on O`ahu without the required permits.

The parties filed post-trial briefing on June 12, 2026, [dkt. no. 355,] July 3, 2026, [dkt. no. 363,] and July 17, 2026, [dkt. no. 365].

The Court, having considered the parties' filings and the testimony given at trial, including the witnesses' declarations and deposition testimony; having judged the credibility of the witnesses; having examined the exhibits admitted into evidence; and having considered the arguments and representations of counsel, issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a), and finds in favor of Defendants as to Plaintiffs' Clean Water Act claim. Any finding of fact that should more properly be deemed a conclusion of law and any conclusion of law that should more properly be deemed a finding of fact shall be so construed.

## II. FINDINGS OF FACT

Plaintiffs' Clean Water Act claim was filed pursuant to Title 33 United States Code Section 1365(a)(1). See Third Amended Complaint for Declaratory Relief and Injunctive Relief, filed 6/13/24 (dkt. no. 130) ("Third Amended Complaint"), at

pgs. 68-69.[1] Plaintiffs allege the Navy has violated, and is engaged in ongoing and continuous violations of, Section 301(a) of the Clean Water Act, *i.e.*, Title 33 United States Code Section 1311(a). See, e.g., Third Amended Complaint at ¶¶ 434-36. Plaintiffs seek, *inter alia*: a declaratory judgment that Defendants have violated, and are violating, the Clean Water Act; an injunction prohibiting unpermitted discharges into waters of the United States; and an injunction requiring Defendants to take necessary actions to prevent unlawful discharges. See id. at pg. 70.[2]

[1] Plaintiffs also assert a claim for violations of the Resource Conservation and Recovery Act ("RCRA"), Title 42 United States Code Section 6901, *et seq.*" [Third Amended Complaint at ¶ 2.b.] Plaintiffs' RCRA claim is not currently before this Court because it has been stayed. See order, filed 5/14/24 (dkt. no. 127), at 29, *available at* 734 F. Supp. 3d 1034 (staying the portions of Plaintiffs' claims concerning matters being addressed through administrative processes); order, filed 8/31/26 (dkt. no. 369), at 22-23 (granting Defendants' request to extend the stay of the proceedings on Plaintiffs' RCRA claim until August 31, 2027), *available at* 2026 WL 2568750. Plaintiffs' RCRA claim relates to "the 20-field constructed bulk fuel [Underground Storage Tanks] ('20 USTs'), surge tanks, and the pumps, infrastructure, and associated piping between the 20 USTs and the pumphouse at the Red Hill Bulk Fuel Storage Facility." See Joint Position Statement, filed 7/8/24 (dkt. no. 133), at 2-3 & n.1.

[2] The Third Amended Complaint also sought civil penalties pursuant to Title 33 United States Code Section 1319(d). See Third Amended Complaint at pg. 70. Plaintiffs now acknowledge that civil penalties are not available. See Plaintiffs' Post-Trial Brief ("Pltfs.' Closing"), filed 6/12/26 (dkt. no. 355), at 43 (citing N. Cheyenne Tribe v. Norton, 503 F.3d 836, 843 (9th Cir. 2007)).

**A. JBPHH and the Facility**

1. At issue in Plaintiffs' Clean Water Act claim is the Navy's fuel distribution system at the Joint Base Pearl Harbor-Hickam ("JBPHH") that primarily consists of: six above-ground fuel-storage tanks ("the Upper Tank Farm"); five fuel piers – Hotel Pier, Kilo Pier, Sierra Pier, Mike Pier, and Bravo Pier (collectively "the Piers"); and the pipelines that connect the Upper Tank Farm to the Piers (all collectively "the Facility"). See Joint Stipulations to Facts and Law, filed 3/4/26 (dkt. no. 301) ("Trial Stipulations"), at ¶ 7. The Facility's other components include, *inter alia*: an Underground Pumphouse and Pumphouse 1554, which are used to pump fuel from the Upper Tank Farm to the Piers; a fuel oil reclamation facility ("FORFAC"), which recovers used fuel for recycling; and a truck loading rack. [Defendants' Corrected Trial Declaration (Redacted) of Guy Pasco, P.E., filed 3/19/26 (dkt. no. 317),[3] at ¶ 6.]

2. The Facility is owned and operated by the Navy. [Trial Stipulations at ¶ 7.]

---

[3] The declaration is an attachment to docket number 317 ("Pasco Declaration"). [Dkt. no. 317-1.] An unredacted version of the Pasco Declaration was filed under seal on March 24, 2026 ("Sealed Pasco Declaration"). [Dkt. no. 328.] Guy Pasco, P.E. ("Pasco") is a civilian Navy employee who has been the Supervisory General Engineer of the Fuels Department, Facilities Division since 2023. [Pasco Decl. at ¶¶ 1-2.] Pasco was a General Engineer in the Fuels Department from December 2020 until he was promoted to Supervisory General Engineer. [Id. at ¶ 2.]

3. The Upper Tank Farm is inland of Pearl Harbor. See id. at ¶ 8. The parties refer to Pearl Harbor as "Pu`uloa." [Id. at ¶ 1.]

4. The Piers are over or adjacent to navigable waters. See Pasco Decl. at ¶ 6 & D_DEMO-020-0002 (depicting the Piers and other major elements of the Facility).

5. The Upper Tank Farm has a secondary containment system that is intended to prevent any fuel releases from reaching the environment. See Trial Stipulations at ¶ 8.

6. The Facility is part of JBPHH's Defense Fuel Support Point ("DFSP"). A DFSP is a location where the military receives, stores, and distributes fuel. [Id. at ¶ 21.]

7. JBPHH's DFSP is operated by the JBPHH Fuels Department ("the Fuels Department"). [Id. at ¶ 23.] The Fuels Department oversees Facility operation and maintenance. [Pasco Decl. at ¶ 28.] It is under the command and control of the JBPHH Commander, [id.,] who is under the command and control of Navy Region Hawaii, an organization under the Commander of the Navy Installations Command, [id. at ¶ 30]. The Director of the Fuels Department ensures that the department meets its mission, and the Deputy Director of the Fuels Department manages the department's operations. The heads of the Fuels Department's divisions report to the Deputy Director, who reports to the Director. [Id. at ¶ 29.]

8. The Fuels Department provides fuel to Navy vessels, Navy aircraft, United States Air Force aircraft, and visiting vessels and aircraft belonging to United States allies and partners. [Trial Stipulations at ¶ 27.]

9. The Fuels Department delivers three types of fuel, including JP-5, which is used by aircraft on Navy aircraft carriers. [Id. at ¶ 29.] The fuel itself is owned by the Defense Logistics Agency ("DLA"). [Id. at ¶ 22.]

10. DLA funds centrally-managed programs, such as the testing of major pipelines and the inspection of the Upper Tank Farm.[4] [Pasco Decl. at ¶ 28.] The Fuels Department performs small maintenance and repair work, "such as draining water and sediment from system low points, performing fire extinguisher and emergency eyewash station inspections and repairs, cleaning strainer baskets, and replacing filter elements." [Id. at ¶ 58.] The Fuels Department is also responsible for conducting routine testing and inspections at the Facility, including monthly corrosion checks, cycling and inspecting the valves, inspecting and testing thermal relief valves ("TRVs"), and checking instrument calibrations. [Id. at ¶ 56.]

[4] Caudill testified that the DLA-funded inspections are not necessarily more complex than inspections done by the Fuels Department. Some inspections are managed centrally because the inspection requirement affects multiple bases. See Transcript of Proceedings, Bench Trial - Day 2 ("Day 2 Trans."), filed 4/2/26 (dkt. no. 337), at 53.

11. When the Fuels Department is unable to perform a maintenance or repair project at the Facility, the project is referred to the JBPHH Public Works Department ("Public Works Department"). [Trial Stipulations at ¶ 30.]

12. When the Public Works Department cannot do a maintenance or repair project, or it cannot complete the project within the required time frame, the Public Works Department refers the project to: the United States Army Corps of Engineers ("Army Corps"), which handles the Facility's recurring maintenance and minor repair ("RMMR") program; or the Naval Facilities Engineering Command ("NAVFAC"), which handles more significant projects under the Sustainment, Restoration, and Modernization ("SRM") program. [Id. at ¶¶ 31-33.] If the project requires greater than a certain funding level, typically hundreds of millions of dollars, Military Construction ("MILCON") funding is used. MILCON funding must be approved by Congress. [Defendants' Trial Declaration of Ted L. Caudill, P.E. (Retired), filed 3/6/26 (dkt. no. 306),[5] at ¶ 58.] A Facility project also requires MILCON funding if it involves the addition

[5] The declaration is an attachment to docket number 306 ("Caudill Declaration"). [Dkt. no. 306-1.] Caudill served as Fuels Department's Chief Engineer from January 2022 through November 2025. During that period, TKC Global Consulting LLC, of which Caudill is a co-owner, was a Navy subcontractor working at JBPHH. See Caudill Decl. at ¶ 5.

of operational functions costing more than $1 million. [Pasco Decl. at ¶ 62.]

a. Repairs done under the Army Corps's RMMR program keep the Facility in useable condition. Examples of such RMMR repairs include part replacements and upgrades required to comply with applicable codes. [Id. at ¶ 60.]

b. Maintenance done under the Amry Corps' RMMR program prevent the Facility's assets from deteriorating. Examples of RMMR maintenance include calibration, cleaning, diagnostic inspections, and testing. [Id.]

c. The Army Corps uses an RMMR contractor. At the time of trial, the RMMR contractor was APTIM Federal Services, LLC, which replaced Pond & Company. [Id.]

d. NAVFAC SRM repairs involve repairs that cost less than $7 million and construction that costs less than $1 million. [Id. at ¶ 61.]

e. Facility projects that require MILCON funding are usually executed by NAVFAC. An example of a Facility MILCON project was the replacement of fuel pipelines connecting a Hotel Pier valve station to an Underground Pumphouse valve chamber. [Id. at ¶ 62.]

f. NAVFAC administrates substantial integrity management inspections and testing, such as annual pressure and leak detection testing and American Petroleum Institute ("API")

Standard 570 inspections. The Fuels Department tracks these inspections and testings in coordination with the NAVFAC Engineering Expeditionary Warfare Center. [Id. at ¶ 57.]

**B. Relevant Fuel Releases**

**13. Hotel Pier Release** – This Court previously found that, on March 17, 2020 and June 2, 2020, the Navy reported to the State of Hawai`i Department of Health ("DOH") an ongoing release of oil from the Hotel Pier area into Pu`uloa and Hālawa Stream. See Order Denying Defendants' Motion for Summary Judgment, filed 9/29/25 (dkt. no. 244) ("9/29/25 Order"), at 4.[6] The releases reported to DOH on March 17, 2020 and June 2, 2020 will be referred to as the "Hotel Pier Release."

14. A Hotel Pier defueling pipeline ("Defuel Line") was the source of the Hotel Pier Release. By August 2021, the Defuel Line had stopped leaking. [Trial Stipulations at ¶ 9.]

15. Following the Hotel Pier Release, the Defuel Line's risers were filled with concrete, its riser valves were removed, the riser pipes were capped, and the caps were welded shut. [Id. at ¶ 10.]

**16. Kilo Pier Release** - For one week during July 2021, a Kilo Pier pipeline released fuel into a boomed area of Pu`uloa ("Kilo Pier Release"). [Id. at ¶ 13.]

[6] The 9/29/25 Order is also available at 2025 WL 2784456.

17. The Navy reported the Kilo Pier Release to DOH and took measures to recover the released fuel. [Id. at ¶ 14.]

18. The Kilo Pier pipelines were isolated, drained, and taken out of service to be repaired. [Id. at ¶ 15.] This occurred in July 2021. [Pasco Decl. at ¶ 37.]

**C. Operations After the Hotel Pier and Kilo Pier Releases**

19. At the time of trial, Hotel Pier and Sierra Pier were the only operational piers at the Facility. See Pasco Decl. at ¶ 9.

20. Hotel Pier's active fuel pipelines have a concrete trough that serves as secondary containment if a fuel release occurs. [Trial Stipulations at ¶ 12; Pasco Decl. at ¶ 10.]

21. The active pipelines at Hotel Pier passed annual pressure testing in 2025. [Trial Stipulations at ¶ 20.]

22. The operations at Sierra Pier are limited to fuel transfers to barges. [Pasco Decl. at ¶ 40.] The barges then fuel other vessels at other locations in Pu`uloa. [Id. at ¶ 16.] Thus, only two of Sierra Pier's thirty-four fueling riser stations are in use. The other fuel risers and the sections of pipelines associated with those risers have been emptied, isolated, and removed from service. [Id.]

23. The Navy intends to make improvements to the Sierra Pier fuel pipelines. [Trial Stipulations at ¶ 19.] Further, the Navy plans to perform an inspection of Sierra Pier and will

perform necessary repairs indicated by the inspection results. [Pasco Decl. at ¶ 40.]

24. The active pipelines at Sierra Pier passed annual pressure testing in 2025. [Trial Stipulations at ¶ 20.]

25. At the time of trial, the Navy was not conducting fuel operations at Kilo Pier. The Navy intends to replace all of the Kilo Pier pipelines before it resumes fuel operations, and this was expected to be completed in June 2026. [Id. at ¶¶ 16-17.] By the time of trial, the contract to replace all of the Kilo Pier pipelines and supports had been awarded, and the work was underway. [Pasco Decl. at ¶ 38.]

26. In 2022, the Navy stopped its fuel operations at Mike Pier and Bravo Pier. In particular, their fuel pipelines were isolated, drained, and taken out of service for repairs. [Trial Stipulations at ¶ 18.] This occurred in January 2022. [Pasco Decl. at ¶ 37.] Mike Pier and Bravo Pier will be kept out of service until the necessary repairs are made. [Id. at ¶ 39.] A contract award is pending prioritization of fiscal year 2026 funding for all Navy petroleum projects. The contract will include the replacement pipe fittings, pipe segments, pipe supports, and TRVs, and the provision of pipeline maintenance coating. [Id.]

27. Pasco testified that the fuel pipelines for Kilo Pier, Mike Pier, and Bravo Pier will remain empty, isolated, and out-

of-service until the completion of the necessary repairs and replacements. [Id. at ¶ 37.]

28. The Navy plans to upgrade the Piers' TRV system before bringing the pipelines back online. [Id. at ¶ 41.] By the time of trial, the Hotel Pier TRVs had been replaced. See id. at ¶ 42.

29. Thus, at the time of trial, the Facility was: receiving fuel from a commercial receipt line to the north of JBPHH; storing the fuel in the Upper Tank Farm; and distributing the fuel at Hotel Pier, Sierra Pier, the truck rack, and Hickam Air Force Base. See Summers Decl. at ¶ 12.

30. Plaintiffs' Exhibit 46 is a spreadsheet of fuel releases that the Navy reported to DOH from 2015 to 2024 ("Spill Spreadsheet"). See Rogers Testimony at pg. 72; Pltfs.' Exh. 46. Plaintiffs emphasize that the Navy reported two discharges of petroleum from the Facility after this action was filed. See Pltfs.' Closing at 18 (citing Pltfs.' Exh. 46 at 2).

a. This Court has previously ruled that the Spill Spreadsheet is not evidence of ongoing violations either at the time this action was filed or as of the current date, but that it may be relevant to Plaintiffs' argument that prior intermittent violations are reasonably likely to recur. See 9/29/25 Order, 2025 WL 2784456, at *10.

b. On June 26, 2024, an "[u]nknown sheen from an unknown source" was observed near the USS Carl Vincent in Pu`uloa at Hotel Pier. [Pltfs. Exh. 46 at 2.]

c. On August 20, 2024, one gallon of diesel fuel was charged from the shore at "Pier B" from a transfer hose that was improperly sealed. [Id.]

d. No additional evidence about these releases was introduced.

## D. Efforts to Address the Hotel Pier and Kilo Pier Releases

**31.** **SGH Report** - Simpson Gumpertz & Heger, Inc. ("SGH") prepared a Final Assessment Report, Assessment of Red Hill Underground Fuel Storage Facility, dated April 29, 2022 ("SGH Report"). See Joint Exh. 2 (excerpts of SGH Report). The Navy engaged SGH to perform an independent review to comply with a DOH emergency order issued in response to the Hotel Pier Release and the Kilo Pier Release. See id. at 2-3.

32. SGH assessed Red Hill and the JBPHH fuel system. Paul Summers, P.E., S.E., CPEng, F.ASCE ("Summers") was SGH's Principal-in-Charge of the assessment. [Defendants' Redacted Trial Declaration of Paul B. Summers, P.E., S.E., CPEng, F.ASCE, filed 3/6/26 (dkt. no. 307),[7] at ¶ 6.] The work for SGH's

[7] The declaration is an attachment to docket number 307 ("Summers Declaration"). [Dkt. no. 317-1.] Summers is the Senior (. . . continued)

assessment began in January 2022 and was completed in April 2022. [Id. at ¶ 22.]

33. Ted Caudill, P.E. ("Caudill") testified that he was one of the lead contributors to the SGH Report. [Caudill Decl. at ¶ 14.]

34. During the 2022 assessment done for the preparation of the SGH Report, Summers and his team observed surface corrosion, pitting, and denting at some sections of pipeline and tank walls in the Facility. See Summers Decl. at ¶ 28. They "took thickness measurements at worst case and randomly selected conditions along representatively similar regions of the fuel system and performed fitness-for-service evaluations to understand the range of impact of [their] observations on system integrity."[8] [Id.] Summers acknowledged that they "noted quite a few"

---

Principal at Simpson Gumpertz & Heger Inc. ("SGH"). [Summers Decl. at ¶ 62.]

[8] Summers described the fitness for service assessments as follows:

> So we took the measured corrosion depth, okay, and we assessed -- and not just its depth but, you know, the – the sort of shape of the corrosion. Is it circular? Is it elongated? Over what area does the corrosion occur? And then we assessed the piping for that corroded item, you know, or for the level of corrosion determined and the pressures within the piping system and the strength of the piping system and the number of those amalgamated effects yields – yields what's known as a fitness for service assessment.

[Transcript of Proceedings, Bench Trial – Day 3 ("Day 3 Trans."), filed 4/2/26 (dkt. no. 338), at 50.]

corrosion issues with JBPHH infrastructure. [Day 2 Trans. at 117.] Pit corrosion, which can eventually lead to a hole in the pipe, was the primary concern. See id. at 135.

35. SGH conducted a quantitative fitness-for-service assessment for "local external corrosion pitted sections of piping" in accordance with API Standard 579. [Joint Exh. 2 (SGH Report) at 292, § 7.9.] All of the tested portions of the Facility, except for one corrosion pit at the Bravo Pier riser, were determined to be fit for service. See id. at 294-299.

36. The SGH Report included both operational recommendations and structural/mechanical recommendations. See Joint Exh. 2 at 303. The operational recommendations will be discussed *infra* ¶¶ II.D.76-99.

37. The SGH Report included thirty-five mitigation measures that were required before the defueling of the USTs. Although most of the thirty-five measures related to systems that are not part of the Facility, one of the measures was to address a polyvinyl chloride ("PVC") fuel reclamation line below Hotel Pier,[9] and two others addressed above-ground pipe segments

[9] The PVC reclamation line does not actively hold fuel. It is used to discharge rainwater that is collected in the concrete trough on Hotel Pier. The PVC line would only hold fuel if there is a fuel spill into the trough. If that occurs, the PVC line would be part of the secondary containment system. See Summers Decl. at ¶ 32.b. Summers acknowledged during cross-examination that API standards prohibit the issue of PVC pipes for fuel lines. See Day 2 Trans. at 133-34.

along a road within the Facility. See Summers Decl. at ¶ 23.c. All thirty-five pre-defueling measures were implemented before defueling began. See id.

38. Other than the pre-defueling measures, the SGH Report made 214 recommendations, 101 of which related exclusively to Red Hill and became unnecessary in light of the decision to decommission and close Red Hill. See id. at ¶ 23.d.

39. Of the remaining 113 recommendations, approximately 50 were related to the Facility and were designated Priority P1 - recommended to be addressed within two years – or Priority P2 - recommended to be addressed within four years. See id.; see also Day 2 Trans. at 96-97 (explaining that the P1 recommendations were meant to be addressed after defueling was completed, with P2 and P3 after that, and the two and four-year periods were estimates because they did not know how long defueling would take). SGH has confirmed that a number of the 50 relevant recommendations have been completed. See Summer Decl. at ¶ 23.d. By the time of trial, "quite a few of" the P1 recommendations and "[s]ome of" the P2 recommendations had been completed, but Summers could not provide specific numbers. See Day 2 Trans. at 98-99.

40. Pasco testified that, after the Hotel Pier Release and the Kilo Pier Release, significant improvements were made to the Facility's infrastructure, including addressing 253 repair

recommendations from various assessments of Red Hill. These repairs were done prior to defueling. See Pasco Decl. at ¶ 31; see also Joint Exh. 11 (Consolidated List for DOH) starting at NAVY_0086049 (spreadsheet titled Consolidated List of Repairs for Safe Defueling);[10] Defs.' Exh. 22 (Joint Task Force – Red Hill Defueling Consolidated Repair/Enhancement List, dated 10/24/22).

a. Some repairs to the Hotel Pier infrastructure were necessary for defueling, such as replacing the drain lines under the pier and replacing seventy-five hangers securing lines below deck. See Pasco Decl. at ¶ 31.

b. Another example of a repair that was required before defueling was the replacement of deficient boot seals in Hotel Pier's reinforced concrete deck,[11] which was required in the report issued by Austin Brockenbrough in November 2022. See Summers Decl. at ¶ 32.a; see also Joint Exh. 10 (Fuel Transfer Infrastructure Assessment, dated 11/7/22, by Austin Brockenbrough and Associates, LLC ("Austin Brockenbrough

[10] The spreadsheet titled Consolidated List of Repairs for Safe Defueling is a thirteen-page document. Only the first page has a bates number. Joint Exhibit 11 also includes other spreadsheets and graphs.

[11] The Hotel Pier fuel lines are contained in a reinforced-concrete trough that has several expansion or construction joints. Boot seals on either side of the areas where the joint penetrates through the trough are necessary to create a fuel-tight joint. See Summers Decl. at ¶ 32.a.

Report")) at 4 ("The boot seals located at the Hotel Pier construction joints are failing and should be replaced to provide positive containment within the piping trench should there be a fuel leak.").[12]

**41. Defueling** - Defueling of Red Hill started in November 2023. [Caudill Decl. at ¶ 29.]

42. The defueling process emptied the USTs through, among other things, the Facility's Underground Pumphouse and the pipelines at Hotel Pier, where the fuel was loaded onto the vessels. [Summers Decl. at ¶ 23.b.] Other receivers, including trucks and barges, were also used during defueling. [Caudill Decl. at ¶ 30.]

43. Over 104 million gallons of fuel were removed during the defueling process. [Summers Decl. at ¶ 23.b.]

44. No release occurred during the defueling process. [Id.; Caudill Decl. at ¶ 29.] The defueling process was "a wonderful example of successful fuel movement without incident" because it was an "intense fuel operation[]" that was done "in a much higher pressure and at a much quicker rate than current operations." [Day 2 Trans. at 100-01 (Summers's testimony).]

---

[12] The Austin Brockenbrough Report was based on an API Standard 570 inspection that occurred between August 7, 2022 and August 21, 2022. See Joint Exh. 7 (Austin Brockenbrough Report) at 3.

45. Pasco testified that the Navy made significant repairs to the Facility after defueling, including, *inter alia*: addressing corrosion; replacing the Hotel Pier riser valves; refurbishing the Hotel Pier sump; replacing the sectional valves for the Hotel Pier pipelines; replacing Hotel Pier's TRVs; and modifying the Hotel Pier pipelines. See Pasco Decl. at ¶ 34. When the Hotel Pier TRVs were replaced, they were installed in the vertical position, according to manufacturer instructions. See id. at ¶ 42.

46. Further significant repairs and improvements are planned for the Piers and Facility's TRV system. See id. at ¶ 35. For example, glass components in the discharge piping at one of the Valve Stations were replaced with piping, and valves have been replaced, overhauled, or calibrated if they were missing nameplates or had failed calibration testing. See id. at ¶ 83.

**47. 2023 IMP** - A 2023 report found that the fuel system at the Pearl Harbor Naval Station was fit for continued service. See Joint Exh. 3 (excerpts of Contract Report, CR-NAVFAC EXWC-SH-2443, October 2023, POL Pipelines Integrity Management Plan (IMP), Volume One: IMP Naval Station Pearl Harbor (PRL) Parts 1-3, by Austin Brockenbrough and Associates, LLC ("2023 IMP")) at NAVY_0042887.

48. Pasco testified that a Navy IMP presents maintenance and repair recommendations that are intended to ensure the integrity of the Facility's pipeline system and to extend the life of the infrastructure. See Pasco Decl. at ¶ 75.

49. The 2023 IMP was developed based on the results of an API Standard 570 inspection of pier pipelines, which is usually conducted every five years.[13] [Id. at ¶¶ 49, 75.]

50. The 2023 IMP includes a list of ninety-seven recommendations and one-time activities. See Joint Exh. 3 at NAVY_0042897-900.

> Broadly, the recommendations are to replace the out-of-service and severely corroded piping at Bravo and Mike Piers, address corrosion, repair pipe coating, fix or replace pipeline hangers (supports for the suspended pipes at the piers), reconfigure piping that is in contact with the ground, eliminate metal-to-metal contact between piping and other infrastructure elements, reconfigure and/or replace thermal relief valves, address issues with a few low-point drains, and a few other miscellaneous items.

[Pasco Decl. at ¶ 76.]

51. Each recommendation in the 2023 IMP was classified as urgent, short-term, or long-term. See Joint Exh. 3 at NAVY_0042897-900. The 2023 IMP states: "These items, if completed, will improve the overall pipeline system integrity and longevity of the facility." [Id. at NAVY_0042897.]

[13] The API Standard 570 inspections are conducted every ten years for non-pier pipelines. [Pasco Decl. at ¶ 49.]

52. The repair recommendations classified as short-term or long-term "should be addressed in timely manner to optimize system efficiency and prevent future degradation." [Id. at NAVY_0042896.]

53. All of the 2023 IMP recommendations either were addressed in repairs that the Navy has recently completed or will be addressed in repairs that the Navy had in progress or had planned by the time of trial. See Pasco Decl. at ¶ 77; see also id. at pgs. 35-40 (table indicating the status of each of the recommended repairs in the 2023 IMP). A "planned" repair "has not been performed yet," but has "an existing project or RMMR service order or a work order assigned or the work is being planned for future execution." [Transcript of Proceedings, Bench Trial - Day 1 ("Day 1 Trans."), filed 4/1/26 (dkt. no. 335), at 171 (Pasco's testimony).] "Planned" does not mean that a project is fully funded. See id. at 174.

54. The majority of the recommended repairs that were classified as urgent concerned Mike Pier or Bravo Pier, which are out-of-service pending repairs. See Pasco Decl. at ¶ 77; see also Day 2 Trans. at 117-18 (Summers's testimony regarding urgent items addressing corrosion). At the time of trial, all of those repairs were described as planned. See Pasco Decl. at pgs. 39-40 (table entries 69-87, 90-97).

55. The 2023 IMP also made two short-term repair recommendations for Bravo Pier, and both were classified as planned at the time of trial. See id. at pg. 39 (table entries 88-89). A contract for those repairs has yet to be awarded. See id. at ¶ 77.

56. Pasco testified that all necessary repairs will be made to Mike Pier and Bravo Pier before the fuel lines there are returned to service. See id. at ¶ 39. This includes the installation of TRVs at Mike Pier and Bravo Pier. See id. at ¶ 79.

57. The 2023 IMP made two urgent repair recommendations for Kilo Pier, and both were in progress at the time of trial. See id. at pg. 38 (table entries 59, 60). Kilo Pier is also out-of-service pending the completion of repairs. See id. at ¶ 37.

58. There were two urgent recommendations that were for portions of the Facility that were in service at the time of the report. One was a penetration repair for a Hotel Pier concrete pipeline, and the other was the replacement of drains at a valve center. Both were completed by the time of trial. [Id. at pg. 35 (table entry no. 1), pg. 37 (table entry no. 40).]

59. Most of the repair recommendations in the 2023 IMP were classified as long-term. See Joint Exh. 3 at NAVY_0042897-99 (table entries 2-58, 61-68).

60. By the time of trial, some of the long-term repair recommendations had been completed, see Pasco Decl. at pgs. 36-38 (table entries 7, 8, 16, 19, 20, 27-29, 31-37, 39, 42, 43, 50, 51, 53), some had been completed in part and were planned in part, see id. at pgs. 36-38 (table entries 12, 13, 21, 41, 54), and some were in progress, see id. at pgs. 37-38 (table entries 38, 56-58, 61). The remaining long-term repairs were classified as planned. See id. at pgs. 35-39 (table entries 2-6, 9-11, 14, 15, 17, 18, 22-26, 30, 44-49, 52, 55, 62-68).

61. The 2023 API Standard 570 inspection resulted in the Facility's current pipeline integrity management plan. [Id. at ¶ 50.]

62. The next API Standard 570 inspection will be conducted in 2028, and the IMP will be updated, as needed, based on the results of the inspection. [Id. at ¶ 75.]

63. Pasco testified that the Navy applies the relevant API standards, as well as other best management practices. [Id. at ¶ 47.]

**64. 2024 SPCC Plan** – The Navy maintains a spill prevention, control, and countermeasure ("SPCC") plan for the parts of the Facility that are subject to Environmental Protection Agency ("EPA") regulations, Title 40 Code of Federal Regulations Part 112. See id. at ¶ 84; Joint Exh. 12 (SPCC plan, dated December 2024 ("2024 SPCC Plan")).

a. Relevant to the instant case, the 2024 SPCC Plan addresses the Upper Tank Farm and the truck loading rack and provides for secondary containment and other measures. See Pasco Decl. at ¶ 85. The 2024 SPCC Plan is designed to prevent any discharged fuel products from reaching Pu`uloa or Hālawa Stream. See id. at ¶ 84.

b. The plan is certified by a professional engineer, and it is updated every five years. See id. at ¶ 84.

c. A release of approximately 165 gallons of fuel occurred on July 1, 2025 during repair work on the pipeline between Tank 55 at the Upper Tank Farm, near the Underground Pumphouse. The release was fully contained within the concrete secondary containment trough, and the release was cleaned up within forty-eight hours. See id. at ¶ 86. Pasco testified that this incident shows that the Navy's spill-control plans are effective. See id.

**65.** **2025 Testing** - All of the Facility pipelines that were in-service at that time passed the annual pressure and leak detection testing in 2025, with the exception of one portion, were a minor seep was identified. See id. at ¶ 54; Defs.' Exh. 23 (HCNA & PPSI Combined Schedule -JB Pearl Harbor-Hickam – 2025 Annual SLPT and Leak Detection Testing Schedule, Revised 6/24/25) at NAVY_0086050, NAVY_0086050.002.

a. The seep was found in a pipeline running from Tank 55 in the Upper Tank Farm to the Underground Pumphouse. [Pasco Decl. at ¶ 52.] The annual pressure testing on that portion of the pipeline was performed on June 5, 2025. [Id. at ¶ 33.]

b. The testing of the portion of the pipeline where the seep was found involved the application of three times the normal pressure on the line. Enough fuel to wet the concrete floor and part of the outer surface of the pipeline seeped out, but there was not enough fuel to measure. [Id.]

c. The test was stopped, the affected segment of the pipeline was drained, the fuel that seeped out was captured, and an emergency repair was ordered. [Id.]

d. That segment of pipeline was replaced, and subsequently passed pressure testing on September 25, 2025. [Id.]

66. In addition to the pressure testing reflected in Defendants' Exhibit 23, hydrostatic pressure testing was conducted during November 2025. [Pasco Decl. at ¶ 52.] A deficient flange gasket near the Underground Pumphouse broke during the test, causing the discharge of approximately 115 to 120 gallons of fuel to enter the Lower Yard Tunnel.[14] The

[14] The "Lower Yard Tunnel" is a piping and utility tunnel near the Underground Pumphouse. See Pasco Decl. at ¶ 33.

discharged fuel was captured in the concrete containment system in the tunnel and was cleaned up within two hours using a vacuum truck and absorbents. See id. at ¶¶ 52, 87.

**67. SGH Follow-Up Site Visit in 2025** – Summers performed a site visit with his colleague, Dr. Emily McCarthy, between January 3 and January 7, 2025. [Summers Decl. at ¶ 26.] The site visit included visual inspection of the Piers from a power boat and visual inspection from a kayak of the areas under Hotel Pier and Sierra Pier, the only Piers currently being used for fuel operations. See id. at ¶¶ 29, 43.e.

68. During its 2022 assessment, SGH took ultrasonic thickness measurements at various points where bare steel was accessible on the fuel line below Sierra Pier.[15] During the 2025 site visit, SGH took ultrasonic thickness measurements at some of the same points as in the 2022 assessment, and SGH also took measurements at other points. See Summers Decl. at ¶¶ 33.a-b & Table 1. A similar process was conducted through wrap at points where bare steel was not accessible. See id. at ¶ 33.c & Table 2. Summers took thirty measurements, all of which showed no deviation. See Day 2 Trans. at 136.

---

[15] The ultrasonic testing was performed to look for any pipe thinning or other degradation. Corrosion could be a potential cause of pipe thinning. See Day 2 Trans. at 128 (Summers's testimony).

69. As to all comparison locations, the variations were negligible "and well within the accuracy of what [Summers and Dr. McCarthy] were measuring from the kayak." See Summers Decl. at ¶ 34. The negligible variations indicate that there is limited, if any, section loss at those locations, and there has not been a significant effect on the thickness of the pipe wall in the three years between the assessments. See id. In other words, the fuel system's integrity remained stable during the period between the assessments. See id. at ¶ 43.

70. Similarly, there were no significant differences between the 2022 and 2025 ultrasonic thickness measurements at Tanks 47 and 55 of the Upper Tank Farm. See id. at ¶ 36 & Table 3.

71. During the 2025 site visit, Summers and Dr. McCarthy took ultrasonic thickness measurements at four locations at the end of Hotel Pier, and two of those locations were used for the 2022 ultrasonic thickness measurements. There were no significant differences between the 2022 measurements and the 2025 measurements. See id. at ¶ 38 & Tables 4, 5.

**72. Infrastructure Changes and Integrity** - During Fiscal Year 2025, the Navy awarded a contract for the demolition of the Defuel Line and for the replacement of the pipe system, including the relief valves, between Hotel Pier and the valve stations. [Trial Stipulations at ¶ 11.] This contract also

includes: the installation of a product recovery tank; replacement of all drain lines under Hotel Pier; and installation of a buried pipe between the Hotel Pier sump and one of the valve stations. [Pasco Decl. at ¶ 36.] The Defuel Line had not been removed by the time of trial, but Pasco testified that it would be removed later in 2026. See Day 1 Trans. at 172-73.

73. Also during 2025, the Navy awarded another contract for the addition or replacement of TRVs and the reconfiguration of the Hotel Pier thermal relief scheme to cascade to the new product recovery tank. [Pasco Decl. at ¶ 36.]

74. At the time of trial, the Navy was preparing to seek another contract that included, *inter alia*: the replacement of Hotel Pier pipeline sections that had corrosion or pitting; the repair of pipe coating at the foot of Hotel Pier; the inspection and repair of the coating on the fuel trench; the replacement of low point drains with welded joints; and the modification or replacement of trench covers. [Id.]

75. The Facility now has a documented system to track testing, maintenance, and repair of the fuel system. See Summers Decl. at ¶ 25.b. The system includes periodic monitoring of the integrity of the fuel system, and the frequency of the specific reviews and inspections are set forth in the current Operations, Maintenance, Environmental, and Safety Plan ("OMES"). See id. at

¶ 25.c; see also Joint Exh. 7 (OMES, dated December 2023 for Defense Fuel Support Point Pearl Harbor Bulk Terminal ("2023 OMES") at 13-1 to 13-20 (Section 13 – Fuel System Integrity).

**76. Operational Changes** – The SGH Report included recommendations for ongoing operations at the Facility, excluding recommendations associated with the USTs. See Joint Exh. 2 (SGH Report) at 308-14.

77. Pasco testified that, after the Hotel Pier Release and the Kilo Pier Release, the Navy overhauled its tracking program for maintenance, testing, and inspections. The Navy began implementing the improved tracking program in 2022. See Pasco Decl. at ¶ 63. The Navy tracking program is made up of three tools: the Fuel Asset Management System ("FAMMS"); a Compliance Tracker; and an Action Tracker. See id. at ¶¶ 64-67. The three tools do not automatically cross-reference data; they are separate, stand-alone systems. See Day 1 Trans. at 159.

78. The SGH's operational recommendations regarding the Facility "were to either enhance existing compliance with the [Occupational Safety and Health Administration ('OSHA') process safety management ('PSM')] standards or to establish new programs that would further improve operational reliability and reduce the risk of fuel releases." [Caudill Decl. at ¶ 22.] On cross-examination, Caudill clarified paragraph 22 by stating that operational reliability is broader than the OSHA PSM

standard, but they are complementary goals. [Day 2 Trans. at 36-37.] The goal of OSHA's PSM program is to prevent accidents involving highly hazardous chemicals, such as fuel products, or to minimize the consequences of such accidents when they occur. [Caudill Decl. at ¶ 18.]

79. The recommendations included "development of thorough, detailed, step-by-step operating procedures with independent verification; addition of process parameter instrumentation (pressure indication); addition of pressure equalization lines across large control valves; confirmation of the operation of emergency mitigations; and implementation of additional procedures and controls." [Id. at ¶ 23.]

80. After the SGH Report was issued, Caudill lead a team at JBPHH that implemented the report's recommendations regarding OSHA PSM, operational integrity, and process hazard analysis. [Caudill Decl. at ¶ 15.]

81. Caudill testified that the fact that no fuel release occurred during the defueling process "demonstrates the value of implementing the OSHA PSM standards and other recommendations in the SGH Report." [Id. at ¶ 29.]

82. In the oil and gas industry, OSHA PSM standards are considered to be the industry standard. Facilities that manage a large volume of highly hazardous chemicals must follow OSHA PSM standards, and those standards are considered best practices for

all facilities that manage chemicals. [Id. at ¶ 19.] The OSHA PSM standards "include fourteen essential elements that ensure safe handling, storage, and transfer of hazardous materials, including operating procedures, process hazard analysis, safe work practices, and emergency response." [Id.]

83. By the time of trial, JBPHH had chosen to operate under the OSHA PSM standards "[t]o minimize the likelihood of a release to the greatest extent practicable." Id.; see also Caudill Decl. at ¶ 47.

84. OSHA requires a facility to: have written procedures for the maintenance of the integrity of its equipment and infrastructure; [Caudill Decl. at ¶ 49;] certify at least every three years that its procedures and practices comply with OSHA regulations; [id. at ¶ 59;] perform an initial hazard evaluation for certain hazardous substances processes; [id. at ¶ 79;] investigate any incident that results in, or could have resulted in, a catastrophic release of highly hazardous chemicals in the workplace; [id. at ¶ 83;] and follow written procedures to manage changes to chemicals, technology, equipment, and operating procedures, [id. at ¶ 88]. Caudill and his team addressed each of these requirements during their time at JBPHH.

85. Caudill's team created a Training Matrix to track Facility employees' new and recurring training requirements that are necessary to comply with the regulations by the relevant

agencies, including OSHA, EPA, DOH, and the United States Coast Guard. [Id. at ¶ 35.] The Navy intends to add a component that automatically tracks attendance and assignments for employee training sessions. See id. at ¶ 36. The Training Matrix was implemented in 2024. See Day 2 Trans. at 46.

86. Caudill developed an annual training plan consisting of monthly courses and make-up courses. The courses included those required to comply with OSHA PSM standards and EPA standards and those required for technical competency. The annual training plan also provided for the development of monthly activities regarding emergency response preparedness. The Fuels Department leadership approved the plan that Caudill developed. See Caudill Decl. at ¶ 37. The annual training plain was implemented by the end of 2024. See Day 2 Trans. at 38.

87. Other operational changes that Caudill helped to develop and/or implement during his time as the Fuels Department's Chief Engineer included: a technical competency program for operations and maintenance employees;[16] see Caudill Decl. at ¶ 38; a forty-hour OSHA training program for hazardous waste operators, with an eight-hour annual refresher course; see id. at ¶ 39; an extensive orientation and training program for new employees that includes classroom instruction and

[16] The technical competency program was created by the end of 2024. See Day 2 Trans. at 38-39.

demonstrations, as well as field demonstrations and exercises; see id. at ¶¶ 40-41; and enhancement of the JBPHH's operations orders ("OPORDs") process,[17] see id. at ¶ 45.

a. One of the enhancements to the OPORD system that Caudill's team implemented was to use an OPORD for each fuel movement, such as the fueling of a vessel. See id. at ¶ 46.

b. Caudill's team improved the Facility's OPORD template by including health and safety requirements, using consistent text and format for warning language, and implementing thorough review and verification to line up the positions of valves. See id. at ¶ 45.

88. Caudill's team implemented new maintenance programs at the Facility, including corrective maintenance and preventive maintenance. See id. at ¶ 51.

89. Caudill's team made improvements to FAMMS. See id. at ¶¶ 54-55. The team's work on FAMMS started in 2022, but most of it was done in 2024. See Day 2 Trans. at 39.

[17] OPORDs are OSHA-required, written, step-by-step procedures for safely conducting phases of fueling operations, including start-up, shutdown, and emergency response. The implementation of each step in the procedure is verified with initials, date, and time. The Fuels Department reviews the OPORDs after the completion of the procedure to improve operations. See Caudill Decl. at ¶¶ 43-45. OPORDs also document new or amended requirements for a procedure. See id. at ¶ 47. Pasco testified that the Facility has "always had OPORDS." See Day 1 Trans. at 196.

a. FAMMS is the same type of system as Maximo, which is widely used in the industry. [Pasco Decl. at ¶ 54.]

b. FAMMS is built around an inventory of petroleum assets and related infrastructure. [Id. at ¶ 64.] This includes items such as valves, pumps, motors, and instruments, and each item has a unique asset number. [Day 2 Trans. at 11.] Pasco acknowledged that the FAMMS inventory was not complete in 2022, although he did not know how many assets were missing from the inventory. [Day 1 Trans. at 155-56.] The list of assets was expanded in 2024, and assets have continuously been added since Pasco joined the Fuels Department in 2020. See id. at 156-57; see also Day 2 Trans. at 50 (Caudill's testimony that most of his team's work on the FAMMS inventory was done in 2024). When Pasco assumed his current position in 2023, hundreds of items could have been missing from the FAMMS inventory. See Day 2 Trans. at 23. Pasco did not consider the inventory complete at the time of trial. See Day 1 Trans. at 157. To the best of his knowledge, all of the assets that he is aware of were identified and entered into FAMMS, but he acknowledged that it is possible that there could be a component that has not been identified. See Day 2 Trans. at 12-13. Caudill estimated that there are thousands of components listed in the FAMMS database. See id. at 57.

c. Examples of improvements that Caudill's team made to the FAMMS system include the verification and correction of equipment tagging and the development of performance metrics. See Caudill Decl. at ¶ 55.

d. FAMMS is generally used to track preventative maintenance. See id. at ¶ 74.

e. FAMMS does not track public works maintenance projects, nor RMMR projects. See Day 1 Trans. at 155. RMMR projects are tracked by the Army Corps. See id. at 160. The Fuels Department does not have access to the Army Corps's RMMR database. See Day 2 Trans. at 28. The Fuels Department, the RMMR contractor, and the Army Corps project manager have monthly meetings to discuss RMMR items. See Day 1 Trans. at 160 (Pasco's testimony). During those meeting, they "go through all of the active and planned service orders." See Day 2 Trans. at 14 (Pasco's testimony). In addition, every quarter the RMMR contractor has a recurring maintenance ("RM") event, during which it performs inspection and maintenance and notes all deficiencies or discrepancies. At the conclusion of the RM event the RMMR contractor meets with the Fuels Department to go over its findings. Minor or incidental deficiencies are addressed by the Fuels Department, and the others are entered as a service order request. See id. at 15-16.

f. FAMMS also does not track SRM projects, which are tracked by NAVFAC's Hawaii regional petroleum engineer, using a NAVFAC database.[18] See Day 1 Trans. at 161. A copy of the NAVFAC tracking spreadsheet is kept in the Fuels Department. See Day 2 Trans. at 17.

g. Further, FAMMS does not track MILCON projects, which are tracked by the project's execution agent, which is usually NAVFAC for Pearl Harbor projects. See Day 1 Trans. at 161-62. The Fuels Department is involved in the development of documents to submit for Congressional approval, and once funding is obtained and the project begins construction, the process is almost identical to an SRM project. See Day 2 Trans. at 18-19.

h. Since Pasco became the Supervisory General Engineer of the Fuels Department in 2023, there has not been a repair, maintenance, or inspection in FAMMS that was forgotten. There have been occasions when a Fuels Department repair, maintenance, or inspection could not be completed. For example, if the component that was to be worked on was serving as an isolation area for other active maintenance, it would not be feasible to do the repair, maintenance, or inspection at that time. Pasco was not aware of any repair, maintenance, or

[18] The status of SRM projects is presented, in a PowerPoint brief and oral presentation, to the Fuels Director during the weekly Fuels Department meetings. See Day 1 Trans. at 175 (Pasco's testimony).

inspection that was feasible, but was not completed. See Day 2 Trans. at 13-14.

90. Caudill developed a SharePoint-based Compliance Tracker for recurring compliance obligations and associated deadlines. See Pasco Decl. at ¶ 61. The Compliance Tracker was implemented sometime in 2024. See Day 2 Trans. at 43.

a. Caudill's team considered commercially available software but determined that using the Navy's existing software was the only feasible option because of the security restrictions, requirements, and prohibitions imposed by the Navy and the Department of War. See Caudill Decl. at ¶¶ 60, 107. Thus, even though commercially available products are used to track compliance in private sector companies in the industry, such products were not feasible for use at the Facility. See id. at ¶¶ 107-08. To the extent that Plaintiffs' expert, Williams James Rogers, Ph.D. ("Dr. Rogers"), testified that all of the Facility's compliance tracking could be conducted using a single, commercially available software product,[19] it "reflects a lack of understanding of the Navy's restrictions and parameters in place." See id. at ¶ 109. Even if the Facility had a

[19] For example, Dr. Rogers recommends that "[a]ny existing databases (e.g., FAMMS) must either a) be rendered capable of interfacing with the new centralized tracking system, or b) should be replaced by the centralized tracking system." [Rogers Testimony at pgs. 77-78.]

centralized database, some of the Facility projects would still require the involvement of DLA, which is an independent organization, as well as NAVFAC's involvement. See Day 2 Trans. at 71-72. Those organizations could not be moved under the JBPHH Commander, in part because "that person may become a bottleneck if they're asked to review everything." See id. at 72.

b. The Compliance Tracker generates reports and, for each item, sends emails to the person responsible and that person's supervisor. See Caudill Decl. at ¶ 61. Pasco testified that he is responsible for completing some of the regulatory tasks recorded in the Compliance Tracker, and he receives automatic email remainders when a task is approaching its due date. See Pasco Decl. at ¶ 69.

c. The Compliance Tracker includes more than one hundred compliance obligations for regulations by various agencies, including, *inter alia*, OSHA, EPA, DOH, and the Department of Transportation, but it can be reconfigured or modified to add new regulatory requirements or to make changes to existing obligations or deadlines. See Caudill Decl. at ¶ 63.

d. The Compliance Tracker is a reminder tool. Other records and documents show whether compliance obligations have been addressed. See id. at ¶ 65. Records of compliance, such as inspection reports, were scanned and stored in a shared drive until they were moved to file management system on SharePoint,

which the Fuels Department recently migrated to. See Day 1 Trans. at 157 (Pasco's testimony). The compilation of compliance completion documentation records and other records started in 2024, and Facility personnel took over the process from TKC and other engineering contractors in 2025. See Day 2 Trans. at 44 (Caudill's testimony).

e. The Compliance Tracker that Caudill developed is still in use at the Facility, and it is maintained by a Compliance Team within the Fuels Department. See Pasco Decl. at ¶ 68.

f. During the weekly Fuels Department staff meetings, a member of the Compliance Team, which includes persons from the safety, environmental, and training divisions, gives a report to the Fuels Director about the status of the Compliance Tracker. See id. at ¶¶ 68, 72.

91. Caudill's team also developed a Microsoft Excel-based "Action Tracker" spreadsheet for actions that not required by a specific regulation, such as testing the deployment and operation of oil spill skimming equipment, see Caudill Decl. at ¶ 69, or installing additional pipe segments in the fueling infrastructure for flexibility and redundancy, see id. at ¶ 77. The Action Tracker was implemented sometime in 2024. See Day 2 Trans. at 45 (Caudill's testimony).

a. Examples of the information that the Action Tracker includes are: the source of the action and a description of the source; see Caudill Decl. at ¶ 70; a target date for the completion of the action; see id. at ¶ 72; and a field for optional prioritization notes, see id. at ¶ 73.

b. Because an action is not removed from the Action Tracker, even after the completion of the action, the Action Tracker also serves as a record of actions taken since the Action Tracker was implemented. See id. at ¶ 70.

c. Caudill acknowledges that there are overdue items on the Facility's Action Tracker, but he attributes the outstanding items to the exhaustive nature of the Action Tracker, meaning that tasks are included even though they do not need to be done immediately. See id. at ¶ 72. He opines that "the overdue items here are no different from those that one would expect to see in the oil and gas industry." [Id.] He also testified that the Action Tracker "can contain things that are just good ideas" but that are not required by law. See Day 2 Trans. at 46.

d. If an item is tracked in FAMMS, it usually is not included in the Action Tracker. See Caudill Decl. at ¶ 74.

e. The JBPHH has over 400 actions, approximately 80 of which are open. [Id.]

f. As with the Compliance Tracker, the Facility continues to use the Action Tracker, and it is maintained by the Fuels Department Compliance Team. The items on the Action Tracker are reviewed at the weekly Fuels Department staff meetings. See Pasco Decl. at ¶ 70.

92. In 2022, Caudill worked with JBPHH to develop a process hazard analysis for the Facility - the Pearl Harbor & Red Hill Fuel Supply Point Process Hazard Analysis, dated March 31, 2022 ("3/31/22 PHA"). See Caudill Decl. at ¶ 80; Joint Exh. 2, App'x B (3/31/22 PHA).

a. The 3/31/22 PHA had 120 recommendations for improvement. The recommendations that related to safe defueling were completed prior to defueling, and the remaining recommendations were completed after defueling. [Caudill Decl. at ¶ 80.]

b. OSHA PSM requires a PHA to be redone every five years. The next JBPHH PHA is due in Spring 2027. [Id.]

93. Caudill worked with JBPHH to develop a tool to identify the root cause of failures that could have resulted in a catastrophic release and to identify corrective actions. As part of this process, employees were trained in conducting investigations and developing corrective actions, and the corrective action is tracked in the Action Tracker. [Id. at ¶¶ 84-85.]

a. Fuels Department leadership and employees reviewed the corrective action processes during training sessions. It is Caudill's understanding that they continued to do so after his contract ended in November 2025. See id. at ¶ 86.

b. Pasco's testimony did not address whether the Facility still follows the root-cause process that Caudill developed.

94. Caudill helped implement management of change ("MOC") instruction at the Facility. See id. at ¶ 91.

a. MOC is the systematic evaluation of proposed changes to procedures involving chemicals, technology, and equipment. Written procedures for the management of changes in these areas are required by OSHA. See id. at ¶¶ 88-89.

b. The final check on the MOC is the pre-startup safety review ("PSSR"), which confirms that safety measures and environmental protections are in place and that potential risks have been addressed. See id. at ¶ 90.

c. Corrective actions identified in the MOC or the PSSR are included in the Action Tracker. See id. at ¶ 92.

d. A proposed change is not implemented until the MOC is approved, and the affected operation does not begin until after the PSSR is completed. See id. at ¶¶ 93-94.

e. Pasco's testimony did not address whether the Facility still follows the MOC and PSSR processes that Caudill helped implement.

95. During Caudill's time at the Facility, he participated in weekly meetings of military, civilian, and contractor personnel who were involved in maintenance or operations activities. The purpose of these meetings was to balance ongoing operations with necessary maintenance. It is Caudill's understanding that these regular meetings continued after he stopped working there. See id. at ¶ 56. "These meetings prevent conflicts from delaying critical maintenance tasks and ensure that the Facility remains in good operating condition." [Id.]

a. Pasco confirmed that these meetings still occur. See Pasco Decl. at ¶ 73 (stating that the Facility has weekly "operations and maintenance schedule synchronization meeting[s]" to review operations, inspections, repairs, and construction that will take place in the upcoming week to address any possible conflicts and that the participants in "[t]hese meetings include the Fuel[s] Department Director and Fuels Department Operations, Facilities, and Maintenance Division leads, as well as representatives from contractors and other commands performing work within the fuel terminal").

b. The weekly synchronization meetings started occurring in 2024, and their purpose is to avoid conflicts

between maintenance and repair projects and tasks necessary to the military mission, such as fueling ships. See Day 1 Trans. at 175-76 (Pasco's testimony).

c. These meetings utilize a team approach, but final decisions are made by the Director of the Fuels Department. See Pasco Decl. at ¶ 73.

d. The team approach ensures coordination among all of the stakeholders regarding scheduling and work sequencing. See id.

96. Caudill recommended that JBPHH hire a new maintenance supervisor, a new maintenance schedule planner, and new maintenance analysts, and all of these positions were filed in mid-2024 or late 2024. See Day 2 Trans. at 37-38.

97. There is now "a formal 'Car Seal' program" in place at the Facility. [Id. at ¶ 80.]

a. The program applies industry practices for pressure management and thermal relief, including: a master index of every TRV, reflecting setpoints, last calibration dates, and service status; and the installation of crimped cables to ensure that each TRV's isolation valve remains in the correct position. See id.

b. Under the Car Seal program, a checklist is used in monthly field checks of each TRV in the system. The checklist includes information about TRV deficiencies, which are reported

to the Supervisor of the Operations Division and entered into the FAMMS database to trigger corrective action. See id. at ¶ 81.

c. The monthly field check includes visual inspection of every relief valve assembly in the Facility, including ensuring that the relief valve is not damaged, is tagged, is within calibration, and that its inlet isolation valve and outlet isolation valve are in the open position. See Day 2 Trans. at 10 (Pasco's testimony).

d. Comptrollers from the Maintenance Division audit the Car Seal program every quarter. See Pasco Decl. at ¶ 81.

98. The Fuels Department Operations Division has also implemented a Thermal Pressure Control Standard Operating Procedure ("Pressure Control SOP") at the Facility. See id. at ¶ 82.

a. An automated control system continuously monitors pressure for all equipment handling fuel, and pressure thresholds are set to ensure safety. See id.

b. The control system warns operators if the pressure exceeds the threshold level. See id.

c. The Pressure Control SOP has a table that lists all of the pressure indictors, with the associated high pressure alarm or other alarm, and the procedure for each. See Day 1 Trans. at 192 (Pasco's testimony). "[I]t provides a primary,

secondary, and tertiary valve for the operator to operate to prevent that portion of the system from being over-pressurized before . . . a high pressure alarm" is triggered. [Id.]

99. During his three and a half years working at the Facility, Caudill did not see any infrastructure deficiency, repair, maintenance, testing requirement, or inspection that was missed. See Day 2 Trans. at 71.

## E. Weight of the Testimony and Expert Opinions

**100. Lieutenant Commander Shannon Bencs ("Bencs")** was the Director of the Fuels Department from approximately May 15, 2020 until she was reassigned from Red Hill on May 12, 2021.[20] See Written Testimony of Lieutenant Commander Shannon Bencs, filed 2/24/26 (dkt. no. 291) ("Bencs Decl."), at ¶¶ 6-7, 10.

101. When Bencs left her position at the Facility in May 2021, the Hotel Pier Release was still ongoing. See id. at ¶ 24.

102. Bencs testified that she still takes part in regular meetings where JBPHH is discussed, including reports about JBPHH infrastructure projects. [Day 1 Trans. at 31-32.]

**103. Dr. Rogers** has a doctoral degree in wildlife and fisheries sciences and master's and bachelor's degrees in biology. See id. at 33-35; Written Direct Testimony of

[20] Bencs's reassignment did not become permanent until May 17, 2022. Since May 2022, Bencs has been the Supply Officer at Marine Corps Base Hawaii, Marine Corps Installation Command Pacific. [Bencs Decl. at ¶¶ 7-8.]

Dr. William Rogers ("Rogers Testimony"), filed 2/24/26 (dkt. no. 290), at pg. 12. Dr. Rogers is a certified project manager, and he teaches project management at West Texas A&M University. He has also managed various complex projects through his environmental consulting firm. See Day 1 Trans. at 37, 53; Rogers Testimony at pgs. 11-14.

104. Plaintiffs initially offered Dr. Rogers as an expert in petroleum management, environmental remediation, and environmental damages. See Day 1 Trans. at 34. After voir dire on his qualifications, Plaintiffs amended their offer and asked this Court to find Dr. Rogers qualified as an expert in petroleum conveyance management, corrosion, project management, and the contamination of petroleum control at military facilities. See id. at 43.

a. Defendants objected to both offers. See id. at 38-39, 48.

b. This Court found Dr. Rogers qualified to give expert testimony in the areas of: corrosion involving petroleum spills; and general project management of systems involving either nuclear waste or other types of potentially toxic products. This Court declined to find Dr. Rogers qualified to give expert testimony regarding petroleum management. See id. at 53.

105. Based on his September 20, 2024 inspection of the Facility and his review of engineering inspections obtained by the Navy, Dr. Rogers opined that "future releases of oil product at the Facility are virtually certain." [Rogers Testimony at pg. 51.]

a. Dr. Rogers's inspection of the Facility lasted approximately five hours, [Day 1 Trans. at 70,] and he did take any measurements or perform any calculations at the site to confirm his visual inspection of the pipelines. See id. at 147.

b. Prior to this trial, Dr. Rogers had never provided this type of opinion in court. See Day 1 Trans. at 37.

c. Dr. Rogers has no experience in the management of Navy operations or Navy projects, see Day 1 Trans. at 47, and he has no experience with Navy inspection or repair contracts, see id. at 38.

d. Dr. Rogers has no recent work experience at petrochemical facilities. See id. at 37-38 (acknowledging that his last employment with an entity that operated a petrochemical facility was from 1977 to 1979).

106. Dr. Rogers testified that some of the reasons why a future release is virtually certain are: the lack of a unified command at the Facility, see id. at 59, 61-62, and the lack of a centralized database to track projects at the Facility, see id. at 66.

a. Dr. Rogers opined that the Facility had "fractured lines of responsibility and [lacked] direct lines of communication to the Unified Command which, in [Dr. Rogers's] opinion, should be the Base Commander or his designated responsible direct report." [Rogers Testimony at pg. 79.] However, Dr. Rogers's opinion is based on the Facility's organizational structure prior to October 2025. See id. On cross-examination, Dr. Rogers testified that it did not matter whether the unified commander was the Base Commander or another individual or entity, "as long as you have unity of command." [Day 1 Trans. at 61.] He also acknowledged that the United States Department of Defense Inspector General recommended that the Fuels Department and the Public Works Department be moved under the JBPHH base commander, and that those reorganizations had occurred. See id. at 62-63; see also Pltfs.' Exh. 29 (Inspector General U.S. Department of Defense Evaluation of the Operation, Maintenance, Safety, and Oversight of the Navy's Red Hill Bulk Fuel Storage Facility, dated 11/8/24). Caudill testified that the term "unified command" refers to a United States Coast Guard regulation addressing the management of an ongoing emergency situation, and the term has nothing to do with the ongoing operations of a military facility. See Day 2 Trans. at 76.

b. As previously stated, Dr. Rogers's opinion that the Facility should use a single, centralized database to track all projects reflects a lack of understanding of the restrictions applicable to the Facility's software. See *supra* ¶ II.D.90.a; see also Day 1 Trans. at 68 (Rogers acknowledged that his written testimony did not address whether the Navy's security restrictions would limit its ability to use a centralized database at the Facility).

c. Dr. Rogers testified that he could not track a significant portion of Facility service orders through Navy databases to confirm whether the work had been completed, and he opined that this impairs the management of those projects. See Day 1 Trans. at 132. He reviewed thirty-four service orders and was unable track fifteen. [Id. at 145.] However, it is unclear what he reviewed when he attempted to track the service orders. He acknowledged that he did not testify regarding what records he used to track the service orders, and he acknowledged that the DLA funding spreadsheet was not one of the spreadsheets that he used. See id. at 145-46. Dr. Rogers confirmed that six of the fifteen service orders were for Red Hill, but he could not confirm whether eight of the remaining orders were for Hickam. See id. at 146.

d. In addition, Dr. Rogers previously acknowledged that he did not review the Action Tracker and the Compliance

Tracker during his site visit at the Facility, and he did not speak to anyone regarding Facility operations. See Day 1 Trans. at 69-70. He stated generally that he had "seen" the Action Tracker. See id. at 69.

107. Dr. Rogers testified that the pipelines at the Facility was "highly corroded," see Rogers Testimony at pg. 74, and he testified at trial that the corrosion made a future failure at the Facility a virtual certainty, see Day 1 Trans. at 57-58. However, he acknowledged that the November 2022 Austin Brockenbrough Report found that the worst part of the pipeline had a remaining service life of forty-one years. See id. at 58.

a. Summers criticized Dr. Rogers's testimony because, *inter alia*, some of Dr. Rogers's references to corrosion were on components that were not in service, and Summers disagreed with Dr. Rogers's findings regarding Tank 47 of the Upper Tank Farm and found that the thickness of the shell was adequate. See Day 2 Trans. at 112-13.

b. Summers also testified that the mere presence of corrosion does not indicate that the piece of infrastructure is compromised "[b]ecause the corrosion has to be extensive and, . . . the pressures within the pipes have to be high and the corrosion has to be deep for the corrosion to have a significant impact on the integrity of the piping system." [Day 3 Trans. at 49-50.]

c. Summers opined that Dr. Rogers confused dirt in run-off from the roofs of the tanks in the Upper Tank Farm, as well as grease marks from inhibitor grease on flange protection bands, with weeping or corrosion. See Summers Decl. at ¶ 63.

108. Plaintiff admitted into evidence photographs that Dr. Rogers took during his 2024 site visit that he testified depicted heavy corrosion, but could not specify whether the section of pipeline depicted in the photograph was an active pipeline. See, e.g., id. at 120-21 (testimony regarding Pltfs.' Exh. 7-69).

a. Summers opined that Dr. Rogers confused surface corrosion with the risk of imminent fuel release and fails to provide an accurate explanation of how the corrosion impacts pipeline integrity. See Summers Decl. at ¶ 48. According to Summers, "[c]orrosion is a well-known and expected phenomenon in steel structures and pipelines, and nearly all steel components experience some degree of corrosion over their design life without impacting their expected structural integrity." [Id.]

b. Summers opined that "none of [Dr. Rogers's] photos depict fuel leaks, and a substantial number of his photos depict parts of the [JBPHH] that are not now, and in many cases have never been, part of the active fuel system." [Id. at ¶ 53.]

109. Dr. Rogers opined that fuel spills at the Facility "continue to occur during routine fueling and maintenance

activities as a result of preventable operational failures." [Rogers Testimony at pg. 73.]

a. Caudill responded that he "witnessed at the Facility that minor spills resulting from operator error or equipment failure were typically captured by secondary containment." [Caudill Decl. at ¶ 123.]

b. Caudill acknowledged that operator errors sometimes occur, but he states that they are not result of deficient infrastructure, management, and operations. The Navy's implementation of industry best practices will ensure that corrective action will be taken quickly, minimizing any consequences of the error. [Id. at ¶¶ 124-25.]

**110.** **Summers** is a registered structural and professional engineer. His expertise includes evaluating the structural integrity of petrochemical facilities. See Summers Decl. at ¶ 3. He has been SGH's Senior Principal since 2015, and was the Principal-in-Charge when SGH performed its assessment of Red Hill and the JBPHH fuel system in 2022. See id. at ¶¶ 5-6.

111. From September 2022 through the time of trial, SGH assisted the Joint Task Force-Red Hill and the Navy Closure Task Force – Red Hill with various matters related to defueling and closure. See id. at ¶ 23. Summers made approximately twenty site visits during the four years prior to trial, including three full days between January 3 and 7, 2025. See id. at ¶ 43.e.

112. By stipulation of the parties, this Court found Summers qualified to give expert testimony in structural engineering, structural mechanics, structural evaluation, and integrity assessment of petrochemical facilities. See Day 2, Trans. at 85-86.

113. Summers opined that there is no ongoing fuel release from the Facility into Pu`uloa and/or Hālawa Stream and such fuel releases are not reasonably likely to occur in the future. See Summers Decl. at ¶ 42; see also id. at ¶ 17 ("I found no evidence of any fuel discharges from the Facility to the Halawa Stream or Pearl Harbor presently occurring . . . .").

a. In forming his opinion, Summers assumed that the Facility repairs that have been identified by various consulting firms will be implemented, as has been the case with other repairs that those firm identified. See id. at ¶ 44.

b. Summers states that this assumption is warranted based on the repairs that were performed prior to trial and the procedures documented in the 2023 OMES. See id.; Joint Exh. 7 (2023 OMES). "[T]he completion of hundreds of necessary recommendations before defueling" shows that "the Navy cares about the system and does the necessary repairs that – that need to be done." [Day 3 Trans. at 52.]

c. In addition, Summers opined that the smaller fuel system currently in use at the Facility "allows for even more

efficient inspection and repairs of potential degradation" and further reduces "the overall risk of fuel release." Summers Decl. at ¶ 67; see also Day 3 Trans. at 52-53 ("[F]uel doesn't have to go three miles away up a hill and then back down. It's pretty much a straight line of piping system that's -- that's much simpler than the one that -- that was -- that was previously being used.").

d. Summers is also confident in his conclusions because of the improvements made to the Facility's operating system, which is "a much simpler operating system now." See Day 3 Trans. at 53.

**114.** **Caudill** was a registered professional engineer until his retirement in November 2025. See Caudill Decl. at ¶ 9. From 1991 to 2015, Caudill held various positions addressing health, environment, and safety at Marathon Oil Company, Marathon Petroleum Company, and Ashland Petroleum company. See id. at ¶ 11. From 2016 to 2018, Caudill was the Environmental and Safety Manager and Process Safety Superintendent at Atlantic Methanol Production Company's methanol production facility in Punta Eurpoa, West Africa. See id. at ¶ 12. Caudill founded TKC Global Consulting in 2018. See id. at ¶ 13. Caudill was one of the lead contributors to the SGH Report, and TKC was a subcontractor at JBHPH from January 2022 and November 2025.

Caudill led the team that implemented the recommendations that were made in the SGH Report. See id. at ¶¶ 14-15.

115. By stipulation of the parties, this Court found Caudill qualified to give expert testimony in the following areas: operations of oil and gas facilities, including operational reliability, training, maintenance, compliance, and monitoring; OSHA PSM elements; and industry standards for oil and gas facilities. [Day 2 Trans. at 31-32.]

116. Caudill opined that there is no ongoing release of fuel into Pu`uloa or Hālawa Stream, and there is no reasonable likelihood that releases from the Facility's fueling operations into Pu`uloa or Hālawa Stream will recur. See Caudill Decl. at ¶ 99.

117. Caudill acknowledges that the potential for a future fuel release from the Facility cannot be eliminated in its entirety, but he opines that "the Navy's efforts to prevent and mitigate future risk extensive efforts to prevent and mitigate future risks have been comprehensive and consistent with (and often more than) standard industry practice." Id. at ¶ 100; see also id. at ¶ 120 (opining that there is minimal risk of discharges to Pu`uloa or Hālawa Stream, and "that risk is no greater than other systems of similar age and size in the industry").

118. Caudill opined that the Fuels Department's and JBPHH's current efforts regarding training, the use of OPORDs, maintenance, tracking of compliance and other actions, process hazard analysis, root cause investigations, and MOC/PSSR processes are consistent with OSHA PSM standards and best practices in the industry. See Caudill Decl. at ¶¶ 42, 48, 57, 78, 82, 87, 96; see also Day 2 Trans. at 81-82 (Caudill's testimony that the Facility is currently operating in a manner consistent with OSHA standards and industry standards).

119. According to Caudill, the Facility now has "a rigorous management system and ensured operational reliability and a reduced risk of fuel release at the Facility." See id. at ¶ 97.

120. Part of the basis for Caudill's conclusion that there is no reasonable likelihood of future discharges is the implementation of OSHA PSM standards and all of the repairs that have been completed at the Facility. See Day 2 Trans. at 41.

**121. Relative Weight** - Because Bencs does not have first-hand knowledge about Facility infrastructure or operations either at the time that this action was filed or at the time of trial, this Court finds that Bencs's testimony is not relevant.

122. Pasco provided knowledgeable, first-hand testimony about the current operations at the Facility. This Court finds his testimony to be credible and persuasive.

123. Dr. Rogers is not an engineer, see Day 1 Trans. at 28, 35, nor is he an API certified inspector, see id. at 58. Further, he has limited experience that is relevant to the infrastructure at, and the operation of, military fuel facilities. See *supra* ¶¶ II.E.105.b-c.

124. In contrast, Summers gave expert testimony regarding, *inter alia*, structural engineering and the assessment of the integrity of petrochemical facilities, see Day 2, Trans. at 85-86, and Caudill gave expert testimony regarding the operations of oil and gas facilities and the industry standards applicable to such facilities, see id. at 31-32. Further, they have far more experience with the Facility and similar operations than Dr. Rogers has. This Court has therefore given more weight to Summers's and Caudill's testimony than Dr. Rogers's testimony.

## III. CONCLUSIONS OF LAW

### A. Clean Water Act Statutory Framework

> The Clean Water Act provides a comprehensive scheme "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Gwaltney [of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.], 484 U.S. [49,] 52, 108 S. Ct. 376 [(1987)] (quoting 33 U.S.C. § 1251(a)). To meet this goal, the Act prohibits "the discharge of any pollutant" into navigable waters unless expressly authorized. 33 U.S.C. § 1311(a). The Environmental Protection Agency ("EPA") or a State (with EPA approval) may authorize the discharge of pollutants into navigable waters through a[ National Pollutant Discharge Elimination System] permit. See id. § 1342(a)-(b).

> The Act includes a citizen suit provision that authorizes a citizen to commence a civil action "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation." 33 U.S.C. § 1365(a). The citizen plaintiff must have "an interest which is or may be adversely affected" by the defendant. Id. § 1365(g). . . .

Coastal Env't Rts. Found. v. Naples Rest. Grp., LLC, 158 F.4th 1052, 1058 (9th Cir. 2025) (some alterations in Coastal Env't Rts.). The preponderance of the evidence standard applies when a Clean Water Act citizen suit proceeds to trial. See Sierra Club, Inc. v. Granite Shore Power LLC, 706 F. Supp. 3d 257, 269-70 (D.N.H. 2023) (citing Carr v. Alta Verde Indus., Inc., 931 F.2d 1055, 1064 (5th Cir. 1991) (once a citizen suit under the CWA proceeds to trial, the court must "actually decid[e] the issue[s] based on a preponderance of the evidence.")).

1. Plaintiffs allege the Navy has violated, and is engaged in ongoing and continuous violations of, Section 301(a) of the Clean Water Act, *i.e.*, Title 33 United States Code Section 1311(a). See, e.g., Third Amended Complaint at ¶¶ 434-36.

2. Plaintiffs have standing to pursue their Clean Water Act claim. See Trial Stipulations at ¶ 3;[21] see also Order

[21] In addition, Plaintiffs submitted testimony by some of the individual Plaintiffs. See Written Testimony of Peter Doktor, filed 2/24/26 (dkt. no. 292); Written Testimony of Jade (. . . continued)

Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment, filed 7/31/25 (dkt. no. 219), at 20-21.[22]

a. The ruling that Plaintiffs have standing to pursue their CLEAN WATER ACT claim only required a conclusion that Plaintiffs made "a good-faith **allegation** of continuous or intermittent violation" at the time the action was filed. See Gwaltney, 484 U.S. at 64 (emphasis added).

3. Because of Section 1365's "'in violation'" requirement, "the citizen-suit provision only authorizes suits to abate **ongoing** or **future** violations — it "does not permit citizen suits for wholly past violations.'" Coastal Env't Rts., 158 F.4th at 1058 (quoting Gwaltney, 484 U.S. at 64, 108 S. Ct. 376).

4. The parties disagree about what point this Court looks at whether it determines if there are ongoing violations. Compare Pltfs.' Closing at 13 ("A plaintiff must demonstrate ongoing violations, at the time the complaint was filed . . . ."), with Defendants' Post Trial Brief ("Defs.' Closing"), filed 7/3/26 (dkt. no. 363), at 6 ("This Court's

Frank, filed 2/24/26 (dkt. no. 293); Written Testimony of Steven Hanaloa Helelā, filed 2/24/26 (dkt. no. 294); Written Testimony of Kalamaoka`aina Niheu, filed 2/24/26 (dkt. no. 295).

[22] The July 31, 2025 Order is also available at 2025 WL 2201066.

inquiry as to whether Defendants are 'in violation of' the CWA should be based on whether Plaintiffs proved there are ongoing violations or a reasonable likelihood of recurrence of past discharges at the Facility at the time of trial . . . .").

5. This Court agrees with Plaintiffs that, at trial, the relevant date is when Plaintiffs filed this action.

> By the conclusion of trial, a citizen plaintiff must "prove the existence of ongoing [CWA] violations or the reasonable likelihood of continuing future violations to prevail on the merits of a citizen enforcement action." Sierra Club v. Union Oil Co. of Cal., 853 F.2d 667, 670 (9th Cir. 1988) (citing Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 66 (1987)). "[A] citizen plaintiff may prove ongoing violations either (1) by proving violations that **continue on or after the date the complaint is filed**, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." . . .

Coastal Env't Rts. Found. v. Naples Rest. Grp., LLC, Case No. 2:21-cv-09172-MCS-JEM, 2023 WL 8872050, at *9 (C.D. Cal. Mar. 15, 2023) (brackets in Coastal Env't Rts.) (emphasis added).

a. This district court has stated:

> In assessing whether there are "ongoing violations," a court may consider any remedial actions taken by the defendant and "any other evidence presented during the proceedings that bears on whether the risk of defendant's continued violation had been completely eradicated **when the citizen plaintiffs filed suit**." [Sierra Club v. Union Oil], 853 F.2d at 671. Significantly, the court's assessment of the

> likelihood of future violations should begin with the date on which the complaint was filed; **the court is not to view the likelihood of continuing violations from its present vantage-point.** Chesapeake Bay Foundation v. Gwaltney, (Gwaltney III) 890 F.2d 690, 693 (4th Cir.1989) (finding that proper point for which to assess the likelihood of continuing violations is not the present, with its advantage of hindsight, but the time of the original suit); Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1134–35 (11th Cir. 1990) (stating that the court must always look to the date the complaint was filed).

Save Our Bays & Beaches v. City & Cnty. of Honolulu, 904 F. Supp. 1098, 1116–17 (D. Hawai`i 1994) (emphases added) (footnote omitted).

b. Defendants argue that the time-of-filing inquiry only applies in cases like Save Our Bays & Beaches and Atlantic States Legal Foundation where civil penalties are at issue and, here, where only injunctive relief is at issue, the time of trial must be considered. See Defs.' Closing at 6-7 & n.3. That argument is based on the theory that a claim for civil penalties can continue even after a claim for injunctive relief becomes moot. See, e.g., Save Our Bays, 904 F. Supp. at 1119 ("In Clean Water Act cases, the mooting of injunctive relief does not moot a plaintiff's prayer for civil penalties and thus does not moot the case as a whole." (citing cases)). Since that time, the Ninth Circuit has rejected that theory and expressly declined to follow the line of cases from other circuits, including the

Eleventh Circuit's Atlantic States Legal Foundation case. See Coastal Env't Rts., 158 F.4th at 1061-64.

c. Defendants also argue the time of trial must be considered because, if injunctive relief is awarded, it must address present and future conditions. [Defs.' Closing at 7-9.] However, that is an issue of remedy that must be considered separately from liability. The timing related to the remedy analysis is not seen in the Coastal Environmental Rights appellate and district court decisions because the trial court bifurcated the trial on liability from a subsequent remedy phase. See Coastal Env't Rts. Found. v. Naples Rest. Grp., LLC, Case No. 2:21-cv-09172-MCS-JEM, 2023 WL 2559193, at *7 (C.D. Cal. Jan. 20, 2023). The remedy phase was never held because the case was dismissed as moot after the appeal. See Coastal Env't Rts. Found. v. Naples Rest. Grp., LLC et al., Case No. 2:21-cv-09172-MCS-JEM, Order and Judgment Dismissing Case as Moot, filed 12/3/25 (dkt. no. 148). It is not necessary to reach the remedy analysis in this case because of this Court's ultimate conclusion that Plaintiffs' Clean Water Act claim is moot. See *infra* Section III.C.

6. Thus, in order to carry their burden of proof, Plaintiffs must establish that, at the time they filed the original Complaint, the Facility was "in 'a state of either continuous or intermittent violation' so that 'a reasonable

likelihood [existed] that [Defendants would] continue to pollute in the future.'" See Coastal Env't Rts., 158 F.4th at 1058 (quoting Gwaltney, 484 U.S. at 57, 108 S. Ct. 376).

7. Even if Plaintiffs make that showing, Defendants would be entitled to judgment in their favor if they establish that Plaintiffs' Clean Water Act claim is now moot. In order to do so, Defendants "'must demonstrate that it is **absolutely clear** that the allegedly wrongful behavior could not reasonably be expected to recur.'" See id. (some citations and internal quotation marks omitted) (quoting Gwaltney, 484 U.S. at 66, 108 S. Ct. 376).

**B. Plaintiffs' Burden of Proof**

8. "To establish a violation of the CWA, a plaintiff must prove that defendants (1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source." Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser, 945 F.3d 1076, 1083 (9th Cir. 2019) (citation and internal quotation marks omitted).

a. Fuel is a type of pollutant for purposes of the Clean Water Act. See Trial Stipulations at ¶ 2; see also 33 U.S.C. § 1362(12)(A).

b. Pu`uloa and Hālawa Stream are navigable waters and waters of the United States for purposes of the Clean Water

Act. See Trial Stipulations at ¶ 1; see also 33 U.S.C. § 1362(7).

c. A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The point source definition is interpreted broadly. Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy, 305 F.3d 943, 955 (9th Cir. 2002). However, the Facility does not include vessels in Pu`uloa. See Day 1 Trans. at 55 (Dr. Rogers's testimony).

**9. Ongoing Violations** - The Hotel Pier Release was not an ongoing discharge when Plaintiffs filed this action. See Trial Stipulations at ¶ 4; see also Order Denying Defendants' Motion for Summary Judgment, filed 9/29/25 (dkt. no. 244) ("9/29/25 Order"), at 23-24.[23]

10. The Kilo Pier Release was not an ongoing discharge when Plaintiffs filed this action. See Trial Stipulations at ¶ 5; see also 9/29/25 Order, 2025 WL 2784456, at *9.

11. The record does not include any evidence that the Navy was responsible for an ongoing discharge of fuel into Pu`uloa or

[23] The 9/29/25 Order is also available at 2025 WL 2784456.

Hālawa Stream at the time that this action was filed. Plaintiffs' reliance on the Spill Spreadsheet addresses Defendants' mootness argument, and Plaintiffs have not identified any incidents on the Spill Spreadsheet that they argue establish an ongoing CLEAN WATER ACT violation at the time that this action was filed. See Pltfs.' Closing at 17-19.

12. This Court concludes that Plaintiffs have not established that there was an ongoing Clean Water Act violation at the time that this action was filed.

**13. Intermittent Violations** – Plaintiffs argue that, as of the time of filing, the Navy's prior Clean Water Act violations at the Facility were reasonably likely to recur. See id. at 19; see also Coastal Env't Rts., 158 F.4th at 1058 (stating that one type of CWA citizen suit alleges an intermittent violation where there is "a reasonable likelihood . . . that the defendant will continue to pollute in the future" (brackets, quotation marks, and citation omitted)).

14. The reports evaluating the Facility and Red Hill as a whole following the Hotel Pier Release and the Kilo Pier Release address the condition of the Facility at the time that this action was filed on June 14, 2022.

15. The SGH Report, which was issued in April 2022, included a number of pre-defueling measures. Although most did not address the Facility, one of the pre-defueling measures

required the Navy to address the PVC reclamation line below Hotel Pier. See Summers Decl. at ¶ 23.c; see also Joint Exh. 2 (SGH Report), App'x A.1 (Site Visit Observations and Recommendations (Sorted by Location)) at 30, Item HP-14 ("replace PVC with appropriate materials," severity H, priority D1, to be completed "[a]s soon as practicable").[24] Although the PVC line was not replaced prior to defueling,[25] SGH confirmed that the PVC line was tested before defueling to confirm that it was water-tight. It also passed water-tightness testing in 2024. See Summers Decl. at ¶ 32.c.

16. The November 2022 Austin Brockenbrough Report covered a period from August 7, 2022 to August 22, 2022. [Joint Exh. 10 (Austin Brockenbrough Report) at NAVY-0070365.] The Austin Brockenbrough Report identified some repairs as urgent and referred to them as "Defuel Mandatory Repairs." See id. at 16. The Facility components that required those repairs "failed a fitness for service evaluation" and "represent[ed] an immediate/major risk to personnel safety and/or the

---

[24] In Appendix A.1, "HP" referred to Hotel Pier, "H" referred to high severity, and "D1" referred to a defueling priority. See Joint Exh. 2 (SGH Report), App'x A.1 at NAVY_0004938 (appendix cover sheet).

[25] While SGH was providing support during the defueling process, the Navy informed SGH that an upcoming construction project would include the replacement of the PVC line with a steel line. See Summers Decl. at ¶ 32.c.

environment." See id. Further, those repairs were "critical to the hydraulic and/or structural integrity of the piping system." [Id.] One of the urgent repairs identified in the Austin Brockenbrough Report was the replacement of deficient boot seals at the joints in Hotel Pier's concrete deck. See *supra* ¶¶ II.D.40.b.

17. Summers, who was SGH's Principal-in-Charge of the assessment that led to the SGH Report, [Summers Decl. at ¶ 6,] testified that there were significant improvements to Hotel Pier prior to defueling as a result of SGH's assessment, including the replacement of boot seals, replacement of the risers, replacement of TRVs, and installation of the TRVs in the preferred vertical position. See Day 3 Trans. at 53-54.

18. Summers testified that, hypothetically, it would have been safe to conduct defueling even without all of the recommendations that SGH made, but SGH determined that "it would be advisable to perform those recommendations before defueling." See id. at 59-60. Summers asserted that the completion of those recommendations made defueling "safer." See id. at 59. Although this Court has found Summers qualified to give expert testimony and found Summers's testimony in general to be credible and persuasive, Summers's opinion that the defueling of the Red Hill USTs would have been safe even without the completion of the pre-defueling recommendations is not credible because it is

contradicted by the record in this case, which establishes the extensive nature of the pre-defueling repairs and improvements.

19. Pasco acknowledged that TRVs "are important because when temperatures in the piping increase, pressure increases," and TRVs protect the pipeline by allowing the fluid to travel into another section or back into the associated storage tank. [Pasco Decl. at ¶ 41.] Pasco also acknowledged that problems with TRVs were first identified in 2010 and were identified again in 2015 and 2023. See Day 1 Trans. at 172. When asked how monthly inspections of the TRVs and the FAMMS inspection program failed to discover problems with the TRVs in 2010, 2015, and 2023, Pasco responded: "I don't think the FAMMS system was that robust in 2010, 2015, you know, those previous years. Since we've increased the inventory of assets into FAMMS, we've been able to identify all of these items and components and get them -- get their maintenance programmed into FAMMS . . . ." [Id. at 185.] As previously noted, the FAMMS inventory was significantly increased in 2024. See *supra* Paragraph II.D.89.b.

20. Pasco did not know exactly when the maintenance requirements for TRVs were entered in FAMMS. He testified that TRVs were part of the monthly print out since he started working with the Fuels Department in December 2020, but that the 2023 IMP may have identified problems with TRVs because not all TRVs were part of the FAMMS inventory at that time, resulting in a

failure to identify calibration issues. See Day 1 Trans. at 186-86. Pasco acknowledged that, if a component is not in the FAMMS inventory, it is not likely to be maintained. See Day 2 Trans. at 24.

21. Pasco also acknowledged that the Car Seal program, which included a master index of every active TRV, was initiated in late 2023 or early 2024, see Day 1 Trans. at 187; Day 2 Trans. at 26, and the Pressure Control SOP was adopted in 2024, but he did not know the exact date, see Day 1 Trans. at 189-90.

22. Pasco also agreed with a statement in the 2023 IMP that threaded fittings can be a leak point in a fuel system, and he agreed with a finding in the 2023 IMP that some fittings were showing signs of leaking in 2023. They were replaced some time in 2024, but Pasco did not know the exact date. See Day 1 Trans. at 180-81.

23. Caudill agreed with the 2023 IMP that closed systems that do not have thermal relief assemblies may have high pressure levels due to thermal expansion, which risks damaging the fuel system. See Day 2 Trans. at 65. Caudill testified that the conditions that were noted in the 2023 IMP would have shown a risk that fuel products would be discharged into Pu`uloa during defueling, but most those conditions were addressed before defueling commenced in October 2023. See id. at 65-66.

24. Caudill states that, before the defueling process started in 2023, "the Navy conducted extensive repairs, developed OPORDs, and conducted intensive training to prepare the Facility and the Fuels Department personnel to safely defuel the 104 million gallons of fuel from Red Hill." [Caudill Decl. at ¶ 106.]

25. During the same period when this action was filed, significant infrastructure repairs and changes to the Facility were found to be necessary, or at least advisable, before the defueling of Red Hill commenced, and those repairs and changes were made before defueling started in November 2023. Considering the condition of the Facility's infrastructure before those repairs and changes were made, this Court concludes that Plaintiffs have established, by a preponderance of the evidence, that, at the time of filing, there was a reasonable likelihood that a fuel release to Pu`uloa or Hālawa Stream would occur in the future.

## C. Defendants' Burden of Proof

**26. Ongoing Violations** - Summers and Caudill opined that, at the time of trial, there was no ongoing fuel release at the Facility into either Pu`uloa or Hālawa Stream. See Summers Decl. at ¶ 42; Caudill Decl. at ¶ 99.

27. Plaintiffs argue that "any unpermitted discharge of petroleum product from the Facility to Pearl Harbor shows

ongoing or intermittent violations." [Pltfs. Closing at 19.] They contend that the Navy's self-reported discharges listed in the Spill Spreadsheet reflect discharges from the Facility after the filing of this action and establish ongoing or intermittent violations. See id. at 18-19.

28. There is insufficient information in the record regarding the June 26, 2024 spill and the August 20, 2024 spill to support a finding that there are ongoing violations at the Facility.

a. The spiller for the June 26, 2024 spill is unknown, and the spill may have come from the USS Carl Vincent. See Pltfs.' Exh. 46 (Spill Spreadsheet) at 2. As noted *supra* Section III.B.8.c, vessels in Pu`uloa are not considered part of the Facility. Thus, if the vessel caused the June 26, 2024 spill, it would not constitute a Clean Water Act violation by the Navy.

b. The August 20, 2024 spill was attributed to JBPHH. See Pltfs.' Exh. 46 (Spill Spreadsheet) at 2. However, one spill incident is insufficient to establish an ongoing Clean Water Act violation.

c. Even if the June 26, 2026 spill was attributed to the Navy, two spill incidents that occurred more than a year prior to the trial date would not establish ongoing violations at the time of trial.

29. This Court previously found that that there was a genuine issue of material fact for trial "as to whether the leaking collar near the truck-fueling station constitutes an ongoing discharge for purposes of the CWA." 9/29/25 Order, 2025 WL 2784456, at *10. However, at trial, Plaintiffs conceded that they were not alleging that any fuel that leaked from the collar reached navigable waters. See Day 3 Trans. at 17-18. Thus, even if this Court accepted Plaintiffs' characterization of the collar as leaking fuel, it does not constitute an ongoing violation of the CLEAN WATER ACT.

30. This Court concludes that, at the time of trial, there was no ongoing fuel release from the Facility into Pu`uloa or Hālawa Stream.

**31. Intermittent Violations** - Summers and Caudill also opined that, as of the time of trial, fuel releases at the Facility into either Pu`uloa or Hālawa Stream were not reasonably likely to recur. See Summers Decl. at ¶ 42; Caudill Decl. at ¶ 99.

32. Rogers opined that future releases at the Facility are virtually certain because of what he opines are deficiencies in the Facility's infrastructure and the Facility's operations. See, e.g., Rogers Testimony at pg. 51; Day 1 Trans. at 59-62, 66.

33. The active pipelines at Hotel Pier and Sierra Pier passed their most recent annual pressure testing. See Trial Stipulations at ¶ 20. The active pipelines, with the exception of one portion where a minor seep was identified, passed their most recent leak detection testing, and the portion that did not pass leak detection testing passed the subsequent pressure testing. See Pasco Decl. at ¶¶ 33, 54. Further, according to the most recent Car Seal monthly audit, all of the pressure relief valves in the active parts of the Facility's fueling system are working. The audit includes checking calibration, identification tags, and making sure the valves are installed in the horizontal position. See Day 2 Trans. at 9 (Pasco testimony). Since Pasco became the Supervisory General Engineer in June 2023, there have not been any problems with thermal pressure management, and the Navy plans to address all remaining findings from the thermal relief study. The remaining findings have not already been addressed because they relate to parts of the Facility that are out-of-service. This includes adding new thermal relief assemblies and replacing certain existing assemblies. See id. at 9-10.

34. Outstanding repairs and improvements to the active portions of the Facility are being addressed in a reasonable manner. For example, at the time of trial, the PVC pipe in the Hotel Pier reclamation line was still being used, but there is a

project in place to replace it. See Day 2 Trans. at 134 (Summers's testimony). The project is "probably a MILCON project, because it would be a significant cost to replace that line with a metal line." [Id.]

a. As another example, Summers agreed that the Austin Brockenbrough Report's recommendation to address areas where fuel pipelines are in contact with the ground was a good recommendation and good practice, but he opined that it was not an urgent recommendation. Where the pipe was inspected and any corrosion is minimal, there would be no required timeline to remove the ground contact, which is considered a long-term repair. See Day 3 Trans. at 38-41; see also Joint Exh. 10 at NAVY_0070442 (sealed image).[26]

b. Although Plaintiffs have pointed to the fact that the Defuel Line had not been removed by the time of trial, Summers testified that "[t]here is no requirement to . . . remove out-of-service components," and he has "seen hundreds of storage tanks and associated piping at refineries and petrochemical facilities around the world that have not been removed." [Summers Decl. at ¶ 62.]

---

[26] The image was among the content in Joint Exhibit 10 that was redacted from the publicly available version. An unredacted version of the exhibit was filed under seal. See generally Order on the Use of Defense Critical Infrastructure Security Information (DCRIT) at Trial, filed 3/19/26 (dkt. no. 319).

35. Dr. Rogers emphasized that the 2023 OMES indicates that the inactive fueling pipelines, including those at the Bravo Pier, Mike Pier, and Kilo Pier are still capable of providing fuel. See Day 1 Trans. at 77-78, 83, 111. He asserted that they could be put back in operation in the future. See id. at 83. However, Dr. Rogers can only speculate that one or more of these piers will be put back in operation before the necessary repairs and improvements are completed.

36. Pasco testified that the fuel pipelines for Kilo Pier, Mike Pier, and Bravo Pier will remain empty, isolated, and out-of-service until the completion of the necessary repairs and replacements. See Pasco Decl. at ¶ 37. This Court finds that Pasco's testimony on this issue is credible, and there is no evidence indicating that Kilo Pier, Mike Pier, or Bravo Pier will be put back in service before the necessary repairs and replacements are completed.

37. Dr. Rogers opined that "fuel spills, releases, and discharges from the Facility are likely to continue, regardless of the Navy's current and proposed future investment in infrastructure upgrades," because "[w]ithout fundamental improvements in management practices and a centralized tracking system, continued discharges are unavoidable." [Rogers Testimony at pgs. 10-11.] This Court finds that Dr. Rogers's opinion is not credible because he lacks the relevant qualifications and

experience to render this opinion, and this opinion is not supported by relevant industry standards.

38. This Court finds credible Caudill's testimony that: the Navy's current compliance and tracking systems adequately inform the Navy about the status of projects at the Facility; there is a clear line of communication from the Fuels Department to the JBPHH Commander; the Navy's compliance and tracking systems meet industry best practice, even without a single, centralized database; and the decision not to use a single, centralized database for all project tracking at the Facility does not affect the question of whether a future fuel release is reasonably likely. See Day 2 Trans. at 68-69. Further, this Court finds credible Caudill's testimony that the lack of "unified command" model in the Facility's organizational structure does not create a reasonable likelihood that releases will recur. See id. at 77.

39. This Court also finds credible Caudill's testimony that, based on his years of experience at the Facility, "the changes and efforts undertaken have created clear lines of authority, appropriately delegated duties and responsibilities, and communication and collaboration." [Caudill Decl. at ¶ 114.]

40. This Court therefore rejects Dr. Rogers's opinion that the infrastructure improvements at the Facility are insufficient to prevent future fuel releases because of what he believes are

deficiencies in the operational structure and tracking system at the Facility.

41. Defendants have established that, as of the time of trial, there is no reasonable likelihood that the Navy will release fuel from the Facility into Pu`uloa or Hālawa Stream. Further, Defendants have established, by a preponderance of the evidence, "that it is absolutely clear that [Clean Water Act violations cannot] reasonably be expected to recur." See Coastal Env't Rts., 158 F.4th at 1058.

42. This Court therefore concludes that, although Plaintiffs have carried their burden of proof as to their CLEAN WATER ACT claim, Plaintiffs are not entitled to relief in this case because Defendants have established that Plaintiffs' CLEAN WATER ACT claim is now moot.

## IV. ORDER REGARDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

AND NOW, following the conclusion of a bench trial in this matter, and in accordance with the foregoing Findings of Fact and Conclusions of Law, it is HEREBY ORDERED that judgment shall be entered immediately in favor of Defendants as to Plaintiffs' Clean Water Act claim in the Third Amended Complaint for Declaratory Relief and Injunctive Relief, filed June 13, 2024. Judgment on the Clean Water Act claim shall be entered pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. There is no just reason to delay the entry of judgment on the

Clean Water Act claim because the remaining claim in the Third Amended Complaint, Plaintiffs' RCRA claim, remains stayed.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, October 28, 2026.

/s/ Leslie E. Kobayashi

Leslie E. Kobayashi
Senior U.S. District Judge